be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). As its first basis for dismissal, defendants argue that plaintiffs failed to raise with the contracting officer claims for "any fiscal years prior to 1993 or after 2001 . . . ." and also their claim regarding the defendants' alleged breach of "the implied covenant of good faith and fair dealing . . . [,]" these claims must therefore be dismissed for lack of subject matter jurisdiction due to plaintiffs' failure to exhaust this jurisdictional requirement of the CDA.[8] Defs.' Mem. at 23. In opposition, plaintiffs concede that claims for fiscal years prior to 1995 are not properly before the Court, Pls.' Opp'n at 13,[9] however, they argue that "the content of their notices were sufficient to raise all the claims presented in the Second Amended Complaint." Id.

In its initial claim letter to the contracting officer dated April 2, 2001, plaintiff Tunica-Biloxi claimed it was entitled to compensation dating back to fiscal year 1996 through fiscal year 2001. Exhibits in Support of Defendants' Motion to Dismiss ("Defs.' Ex.") B (Tunica-Biloxi Contract Dispute Claim dated April 2, 2001). In its second claim letter dated September 27, 2001, Tunica-Biloxi claimed amounts it was owed for fiscal year 1995. Defs.' Ex. C (Tunica-Biloxi Contract Dispute Claim dated September 27, 2001). Plaintiff Ramah's contract dispute claim was filed with the IHS on August 31, 2001, and it "relate[d] to fiscal year[s] 1993 through 1996." Defs.' Ex. E (Ramah

---

[8]Defendants concede that plaintiffs' claim for breach of trust was not subject to the CDA's exhaustion requirement. Defs.' Mem. at 21 n.12. Therefore, the Court need not address that claim in this section of the opinion.

[9]The CDA requires that all claims "be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 605(a). Plaintiffs concede that claims relating to years prior to fiscal year 1995 (which began October 1, 1994, and extended to September 30, 1995) are "outside the claims[]" they may pursue before the Court. Pls.' Opp'n at 13. The Court will limit plaintiffs' request for relief accordingly.

Contract Dispute Claim dated August 31, 2001) at 1 n.1. Neither Tunica-Biloxi's or Ramah's administrative claims addressed claims for fiscal years after 2001; indeed, Ramah's claims ended at 1996. In addition, neither of the plaintiffs' administrative claims explicitly raised the argument made in claims one and two of the second amended complaint, namely, that the Secretary has breached "the implied covenant of good faith and fair dealing" by failing "to request [that] Congress . . . [provide] sufficient appropriations . . . ." Compl. ¶¶ 36, 40.

In the CDA, Congress has provided a limited waiver of sovereign immunity for suits against the government. SMS Data Products Group, Inc. v. United States, 19 Cl. Ct. 612, 614 (Cl. Ct. 1990) (citations omitted). As a prerequisite to filing a suit pursuant to the CDA, section 605(a) requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (emphasis added). "Compliance with these requirements is a jurisdictional prerequisite to the filing of a complaint under the CDA." Foley Co. v. United States, 26 Cl. Ct. 936, 944-45 (Cl. Ct. 1992) (citations omitted), aff'd 11 F.3d 1032 (Fed. Cir. 1993); SMS Data, 19 Cl. Ct. at 615 ("The [CDA's] limitations on the waiver of sovereign immunity necessarily restrict the jurisdiction of this court."). The administrative filing requirement serves an important purpose: "Congress required contractors to file all claims with the contracting officer to provide the Government with an opportunity to settle the case or otherwise avoid unnecessary litigation." SMS Data, 19 Cl. Ct. at 614. Thus, the CDA's clear language that

> '[a]ll claims . . . shall be submitted to the contracting officer for a decision[,]' . . . does not permit claims discovered after an initial decision to escape contracting officer review. The Act exempts no claims from

> contracting officer review. Upon discovery of a new claim, a contractor must submit it to the contracting officer.

Id. at 616 (emphasis in original and emphasis added); see also Johnson Controls World Services, Inc. v. United States, 43 Fed. Cl. 589, 592 (Fed. Cl. 1999) ("A valid final decision by the contracting officer is thus 'a 'jurisdictional prerequisite' to further legal action thereon.'") (citation omitted).

As indicated, plaintiffs argue that "their notices were sufficient to raise all the claims presented in the Second Amended Complaint." Pls.' Opp'n at 13. They rely on the Foley decision as support for the proposition that as long as "the claims arise from the 'same set of operative facts' as those presented to the contracting officer for decision[,]" the claims are properly before the Court. Id. (citing Foley, 26 Cl. Ct. at 945). The Court agrees that "[i]If the complaint brought [in this Court] is based on the same set of operative facts underlying the claim presented to the contracting officer, then this court has jurisdiction under the CDA." Cerberonics, Inc. v. United States, 13 Cl. Ct. 415, 417 (Cl. Ct. 1987). Thus, in determining whether compensation requested for those years not presented to the contracting officer can be brought to this Court because they are "based on the same set of operative facts[,] . . . [t]he critical test . . . [is] whether the scheme of adjudication prescribed by the CDA is undermined by the [tribes'] claim [it has filed in this Court] --that is, by circumventing the statutory role of the contracting officer to receive and pass judgment on the [tribes'] entire claim." Id. at 418.

In Cerberonics, the court concluded that it had jurisdiction over a claim that had not been presented to the contracting officer because it was based on the same

operative facts as the administrative claim presented to the contracting officer. Id. There, the plaintiff had presented an administrative claim to the contracting officer for the sum of $36,120, which the plaintiff described as "'a fair and equitable fee to cover (1) finance charges . . . as well as (2) [the plaintiff's] successful efforts to obtain the best available price.'" Id. at 416. After the contracting officer denied its claim, the plaintiff filed a complaint in the United States Claims Court, in which it also sought to recover $36,120, but justified recovery in this identical amount on grounds expressed differently than those articulated in the administrative claim to the contracting officer. Id. at 417. In holding that the complaint was based on the same operative facts as the administrative claim that had been submitted to the contracting officer, the court noted that "[p]laintiff's action in this court, in the identical sum of $36,120, admittedly is not couched in exactly the same language as the claim presented to the contracting officer." Id. at 418. However, the court stated that "neither the language of plaintiff's complaint nor its explanation of this action in accompanying briefs . . . indicate that it is based on a different set of operative facts or seeks different categories of relief." Id. The court read plaintiff's complaint as "augment[ing] the legal theories underlying its claim[,]" and concluded that this did "not change the essence of that claim, i.e., that plaintiff is entitled, based on its contractual relationship with defendant, to compensation of $36,120 for the procurement of services and late payment penalty . . . ." Id. at 419.

A similar issue, albeit resolved differently, was addressed by the court in Johnson Controls. There, defendant United States sought to assert a counterclaim before the court that had not been presented to the contracting officer in a contract

dispute arising under two contracts. This raised an issue similar to the dispute in Cerberonics because pursuant to the CDA, "[a]ll claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer." 41 U.S.C. § 605(a). The United States in Johnson Controls submitted that its counterclaims, inter alia, arose "from the same operative facts underlying the claim in the contracting officer's final decision," and thus argued that the court had jurisdiction over the counterclaims. 43 Fed. Cl. at 594. In holding that the claim did not arise from the same set of operative facts as that aspect of the counterclaim at issue, the court held that the contract officer's claim for $54,923,068 and the defendant's counterclaim for the same amount arose from the same operative facts. However, the court also held that to the extent the defendant was claiming that its counterclaim for $54,923,068 was the same as the contract officer's claim for $1,192,254, the claims, although based on the same legal theory, sought different relief based on a different set of operative facts. Id. Thus, although the defendant's counterclaims were "based on the same legal theory, but [sought] vastly different relief based on a different set of operative facts[,]" the court held that the counterclaims could not be entertained. Id. at 595. Notably, the court also held that a second counterclaim, in which the defendant sought $845,429 and which the plaintiff conceded was based on the same operative facts, could not be raised because it had not been presented to the contracting officer. Id.

______The case now before the Court is more akin to Johnson Controls than to Cerberonics. Here, the amount of indirect contract costs awarded for each fiscal year is not identical due to increases in the prices for services and the nature of the services each tribe has contracted to receive. The precise amount of money allegedly due for

each of the fiscal years after 2001 (or after 1996 for Ramah) are not known and have never been presented to the contracting officer for decisions on their validity. Thus, although "each is based on the same legal theory, . . . [each] seeks . . . different relief based on a different set of operative facts[,]" Johnson Controls, 43 Fed. Cl. at 595, since the mathematical calculation for each fiscal year varies. The record demonstrates that plaintiffs would not be seeking the same amount of recovery for the fiscal years not presented to the contracting officer, as they have sought varying amounts for each of the fiscal years that were presented to the contracting officer. See, e.g., Defs.' Ex. B (Tunica CDA claim in which the tribe sought $48,869 for fiscal year 1996; $45,001 for fiscal year 1997; $56,854 for fiscal year 1998, etc.); Defs.' Ex. E (Ramah CDA claim in which Ramah sought $13,028 for fiscal year 1993; $12,075 or fiscal year 1994; $68,644 for fiscal year 1995; and $52,163 for fiscal year 1996). Therefore, these non-submitted claims should have been presented to the contracting officer in the first instance. Johnson Controls, 43 Fed. Cl. at 592 ("A valid claim must give adequate notice by specifying the basis and amount of liability.") (citation omitted) (emphasis added).

Having concluded that the claims do not arise from the same operative facts, the Court must address plaintiffs' argument that their claims can still be salvaged under "[t]he enlarged claim doctrine." Pls.' Opp'n at 17; see also Johnson Controls, 43 Fed. Cl. at 594. This doctrine permits the Court to exercise jurisdiction over "an increase in the amount of the claim [that had been presented to the contracting officer] if (1) the party requesting the increase neither knew nor reasonably should have known of the factors justifying the increase prior to issuance of the final decision, and (2) the increase

is based on the same operative facts." Id. (citation omitted). The justification for this doctrine is that

> [t]he Disputes Act does not bar plaintiff[s] from seeking an amount of damages that exceeds the quantum in the claim to the contracting officer. The excess quantum must, however, spring from the same certified claim. Plaintiff[s] may not seek damages for a new claim - a claim not yet submitted to and decided by the contracting officer.

SMS Data, 19 Cl. Ct. at 615 (citations omitted) (emphasis). Clearly, however, this doctrine cannot be used to salvage plaintiffs' claims here because, as stated previously, the Court concludes that each claim involving different fiscal years involve different facts, which results in different amounts being claimed by each plaintiff for each fiscal year. Therefore, plaintiffs were required to submit these claims to the contracting officer. Thus, the Court will dismiss the plaintiffs' claims for payments in those years for which payments are sought before fiscal year 1995 and after fiscal year 2001.

Regarding the plaintiffs' claim that the defendants breached the "implied covenant of good faith and fair dealing" by failing to request from Congress "sufficient appropriations to meet [the ISDA] obligations[,]" the Court finds that this claim did not have to be presented to the contracting officer. This claim is merely an alternative theory upon which plaintiffs seek relief; they are not seeking additional money pursuant to this theory, but merely advance it as an alternative basis for obtaining judgment in their favor. The CDA's de novo review "permits the introduction of new facts and/or legal theories in support of the original claim." Cerberonics, Inc., 13 Cl. Ct. at 418 (footnote omitted). For example, in Foley, the government sought to assert a counterclaim and a defense against the plaintiff that had not been presented to the

contracting officer. Foley, 26 Cl. Ct. at 939. The court stated that "whether [a] claim . . . constitutes a new claim for the contract balance is whether the two issues are based on the same set of operative facts." Foley, 26 Cl. Ct. at 945. The court noted that while it was "clear" that a counterclaim had to be presented to the contracting officer for a final decision before it could be pursued in court, "[w]ith respect to defenses, however, there could be some doubt as to whether the requirement to have 'claims' decided by a contracting officer bars the government from asserting new defenses in the Claims Court." Id. at 940. The court concluded that "where the so-called 'defense' is the government's justification for withholding the contract price, it is settled that the case presents a government claim, not a contractor claim." Id. (citation omitted). Therefore, because the government sought to withhold money from the contractor based on its defense, the court held that "the 'defense' should have been the subject of a decision by the contracting officer.'" Id.

Here, plaintiffs do not seek any additional sums of money based on the defendants' alleged breach of the implied covenant of good faith and fair dealing, but merely assert this position as an alternative theory to obtain recovery of the amounts they sought from the contracting officers. As such, these "claims" will not be dismissed. See Cerberonics, Inc., 13 Cl. Ct. at 418 (holding that the court had jurisdiction over plaintiff's claim where plaintiff sought "the identical sum" he sought before the contracting officer, despite the fact that the claim was "admittedly not couched in

exactly the same language as the claim presented to the contracting officer. . . .").[10]

**(3) Defendants' Mootness and Standing Challenges**

Next defendants attack the complaint on the grounds of mootness and lack of standing.[11] Specifically, defendants argue that plaintiffs' claims for years in which lump sum appropriations[12] were made are moot because these appropriations have lapsed, and that plaintiffs do not have standing to challenge the amounts they received after fiscal year 1996 since neither plaintiff has negotiated indirect cost rates for those years after 1996. For the reasons set forth below, the Court declines to dismiss plaintiffs' claims on the grounds of mootness, and will order limited discovery and supplemental briefing concerning whether or not the plaintiffs' claims are moot and whether they have standing to challenge the indirect cost rates for those years after 1996.

---

[10]Defendants argue in their reply that "[p]laintiffs have abandoned their claim for breach of the implied covenant of good faith and fair dealing, as they have not responded to [d]efendants' [m]otion on this basis." Defs.' Reply at 22. However, the Court finds that plaintiffs did respond to this argument, although not in significant detail on page 14 of their opposition by arguing that they had properly exhausted their administrative remedies. See Pls.' Opp'n at 14-15 ("Defendants cite failure to notify the contracting officers of the allegation in the complaint of [d]efendants' failure to request appropriations. They contend this failure bars [p]laintiffs from raising this issue in court because it is a 'new' claim. It is not a claim at all; it is a response to the defendant of unavailability of funds raised by the contracting officers.") (citing Foley, 26 Cl. Ct.[ ] at 939, 941-42). Because the claim pertaining to the defendants' alleged breach of the implied covenant of good faith and fair dealing is premised on the defendants' purported duty "to request [from] Congress . . . sufficient appropriations to meet [their ISDA] obligations," Compl. ¶ 36, the Court concludes that plaintiffs adequately defended their inclusion of this theory of recovery in their complaint. Accordingly, it will not be dismissed.

[11]Because of the Court's resolution of the mootness and standing issue, it need not address defendants' argument that plaintiffs' claims are not ripe for failure to obtain a recent rate.

[12]See footnote 6, supra at 4, and footnote 14, infra at 19, for discussions about lump sum appropriations.

A.

First, defendants argue that "[p]laintiffs' claims for monetary relief arising out of the distribution of indirect CSC in fiscal years [1995 - 2001][[13]] are moot because the relevant appropriation has lapsed and there is no other source of funding available for this purpose." Defs.' Mem. at 23. Since there are no funds available to pay plaintiffs, defendants argue plaintiffs' claims for relief are moot.

"Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (citation omitted). Defendants rely on City of Houston v. Department of Housing and Urban Development, 24 F.3d 1421 (D.C. Cir. 1994), in support of their mootness argument. The City of Houston court, in concluding that the city's claim for appropriated funds that had lapsed was moot, held that "[i]t is a well-settled matter of constitutional law that when an appropriation has lapsed or has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation." Id. at 1424. Thus, because the appropriated funds from which the plaintiff sought payment had lapsed, and because "[a]n award of monetary relief from any source of funds other than the . . . appropriation would . . . not be authorized by [the Administrative Procedures Act] . . . [,]" the court held that the city's claim for monetary relief was moot. Id. at 1428.

In opposition to defendants' mootness argument, plaintiffs counter that

---

[13]Originally, defendants directed this argument to fiscal years 1993-2002. Defs.' Mem. at 23. Because the Court has concluded that claims prior to fiscal year 1995 and after fiscal year 2001 are not properly before it, it will assess defendants' arguments only as they pertain to fiscal years 1995 through 2001.

defendants' "lapse of appropriations" position is not relevant for the lump sum years[14] (years prior to fiscal year 1998) because "these sums were in fact legally obligated to [p]lantiff's contracts during the fiscal year in question . . . . " Pls.' Opp'n at 15. Thus, plaintiffs state that they "expect to find the so-called unobligated balances on the books of the IHS." Id. Plaintiffs also note that they had "multi-year or indefinite term contracts[,]" and thus the "methodology carries over from year to year . . . . " Id. at 16. In addition, plaintiffs posit that any monetary relief they could be awarded would be paid "from the Permanent and Indefinite Judgment Fund[,]" and thus the appropriated funds position is irrelevant. Id. Defendants, on the other hand, take exception to all of these arguments and as to the Permanent Judgment Fund position contend that recovery from the Fund "is not available to pay additional indirect CSC[,]" although they concede that "[i]n other contexts, damages under the [CDA] can be paid from the Judgment Fund . . . ." Defs. Mem. at 24.

The Court first concludes that the City of Houston mootness holding is not applicable to the present case. While holding that the plaintiff there could not recover appropriated monies for fiscal years for which the appropriations had lapsed, the City of Houston court's holding was also contingent on the fact that the APA, the statute pursuant to which the suit had been filed, would not permit the recovery of monetary damages, and thus, there was no other legal method by which the plaintiff could be made whole. 24 F.3d at 1428. However, in this case, at least one other court has

[14]In lump sum years, which includes fiscal years 1994-1997, "Congress did not specify directly in the appropriation acts how much IHS could spend on ongoing CSC, but instead made a general appropriation . . . to IHS for Indian [h]ealth [s]ervices, available for one year." Defs.' Mem. at 27. In capped years, Congress "'capped' the amount of funds that IHS could spend on ongoing CSC." Id. at 27 n.16.

directly agreed with plaintiffs' argument and held that a plaintiff's claims for indirect CSC were not moot even for those years for which the relevant appropriations had lapsed. See Thompson v. Cherokee Nation of Oklahoma, 334 F.3d 1075, 1092 (Fed. Cir. 2003).[15]

The situation in Thompson is analogous to this case in many respects. There, the Cherokee Nation of Oklahoma, had "entered into contracts with the Secretary [of Health and Human Services] under the ISDA, to operate" various health related programs "which were formerly operated by the Secretary." Id. at 1081. The tribe filed suit against the Secretary claiming that he had "breached his contracts . . . by failing to pay the full indirect costs of administering . . . the programs for fiscal years 1994 through 1996." Id. at 1079, 1081. In rejecting the Secretary's arguments that the claim for damages was "moot[.] because the case was filed after the close of the relevant fiscal years, and because section 314[16] [of the ISDA] barred payment after the close of the fiscal years[,]" arguments that the defendants make here, the court held that the relevant

[15]The Thompson court acknowledged that its holding directly conflicted with the holdings of the Ninth and Tenth Circuits. See 334 F.3d at 1086 (citing Cherokee Nation of Oklahoma v. Thompson, 311 F.3d 1054, 1066 (10th Cir. 2002) and Shoshone-Bannock Tribes of the Fort Hall Reservation v. Dep't of Health & Human Services, 279 F.3d 660, 668 (9th Cir. 2002)). The Court will address the Tenth and Ninth Circuit opinions, infra at 21.

[16]"Section 314 provides, in relevant part, as follows:

> 'Notwithstanding any other provision of law, amounts appropriated to or earmarked in committee reports for the Bureau of Indian Affairs and the Indian Health Service [. . .] for payments to tribes and tribal organizations for contract support costs . . . are the total amounts available for fiscal years 1994 through 1998 for such purposes . . . .'"

Thompson, 334 F.3d at 1091 (quoting Pub. L. No. 105-277, 112 Stat. at 2681-288).

> issue in th[e] case [before it] under the availability clause, however, [was] whether funds were available for the Secretary to meet his contractual obligations, not whether those funds remain available now. The courts have long entertained breach of contract claims against the government filed after the relevant fiscal years have expired. In such a case, damages are awarded from the judgment fund created by 31 U.S.C. § 1304.

Id. at 1092 (citing Lee v. United States, 129 F.3d 1482, 1484 (Fed. Cir. 1997)). Based on the Thompson court's ruling, the Court cannot conclusively state at this juncture that there would be no alternative source of funds from which defendants could compensate plaintiffs. Unlike City of Houston, the payment of such funds would not violate the statute pursuant to which plaintiffs have filed this action; rather, "[d]amages for breach of contract may be awarded out of the Judgment Fund when payment is not otherwise provided for." Thompson, 334 F.3d at 1093 (citing Lee, 129 F.3d at 1484).

Defendants argue that payment of past year indirect CSC to the plaintiffs would "reward these two [p]laintiffs to the detriment of all other contracting tribes[,]" and thus is not permissible under the District of Columbia Circuit's decision in Ramah Navajo Sch. Bd. v. Babbitt, 87 F.3d 1338 (D.C. Cir. 1996). Defs.' Reply at 16. Ramah does not, as defendants contend, require a different result. The Circuit Court in Ramah held that the "Secretary exceeded the limited scope of his authority in promulgating . . . new allocation rules[,]" that provided that any tribe that submitted its fiscal year 1995 proposal for indirect costs beyond June 30, 1995, would not be eligible for full funding, but instead would receive 50% of the funding received for fiscal year 1994. Ramah, 87 F.3d at 1349. The court concluded that the Secretary exceeded his authority because "the ISDA does not commit the allocation of insufficient CSF to the Secretary's discretion . . . . [and the] Secretary's decision to institute the 50% penalty exceeded his

limited authority and violated the ISDA." Id. at 1352.

Ramah does not mandate dismissal of plaintiffs' claims for several reasons. First, it has not been established at this juncture whether or not the appropriated funds have been depleted. For example, the defendants have not submitted affidavits or other evidence which shows that the funds the tribes claim they were legally entitled to receive have been completely dispensed. Cf. City of Houston, 24 F.3d at 1427 (Agency had provided an affidavit to the court stating that "more than six months before Houston filed its [c]omplaint -- the agency 'contractually obligated its entire [fiscal year] 1986 CDBG entitlement appropriation from Congress . . . .'") (citation omitted). Second, whether or not recovery from the Judgment Fund would result in decreased funding to other tribes is an issue that would need further briefing and is perhaps more appropriate for resolution by summary judgment or trial. The Court is unwilling to dismiss plaintiffs' claims based on the defendants' unsubstantiated and conclusory allegation, when at least one court has recently held that such recovery from the Judgment Fund is permissible. See Thompson, 334 F.3d at 1093 (noting that the Secretary failed to clarify "how much of the lump-sum appropriations were obligated to programs serving other tribes for purposes of section 450j-1(b)[,]" but in any event, the evidence showed that the Secretary possessed an amount of funds "more than sufficient during the relevant fiscal years . . . to pay full contract support costs to the tribe, and the Secretary would not, therefore, have been forced to reduce funding for programs serving other tribes in order to meet his obligations."); see also 25 U.S.C. § 450*l*(c)(9) (Model Agreement) ("Notwithstanding any other provision of law, any funds provided under this Contract -- (A) shall remain available until expended[.]"). Therefore, the Court

concludes that plaintiffs' claims for indirect CSC for fiscal years in which there were lump-sum payments (fiscal years 1995-1997) are not moot.

The Court acknowledges that the Ninth and Tenth Circuits have reached results contrary to the one reached in Thompson. See Cherokee Nation of Oklahoma v. Thompson, 311 F.3d 1054, 1066 (10th Cir. 2002) and Shoshone-Bannock Tribes of the Fort Hall Reservation v. Dep't of Health & Human Services, 279 F.3d 660, 668 (9th Cir. 2002). However, the Court first notes that both cases were decided on motions for summary judgment, not at the motion to dismiss stage, and not on mootness grounds. Notably, in Cherokee Nation, the Tenth Circuit indicated that the district court's grant of summary judgment was "[b]ased on the materials before it at the summary judgment stage," which included declarations from the pertinent government officials "stat[ing] that all of the money appropriated for fiscal years 1996 and 1997 was in fact spent, leaving a zero balance at the end of the year." Cherokee Nation, 311 F.3d at 1062. Declarations of this nature have not been submitted to the Court. Furthermore, the issue of payment from the Judgment Fund was not raised in either the Ninth or Tenth Circuit cases. Therefore, while these cases may ultimately serve as a basis for precluding the tribes' recovery on the merits of their claims, they do not warrant the dismissal of the tribes' claims at this stage of the proceedings.

Although plaintiffs are on less secure footing as to their second claim relating to capped years (their claims related to fiscal years 1998 through 2001), again, based on the record currently before it, the Court will not dismiss these claims. Pursuant to 25 U.S.C. § 450j-1(b):

Notwithstanding any other provision in this subchapter, the provision of

> funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

This provision was enacted by Congress "not to excuse the Secretary's obligation to follow the mandates of the statute, but rather to make it evident that the Secretary is not required to distribute money if Congress does not allocate that money to him under the Act." Ramah, 87 F.3d at 1345. Unlike lump sum years, where money is not designated for indirect versus direct CSC, in capped years, there is a provision providing that payment of indirect CSC is not to exceed a certain amount. 25 U.S.C. § 450j-1. As plaintiffs correctly point out, "[t]he effect of these caps was to limit the amount the Secretary has paid to each contractor based on a pro rata apportionment of the appropriated 'not to exceed' amount." Compl. ¶ 40. This pro rata apportionment is exactly the type of distribution the Circuit Court held would be acceptable in Ramah. See 87 F.3d at 1348-49 ("a pro rata reduction [would] easily 'effectuate the original statutory scheme' of the ISDA, but such a plan would also comply with congressional intent behind the 1995 Appropriations Act. The legislative history of the 1995 Act indicates that Congress, aware that it had appropriated an insufficient amount for full [contract support] funding, intended for the agency to deal with the shortfall through a pro rata reduction."); Babbitt v. Oglala Sioux Tribal Public Safety Dep't, 194 F.3d 1374, 1379 (Fed. Cir. 1999) ("[W]e decline to find that Interior's pro rata allocation of the capped appropriations providing Oglala 91.74% of its indirect costs for 1995 constitutes an absurd result.") (citation omitted).

The court's pronouncement in Ramah is clear: in years in which Congress has

not appropriated sufficient funds, "if the money is not available, it need not be provided, despite a Tribe's claim that the ISDA 'entitles' it to the funds." 87 F.3d at 1345; see also Babbitt, 194 F.3d at 1378 ("[I]n the face of congressional under-funding, an agency can only spend as much money as has been appropriated for a particular program.") (citations omitted). Capped year amounts differ from lump sum years because Congress has expressly limited the amount of funds that may be used for indirect CSC, whereas in lump sum years, the agency has more "'flexibility'" in determining how to allocate the funds. Ramah, 87 F.3d at 1346 (citation omitted). Despite the fact that the amount of funds that could be used for indirect CSC was "capped," plaintiffs argue that they were still entitled to the full amounts of their indirect CSC because "the United States may be liable upon an obligation, regardless whether a liquidating appropriation is made." Pls.' Opp'n at 20. However, as the Babbitt court made clear, the cases upon which plaintiffs rely are different because those cases "involved a situation in which the Government, as a contracting party, had simply failed to appropriate and pay its unqualified contractual obligation." 194 F.3d at 1379. The situation here is "fundamentally" different because "the ability of the Interior to bind the Government contractually was expressly conditioned on the availability of appropriations." Id. Section 450j-1(b) of the ISDA expressly conditions the payment of indirect CSC upon the availability of funds; in capped years, where the amount of funds that may be used for payment of such costs is established, the tribe is prevented "from asserting that it was entitled to full funding as a matter of right." Id. at 1380 (citation omitted); Ramah, 87 F.3d at 1345 ("[I]f the money is not available, it need not be provided, despite a Tribe's claim that the ISDA 'entitles' it to the funds.").

However, at this stage, defendants have failed to demonstrate that these funds were completely disbursed. Although defendants suggest this fact in their motion to dismiss, see Defs.' Mem. at 26 ("Although these funds are not available as a matter of law, Defendants expect to be able to present the Court with factual support to demonstrate that all of the relevant appropriations have been obligated or otherwise are no longer available for obligation. Under City of Houston, such a showing would also render Plaintiffs' claims moot."), at this juncture, and despite the Court's inclination to dismiss these claims, it does not have the factual predicate to do so. Therefore, the Court will order limited briefing regarding the availability of funds pertaining to fiscal years 1998 through 2001, to permit the defendants to submit the requisite affidavits and other supporting evidence, and to allow plaintiffs the opportunity to challenge the defendants' submissions. Accordingly, the Court will not dismiss plaintiffs' second claim for relief at this time.

______________________________________B.

Mootness aside, defendants next argue that plaintiffs do not have standing to bring this action because "[p]laintiffs have not negotiated and obtained new indirect cost rates since 1996 [and] it is entirely unclear whether they have been injured by the application of the formula." Defs.' Reply at 16. Plaintiffs respond that the defendants cannot raise the defenses of standing and ripeness because these defenses were not cited in the contracting officer's decision. Pls.' Opp'n at 38. The Court can summarily reject plaintiff's position.

Standing and ripeness, like mootness, are doctrines that relate directly to the Court's subject matter jurisdiction, without which this Court has no authority to

adjudicate the claims raised in plaintiffs' complaint. See Mahorner v. Bush, 224 F. Supp. 2d 48, 49 (D.D.C. 2002) (Walton, J.) ("As a result of the Constitution's 'case or controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, [and] mootness . . . .' An analysis of these 'justiciable doctrines' reveals beyond all doubt that this Court lacks subject matter jurisdiction to entertain the plaintiff's complaint because he is unable to satisfy . . . standing . . . .") (citations omitted) (alteration added); Tax Analysts v. IRS, No. Civ.A. 97-0260, 1998 WL 773651, at *3 (D.D.C. Mar. 31, 1998) ("Lack of ripeness denies the Court subject matter jurisdiction.") (citation omitted). Because the Court has the independent obligation to assure itself that it has subject matter jurisdiction, which cannot be waived by either party, these issues are properly raised by the defendants and could have been considered by the Court sua sponte. Akinseye v. District of Columbia, 339 F.3d 970, 971 (D.C. Cir. 2003) ("Although the District has not raised lack of jurisdiction in these proceedings, we may raise the question of subject-matter jurisdiction sua sponte. . . . Moreover, because subject-matter jurisdiction is 'an Art. III . . . requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'") (citations omitted). The fact that this Court may have jurisdiction over plaintiffs' claims under the ISDA does not alter this analysis. See Ramah, 87 F.3d at 1344 n.6 ("Of course it is true that a statutory grant of jurisdiction cannot overcome a constitutional bar to judicial review (such as standing or mootness) . . . ."). Accordingly, the Court rejects the plaintiffs' argument that it cannot consider standing and ripeness as grounds for dismissing plaintiffs' claims.

Plaintiffs allege that there is evidence in the record which merits the Court finding

that although they did not specifically obtain a new indirect cost rate after 1996, there had been an agreement to use a prior year's rate. Pls.' Opp'n at 38. For example, in Tunica-Biloxi's self-determination contract effective January 1, 1996, through December 31, 1996, it states:

> The Tribe does not have an approved Indirect Cost Rate for the period beginning January 1, 1997. The fixed carry forward rate of 57.9% (the Tribe's latest approved rate) is designated as a temporary rate. Once the tribe receives a current approved rate from the Department of the Interior (DOI), for the period beginning January 1, 1997, this annual funding agreement will be modified accordingly. The tribe will be reimbursed using the temporary rate of 57.9%, applied to total direct cost, and appropriate adjustment(s) for reimbursement for Indirect Cost will be made upon receipt of new Indirect Cost rate for this contract period.

Defs.' Ex. J (Notice of Self-Determination Contract Model Agreement for Tunica-Biloxi Tribe of Louisiana).

As a preliminary matter, it is clear to the Court that plaintiffs have standing to challenge the indirect CSC they received for fiscal years 1995 and 1996, because they have adequately demonstrated that they sustained injury as a result of the defendants allegedly making deficient payments to them for those years that timely claims were presented to the contracting officers. Moreover, based on the Court's analysis above, these claims are not moot.[17] Therefore, a finding in defendants' favor on the standing issue would not render the complaint a nullity, but rather would only preclude the plaintiffs from asserting claims for fiscal years after 1996. In its CDA claim for fiscal years 1996 through 2000, Tunica-Biloxi relied on "an indirect cost rate of 54.78%" which it alleged was "established by agreement with the Office of Inspector General of the

[17] Ramah did not present claims beyond 1996; therefore, the Court's discussion beyond this point refers solely to Tunica-Biloxi.

DOI." Defs.' Ex. B (Tunica-Biloxi CDA claim dated April 2, 2001). Although the CDA claim states that a copy of the applicable agreement was attached as Exhibit 1 of the claim, no such exhibit was attached to the claim letter. Therefore, it is unclear what agreement was being referenced. For this reason, the Court will order further briefing on the limited issue of whether there was an agreement between the parties that a certain rate would be applicable to fiscal years subsequent to 1996, in the absence of a new agreement. Accordingly, a ruling as to whether plaintiffs have standing to bring claims for fiscal years after 1996 will be reserved.

**(4) Defendants' Statute of Limitations Challenge**

Defendants next raise a statute of limitations challenge. They rely on 28 U.S.C. § 2401(a) to support their argument that any allegations regarding decisions made prior to December 9, 1996, are time barred. Defs.' Mem. at 29. Plaintiffs contend that the CDA contains its own statute of limitations and that they timely filed their complaint in this Court pursuant to that limitation period.

28 U.S.C. § 2401 states that "[e]xcept as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." (emphasis added). In light of this clear language excepting suits filed pursuant to the CDA, defendants attempt to persuade the Court that although the plaintiffs' claims are ostensibly filed pursuant to the CDA, "their primary contention is that the ISDA (and not the individual contracts) required IHS to fund a specific amount of indirect CSC." Defs.' Mem. at 29 (citing Compl. ¶ 19). If the Court construes the claims in this matter, defendants opine that "any allegation related to IHS' funding decisions made prior to

December 9, 1996, would be barred by the six-year general statute of limitations applicable to claims against the federal government." Id. (citing 28 U.S.C. § 2401(a)).

This argument, while ingenious, must be rejected. The Court construes plaintiffs' complaint as challenging the amount of funds they received for indirect CSC. Their entitlement to these funds arose from the self-determination contracts at issue, and any disputes concerning these contracts are governed by the CDA, because the ISDA states that "[t]he Contract Disputes Act ... shall apply to self-determination contracts . . . ." 25 U.S.C. § 450m-1(d). The CDA expressly states that a claim "shall be filed within twelve months from the date of the receipt by the contractor of the decision of a contracting officer concerning the claim[ ] . . . ." 41 U.S.C. § 609(a)(3). Tunica-Biloxi's decision letter was issued by the contracting officer on May 3, 2002. See Defs. Ex. D. Ramah's decision letter was dated December 18, 2001. See id. Ex. F. The original complaint in this case was then filed on December 9, 2002. Thus, the Court having concluded that plaintiffs' claims all arise under the CDA, they were therefore filed timely since the original complaint was filed within twelve months after the decision letters were issued by the contracting officers.

**(6) Dismissal of the Named Defendants**

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983) (footnote omitted). Defendants posit that the ISDA contains only a limited waiver of sovereign immunity, which provides that

> [t]he United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this subchapter and . . . over any civil action or claim against the Secretary for

money damages arising under contracts authorized by this subchapter.

25 U.S.C. § 450m-1(a) (emphasis added). Defendants argue that pursuant to this limited waiver of immunity the only proper defendants in this action are the Secretaries, as the ISDA's definition of the term "'Secretary', unless otherwise designated, means either the Secretary of Health and Human Services or the Secretary of the Interior or both[.]" 25 U.S.C. § 450b(i).

In opposition, plaintiffs argue when the Secretary executed the contracts at issue, he "act[ed] as agent for the United States." Pls.' Opp'n at 11 (citations omitted). Plaintiffs contend that because "the CDA is expressly mentioned in §450m-1, it follows that the use of the word 'Secretary' in that same subsection was intended to mean the United States. Any other conclusion would do damage to the express agency created in 25 U.S.C. §450*l*(c), Model Agreement §1(a)(1)." Id. The Model Agreement, which is incorporated into each self-determination contract that arises under the ISDA pursuant to 25 U.S.C. § 450l(a)(1), states, in pertinent part: "This agreement, denoted a Self-Determination Contract . . . entered into by the Secretary of the Interior or the Secretary of Health and Human Services . . . for and on behalf of the United States . . . ." Plaintiffs even go as far as to state that "[n]o court has held . . ." that the United States is not a proper party under the ISDA because the statute incorporates the provisions of the CDA. Pls.' Opp'n at 11. However neither party has presented, nor has the Court been able to discover, any cases that precisely hold that the United States has waived its sovereign immunity in the ISDA.

Plaintiffs note that "[e]very action against [a] United States official is treated as

an action against the United States for purposes of the Tucker Act[,]"[18] and if plaintiffs had filed this lawsuit in the Court of Federal Claims, an option available to it under the CDA, the caption of such an action "would automatically have been "XYZ Plaintiff v. United States, Defendant." Pls.' Opp'n at 11. Plaintiffs are correct that the Tucker Act waives the sovereign immunity of the United States and provides jurisdiction in the Court of Federal Claims for claims against the United States "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). However, plaintiffs fail to explain how the Tucker Act, which gives jurisdiction to the Court of Claims, is applicable to this Court. The United States Court of Federal Claims has itself recognized that "[t]he Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages." Carlow v. United States, 40 Fed. Cl. 773, 778 (Fed. Cl. 1998) (citing United States v. Mitchell, 445 U.S. 535, 538 (1980)). Accordingly, because "a waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed[,]" . . . [t]he [plaintiffs] . . . must look beyond the jurisdictional statute for a waiver of sovereign immunity." Id. at 779 (citations omitted); see also Demontiney v. United States, 255 F.3d 801, 806 (9th Cir. 2001) ("[T]he Contract Disputes Act, in conjunction with the Tucker Act . . . do not waive federal sovereign immunity for district court jurisdiction here. Instead, the statues grant the

[18]The Tucker Act vests jurisdiction in the Court of Federal Claims for suits against the United States "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

Court of Federal Claims jurisdiction to adjudicate any contract claims [the plaintiff] may have against the United States.") (emphasis added); Mustard v. Forsgren, No. Civ.A. 84-560, 1985 WL 1824, at *2 (N.D. Ind. May 10, 1985) (holding that although 28 U.S.C. § 1331 provided jurisdiction for the plaintiff's claim, the statute could "not be cited as a waiver of sovereign immunity.").[19]

Nonetheless, the Court finds that the United States has waived sovereign immunity in the ISDA in the context of the matters before the Court. "A waiver of federal sovereign immunity can be found in one of two places: in the specific statute governing a governmental entity, or in one of the broad waivers of immunity made by Congress for certain classes of federal agencies. The Tucker Act . . . and the Contract Disputes Act . . . are examples of the latter type of waiver." Research Triangle Inst. v. Bd. of Governors of the Federal Reserve System, 132 F.3d 985, 988 (4th Cir. 1997) (footnotes omitted). At least one court has stated, in dicta, that the ISDA provides a waiver of federal sovereign immunity pertaining to self-determination contracts. See Demontiney, 255 F.3d at 806 ("In 1988, Congress amended the [ISDA] to waive federal sovereign immunity in federal district court for certain contract claims."). In Demontiney, the court stated that "[t]he [ISDA's] waiver of federal sovereign immunity is limited to 'self-determination contracts' entered into by Indian tribes or tribal organizations and the

[19]Although having concluded that the statute's jurisdictional grant is not dispositive of the immunity waiver issue, the plaintiffs' reliance on the Tucker Act is also unavailing because the language in that Act differs from jurisdictional grant found in the ISDA. The Supreme Court, in analyzing the waiver of sovereign immunity in the Tucker Act, concluded that "[t]he existence of a waiver is readily apparent in claims founded upon 'any express or implied contract with the United States.'" Mitchell, 463 U.S. at 215 (quoting 28 U.S.C. § 1491). Indeed, the Tucker Act's jurisdictional grant explicitly states that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States . . . ." 28 U.S.C. § 1491(a)(1).