government." Id. at 805. The Demontiney court held that because the plaintiff could not "establish that he [or his corporation was] a tribe or tribal organization, he could not have entered into a self-determination contract with the [Bureau of Indian Affairs]." Id. Accordingly, because the plaintiff was

> not a party to a self-determination contract, he [could] not take advantage of the [ISDA's] waiver of federal sovereign immunity for claims in district court. Although § 450m-1 waives sovereign immunity in district court for contract actions pertaining to disputes arising from self-determination contracts, nothing therein provides support for [the plaintiff's] argument that a sovereign immunity waiver permits his claims against the United States in district court.

Id. at 808 (footnote omitted). Further support for the conclusion that the United States has waived its sovereign immunity as it pertains to self-determination contracts is found in Supreme Court precedent. For example, the Supreme Court has stated that "government liability in contract is viewed as perhaps 'the widest and most unequivocal waiver of federal immunity from suit.'" Mitchell, 463 U.S. at 215 (citation omitted). Thus, although the Tucker Act 'does not create any substantive right enforceable against the United States for money damages[,]'" id. at 216 (citations omitted), the Court has stated that

> a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained. In undertaking this inquiry, a court need not find a separate waiver of sovereign immunity in the substantive provision, just as a court need not find consent to suit in 'any express or implied contract with the United States.'

Id. at 218 (citation omitted) (emphasis added).

The Court of Federal Claims has held that where the funds a party seeks to recover would not be acquired from appropriated public funds, the court lacked

jurisdiction over the plaintiff's contract claims, even though the contract at issue was subject to the Contract Disputes Act. Furrash & Co. v. United States, 46 Fed. Cl. 518 (2000). There, the plaintiff had "entered into a professional services contract with the Federal Housing Finance Board . . . . to provide consulting services . . . ." Id. at 519. After the plaintiff filed its complaint in the Court of Federal Claims, the defendant moved for dismissal of the complaint arguing that the court did not have "jurisdiction over claims arising out of the contract activities of the Finance Board." Id. at 520. The court agreed, holding "that the court's Tucker Act jurisdiction may not be invoked with respect to transactions that 'involved agencies where the statutory authority for the activities [in the lawsuit] specifically limited liability or expenditures to non-appropriated funds.'" Id. (citation omitted). Because the Finance Board's expenses were privately funded, the court concluded

> that, in the absence of an affirmative commitment of appropriated funds by Congress . . . Congress has made clear its intent for the Board to be self-sustaining. The relief to which plaintiff is entitled, if any, must come from funds raised by the Finance Board, and not from the public treasury.

Id. at 526.

In this case, there are several factors that support plaintiffs' position that the United States' sovereign immunity to suit has been waived by the ISDA.

First, any recovery by plaintiffs from the Judgment Fund would necessarily be paid from public funds. See 31 U.S.C. § 1304(a) ("Necessary amounts are appropriated to pay final judgments . . . ."). Second, the ISDA confers on this Court jurisdiction at least as extensive as the Court of Claims' jurisdiction. Specifically, the statute states, in relevant part:

> The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this subchapter and, subject to the provisions of subsection (d) [relating to Application of the Contract Disputes Act] of this section and concurrent with the United States Court of Claims, over any civil action or claim against the Secretary for money damages arising under contracts authorized by this subchapter.

25 U.S.C. § 450m-1 (emphasis added). In light of the scope of this jurisdictional grant, and the fact that any payments plaintiffs may receive would be from appropriated public funds, the Court concludes that the United States' sovereign immunity to suit has been waived in the ISDA as to the claims before the Court in this lawsuit.[20] However, this conclusion does not mean that a finding of a waiver of sovereign immunity supports a finding that the individually named defendants are properly named as parties in the complaint. Although the parties frame the issue as a sovereign immunity issue, the Court sees the issue as whether the ISDA grants the Court jurisdiction over any named federal official based on the United States' waiver of sovereign immunity. The Court does not think it does. Rather, § 450m-1's language, limiting the Court's jurisdiction to the "appropriate Secretary," would be rendered meaningless if the Court concluded that the ISDA permits claims against all the individually named officials. Furthermore, plaintiffs fail to assert why defendants Grim, Devaney, and Vigotsky, who have all been sued in their official capacities, are necessary parties to this action when clearly the Secretaries, who act as agents on behalf of the United States, are appropriately before the Court. These individually named defendants are merely agents of the Secretary

[20]Defendants indicate that "it does not appear that Secretary Norton[,] [has] been properly served pursuant to Federal Rule of Civil Procedure 4(i)(2)(A)." Defs.' Opp'n at 44. The Court will permit plaintiffs to file proof of service within a prescribed time. Failure to provide the requisite proof of service will result in dismissal of defendant Norton from this action.

and plaintiffs would not be entitled to any greater relief by the inclusion of these defendants in this lawsuit. Accordingly, the Court will grant the defendants' motion and dismiss Grim, Devaney, and Vigotsky as parties in this case.

**(B) Lack of Standing or Alternatively, Failure to State a Claim Upon Which Relief Can be Granted as to Plaintiffs' Claims that the Secretary Breached the Duty of the Implied Covenant of Good Faith and Fair Dealing and the Duty of Trust**

Finally, defendants argue that plaintiffs lack standing regarding their claim that the Secretary had a duty to ask Congress for additional appropriations, or, alternatively, that plaintiffs have failed to state a claim upon which relief can be granted "because they can point to no statute that created a trust relationship requiring the Secretary, on behalf of [p]laintiffs, to ask Congress for additional appropriations for indirect CSC." Defs.' Mem. at 41. Also encompassed in this argument is defendants' position that they did not violate the implied covenant of good faith and fair dealing.

Without definitively ruling on the issue, it would appear that defendants' alternative theory – the non-existence of a statute creating a duty of trust between the government and the plaintiffs – is not well founded. The ISDA expressly acknowledges "the Federal government's historical and special legal relationship with, and resulting responsibilities to, American Indian people[ ] . . . ." 25 U.S.C. § 450(a)(1). These words of the statute at a minimum imply the existence of a trust relationship between the United States and Indian people in those areas covered by the statute. Cf. Mitchell, 463 U.S. at 225 ("'[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties . . . even though nothing is said expressly in

the authorizing or underlying statute . . . about a trust fund, or a trust of fiduciary connection.'") (citation omitted). Furthermore, the Model Agreement, which is incorporated into every self-determination contract, expressly provides that "[t]he United States reaffirms the trust responsibility of the United States to the ____________ Indian tribe(s) to protect and conserve the trust resources of the Indian tribe(s) and the trust resources of individual Indians." 25 U.S.C. § 450(l)(c)(d)(1)(A). In addition, because of the federal government's continual recognition of a special trust relationship with Indian tribes, the defendants' claim of the absence of a trust relationship is unsupported by the history of the government's interaction with Indian tribes. Cf. Mitchell, 463 U.S. at 225 ("This Court has previously emphasized 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'") (quoting Seminole Nation v. United States, 316 U.S. 286, 296 (1942)).

As to plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, however, even if the Court were to conclude that a fiduciary relationship between the parties exists, and that a covenant of good faith and fair dealing can be implied, these recognitions do not necessarily translate into a duty on the part of the Secretary to request additional appropriations from Congress. The text of the ISDA makes clear that Congress did not intend to obligate the Secretary to distribute funds that had not been allocated to him under the Act. See 25 U.S.C. § 450j-1(b); Ramah, 87 F.3d at 1345 ("Congress clearly included [the proviso of 25 U.S.C. § 450j-1(b)] not to excuse the Secretary's obligation to follow the mandates of the statute, but rather to make evident that the Secretary is not required to distribute money if Congress does not allocate that money to him under the Act."). Language by the court in Ramah

Court of Federal Claims jurisdiction to adjudicate any contract claims [the plaintiff] may have against the United States.") (emphasis added); Mustard v. Forsgren, No. Civ.A. 84-560, 1985 WL 1824, at *2 (N.D. Ind. May 10, 1985) (holding that although 28 U.S.C. § 1331 provided jurisdiction for the plaintiff's claim, the statute could "not be cited as a waiver of sovereign immunity.").[19]

Nonetheless, the Court finds that the United States has waived sovereign immunity in the ISDA in the context of the matters before the Court. "A waiver of federal sovereign immunity can be found in one of two places: in the specific statute governing a governmental entity, or in one of the broad waivers of immunity made by Congress for certain classes of federal agencies. The Tucker Act . . . and the Contract Disputes Act . . . are examples of the latter type of waiver." Research Triangle Inst. v. Bd. of Governors of the Federal Reserve System, 132 F.3d 985, 988 (4th Cir. 1997) (footnotes omitted). At least one court has stated, in dicta, that the ISDA provides a waiver of federal sovereign immunity pertaining to self-determination contracts. See Demontiney, 255 F.3d at 806 ("In 1988, Congress amended the [ISDA] to waive federal sovereign immunity in federal district court for certain contract claims."). In Demontiney, the court stated that "[t]he [ISDA's] waiver of federal sovereign immunity is limited to 'self-determination contracts' entered into by Indian tribes or tribal organizations and the

[19]Although having concluded that the statute's jurisdictional grant is not dispositive of the immunity waiver issue, the plaintiffs' reliance on the Tucker Act is also unavailing because the language in that Act differs from jurisdictional grant found in the ISDA. The Supreme Court, in analyzing the waiver of sovereign immunity in the Tucker Act, concluded that "[t]he existence of a waiver is readily apparent in claims founded upon 'any express or implied contract with the United States.'" Mitchell, 463 U.S. at 215 (quoting 28 U.S.C. § 1491). Indeed, the Tucker Act's jurisdictional grant explicitly states that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States . . . ." 28 U.S.C. § 1491(a)(1).

government." Id. at 805. The Demontiney court held that because the plaintiff could not "establish that he [or his corporation was] a tribe or tribal organization, he could not have entered into a self-determination contract with the [Bureau of Indian Affairs]." Id. Accordingly, because the plaintiff was

> not a party to a self-determination contract, he [could] not take advantage of the [ISDA's] waiver of federal sovereign immunity for claims in district court. Although § 450m-1 waives sovereign immunity in district court for contract actions pertaining to disputes arising from self-determination contracts, nothing therein provides support for [the plaintiff's] argument that a sovereign immunity waiver permits his claims against the United States in district court.

Id. at 808 (footnote omitted). Further support for the conclusion that the United States has waived its sovereign immunity as it pertains to self-determination contracts is found in Supreme Court precedent. For example, the Supreme Court has stated that "government liability in contract is viewed as perhaps 'the widest and most unequivocal waiver of federal immunity from suit.'" Mitchell, 463 U.S. at 215 (citation omitted). Thus, although the Tucker Act 'does not create any substantive right enforceable against the United States for money damages[,]'" id. at 216 (citations omitted), the Court has stated that

> a court must inquire whether the source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained. In undertaking this inquiry, a court need not find a separate waiver of sovereign immunity in the substantive provision, just as a court need not find consent to suit in 'any express or implied contract with the United States.'

Id. at 218 (citation omitted) (emphasis added).

The Court of Federal Claims has held that where the funds a party seeks to recover would not be acquired from appropriated public funds, the court lacked

jurisdiction over the plaintiff's contract claims, even though the contract at issue was subject to the Contract Disputes Act. Furrash & Co. v. United States, 46 Fed. Cl. 518 (2000). There, the plaintiff had "entered into a professional services contract with the Federal Housing Finance Board . . . . to provide consulting services . . . ." Id. at 519. After the plaintiff filed its complaint in the Court of Federal Claims, the defendant moved for dismissal of the complaint arguing that the court did not have "jurisdiction over claims arising out of the contract activities of the Finance Board." Id. at 520. The court agreed, holding "that the court's Tucker Act jurisdiction may not be invoked with respect to transactions that 'involved agencies where the statutory authority for the activities [in the lawsuit] specifically limited liability or expenditures to non-appropriated funds.'" Id. (citation omitted). Because the Finance Board's expenses were privately funded, the court concluded

> that, in the absence of an affirmative commitment of appropriated funds by Congress . . . Congress has made clear its intent for the Board to be self-sustaining. The relief to which plaintiff is entitled, if any, must come from funds raised by the Finance Board, and not from the public treasury.

Id. at 526.

In this case, there are several factors that support plaintiffs' position that the United States' sovereign immunity to suit has been waived by the ISDA.

First, any recovery by plaintiffs from the Judgment Fund would necessarily be paid from public funds. See 31 U.S.C. § 1304(a) ("Necessary amounts are appropriated to pay final judgments . . . ."). Second, the ISDA confers on this Court jurisdiction at least as extensive as the Court of Claims' jurisdiction. Specifically, the statute states, in relevant part:

> The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this subchapter and, subject to the provisions of subsection (d) [relating to Application of the Contract Disputes Act] of this section and concurrent with the United States Court of Claims, over any civil action or claim against the Secretary for money damages arising under contracts authorized by this subchapter.

25 U.S.C. § 450m-1 (emphasis added). In light of the scope of this jurisdictional grant, and the fact that any payments plaintiffs may receive would be from appropriated public funds, the Court concludes that the United States' sovereign immunity to suit has been waived in the ISDA as to the claims before the Court in this lawsuit.[20] However, this conclusion does not mean that a finding of a waiver of sovereign immunity supports a finding that the individually named defendants are properly named as parties in the complaint. Although the parties frame the issue as a sovereign immunity issue, the Court sees the issue as whether the ISDA grants the Court jurisdiction over any named federal official based on the United States' waiver of sovereign immunity. The Court does not think it does. Rather, § 450m-1's language, limiting the Court's jurisdiction to the "appropriate Secretary," would be rendered meaningless if the Court concluded that the ISDA permits claims against all the individually named officials. Furthermore, plaintiffs fail to assert why defendants Grim, Devaney, and Vigotsky, who have all been sued in their official capacities, are necessary parties to this action when clearly the Secretaries, who act as agents on behalf of the United States, are appropriately before the Court. These individually named defendants are merely agents of the Secretary

[20]Defendants indicate that "it does not appear that Secretary Norton[,] [has] been properly served pursuant to Federal Rule of Civil Procedure 4(i)(2)(A)." Defs.' Opp'n at 44. The Court will permit plaintiffs to file proof of service within a prescribed time. Failure to provide the requisite proof of service will result in dismissal of defendant Norton from this action.

and plaintiffs would not be entitled to any greater relief by the inclusion of these defendants in this lawsuit. Accordingly, the Court will grant the defendants' motion and dismiss Grim, Devaney, and Vigotsky as parties in this case.

**(B) Lack of Standing or Alternatively, Failure to State a Claim Upon Which Relief Can be Granted as to Plaintiffs' Claims that the Secretary Breached the Duty of the Implied Covenant of Good Faith and Fair Dealing and the Duty of Trust**

Finally, defendants argue that plaintiffs lack standing regarding their claim that the Secretary had a duty to ask Congress for additional appropriations, or, alternatively, that plaintiffs have failed to state a claim upon which relief can be granted "because they can point to no statute that created a trust relationship requiring the Secretary, on behalf of [p]laintiffs, to ask Congress for additional appropriations for indirect CSC." Defs.' Mem. at 41. Also encompassed in this argument is defendants' position that they did not violate the implied covenant of good faith and fair dealing.

Without definitively ruling on the issue, it would appear that defendants' alternative theory – the non-existence of a statute creating a duty of trust between the government and the plaintiffs – is not well founded. The ISDA expressly acknowledges "the Federal government's historical and special legal relationship with, and resulting responsibilities to, American Indian people[ ] . . . ." 25 U.S.C. § 450(a)(1). These words of the statute at a minimum imply the existence of a trust relationship between the United States and Indian people in those areas covered by the statute. Cf. Mitchell, 463 U.S. at 225 ("'[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties . . . even though nothing is said expressly in

the authorizing or underlying statute . . . about a trust fund, or a trust of fiduciary connection.'") (citation omitted). Furthermore, the Model Agreement, which is incorporated into every self-determination contract, expressly provides that "[t]he United States reaffirms the trust responsibility of the United States to the ___________ Indian tribe(s) to protect and conserve the trust resources of the Indian tribe(s) and the trust resources of individual Indians." 25 U.S.C. § 450(l)(c)(d)(1)(A). In addition, because of the federal government's continual recognition of a special trust relationship with Indian tribes, the defendants' claim of the absence of a trust relationship is unsupported by the history of the government's interaction with Indian tribes. Cf. Mitchell, 463 U.S. at 225 ("This Court has previously emphasized 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'") (quoting Seminole Nation v. United States, 316 U.S. 286, 296 (1942)).

As to plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, however, even if the Court were to conclude that a fiduciary relationship between the parties exists, and that a covenant of good faith and fair dealing can be implied, these recognitions do not necessarily translate into a duty on the part of the Secretary to request additional appropriations from Congress. The text of the ISDA makes clear that Congress did not intend to obligate the Secretary to distribute funds that had not been allocated to him under the Act. See 25 U.S.C. § 450j-1(b); Ramah, 87 F.3d at 1345 ("Congress clearly included [the proviso of 25 U.S.C. § 450j-1(b)] not to excuse the Secretary's obligation to follow the mandates of the statute, but rather to make evident that the Secretary is not required to distribute money if Congress does not allocate that money to him under the Act."). Language by the court in Ramah

indicates that the fiduciary relationship the government has with Indian tribes does not require the Secretary to request additional appropriations where Congress is aware that it has provided insufficient funds under the statute.

> Perhaps an analogy helps. Suppose a school regulation states that the principal must distribute one textbook per course to each student enrolled at the school, but also states that the provision of books under this regulation is 'subject to the availability of supplies.' Furthermore, the regulation notes that the principal is not required to take books from one student to make them available to other students. . . . Our view . . . is that this regulation requires the principal to follow the general formula of the regulation (one book per student per course) as closely as possible, given the restraint of the shortfall. The subject-to-availability language means that the principal need not go to the Salvation Army in search of extra books, and the last sentence means that she need not require the son of a math teacher to bring his extra math books from home to meet the needs of his classmates.

Ramah, 87 F.3d at 1346. This analogy by the Circuit Court, although not a direct pronouncement that the Secretary is not required to request additional appropriations from Congress, nonetheless, supports this conclusion.

In addition, the Court agrees with defendants' assertion that plaintiffs' position raises an issue of redressability. In other words, defendants opine that because "Congress is under no obligation to appropriate any additional funds [,any] injury [claimed by plaintiffs] would not be redressed by an order requiring the Secretary (or the President) to ask Congress for [additional] funding." Defs.' Mem. at 40. The Court agrees. While plaintiffs may have suffered injury resulting from their inability to recoup the costs of administering their health service programs due to insufficient funding, requiring the Secretary to ask Congress for more funds would not redress the plaintiffs' injuries. See US Ecology, Inc. v. United States Dep't of the Interior, 231 F.3d 20, 25 (D.C. Cir. 2000) (when redressability is dependent on the actions of a third party, it is

the plaintiff's burden to "'adduce facts showing that those choices have been or will be made in such manner as to . . . permit redressability of injury.'") (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992)). This reality, coupled with the Circuit Court's rejection of the notion that the Secretary has an independent duty to request additional funds from Congress, requires dismissal of these claims.

Plaintiffs nonetheless argue that the United States may be held liable for its contractual obligations regardless of whether or not they receive adequate appropriations from Congress. While this proposition at first blush may seem attractive, it has been expressly rejected by the District of Columbia Circuit, as well as the Ninth and Tenth Circuits. See Ramah, 87 F.3d at 1345 ("Congress clearly included [the proviso of 25 U.S.C. § 450j-1(b)] not to excuse the Secretary's obligation to follow the mandates of the statute, but rather to make evident that the Secretary is not required to distribute money if Congress does not allocate that money to him under the Act."); Cherokee Nation of Oklahoma, 311 F.3d at 1063 ("In sum, we agree with the district court that funding for the Tribes' ongoing CSCs was subject to the availability of appropriations from Congress . . . ."); Shoshone-Bannock Tribes, 279 F.3d at 665 ("Congress has plainly excluded the possibility of construing the contract support costs provision as an entitlement that exists independently of whether Congress appropriates money to cover it."). Accordingly, plaintiffs' claim that the Secretary has breached the implied covenant of good faith and fair dealing and their third claim for relief based on the Secretary's alleged breach of trust, must be dismissed.

**III. Conclusion**

For the reasons set forth above, defendants' motion to dismiss plaintiffs' second

amended class action complaint is granted in part and denied in part.

**SO ORDERED** on this 20th day of January, 2004.[21]

REGGIE B. WALTON
United States District Judge

[21]An Order consistent with the Court's ruling accompanies this Amended Memorandum Opinion.

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service
Albuquerque Area Indian Health Service
5300 Homestead Road, NE
Albuquerque, New Mexico 87110

DEC 18 2001

Jim Hooper, Jr.
Administrative Services Director
Ramah Navajo School Board, Inc.
P.O. Box 10
Pine Hill, New Mexico 87357

Subject: Contract Dispute for Contract No. 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: Indirect Cost Shortfalls for FYs 1993-1996

Dear Mr. Hooper:

The Indian Health Service (IHS) received your claim on August 31, 2001. On September 13, 2001, we notified you that we would answer your claim no later than December 14, 2001. Your claim is denied for the reasons set forth herein.

## Description of Claims

Your letter of August 31, 2001 sets forth two claims. The first claim alleges that the IHS failed to pay the full amount of indirect costs generated by the indirect cost rate Ramah Navajo School Board (Contractor) negotiated with the Department of the Interior's Office of the Inspector General (OIG) for fiscal years (FYs) 1993, 1994, 1995, and 1996. You claim the difference between the amounts the Contractor should have been paid, and the amounts actually paid. According to your letter, this amount is $297,088.

The second claim alleges that IHS should have adjusted the indirect cost rate that the Contractor negotiated with the OIG for FYs 1993-1996 to take into consideration the failure of other federal agencies to reimburse indirect costs fully. According to your letter, these adjustments would have produced $145,910 in additional indirect cost funding for the subject contract.

## Contract Terms at Issue

Contract 242-88-049, effective date 9/21/88, provides as follows:

> Section G(2)(A): Limitation of Cost: Subject to General Provision Clause 3, "Limitation of Cost" the total cost to the Government, including all direct and indirect costs for the performance of this contract, shall not exceed $498,897 until and unless the Contractor is notified in writing by the Contracting Officer that this ceiling amount has been increased.

DEF. EX 27 - 1

> Section G(2)(B): Allowable Cost: The Contractor will be reimbursed for all costs incurred in the performance of this contract, claimed by the Contractor, and accepted by the Contracting Officer, in accordance with General Provision Clause 3, "Limitation of Cost"; Clause 4, "Allowable Cost"; and Clause 5, "Negotiated Overhead Rates", if appropriate.
>
> Section G(2)(E): Indirect Costs. Indirect costs during the period of this contract shall be reimbursed at rates established by agreement between the Contractor and the Dept. of Interior, Office of Inspector General. No deviation from the established rate will be made without approval of the Office of Inspector General, as evidenced by a formal rate negotiation agreement.
>
> Notwithstanding the foregoing provisions the contractor shall, in the case of an upward adjustment of the overhead rate, comply with the requirements of General Provision Clause 3, Limitation of Cost, and provide timely notifications to the Contracting Officer, when such increase in costs causes operation of that Clause.
>
> Section H(4): Funds are not presently available for performance under this contract beyond June 30, 1989. The Government's obligation for performance of this contract beyond that date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. No legal liability on the part of the Government for any payment may arise for performance under this contract beyond June 30, 1989, until funds are made available to the Contracting Officer for performance and until the Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.

The Contract also incorporates PHSAR §§ 352.280-4(a)(3), Limitation of Cost, 352.280-4(a)(4), Allowable Cost, 352.280-4(a)(5), Negotiated Overhead Rate.

Modification 25, effective date 5/24/93, added $14,877 indirect cost funding to the contract and modified Section G(2), the limitation of cost clause, as follows:

> Subject to General Provision Clause 3, "Limitation of Cost" the total cost to the Government, including all direct and indirect costs for the performance of this contract shall not exceed $5,021,051 until and unless the Contractor is notified in writing by the Contracting Office that this ceiling amount has been increased.

Modification 28, effective date 7/01/93, added $209,174 indirect cost funding to cover FY 1993 obligations and modified Section G(2), the limitation of cost clause, as follows:

> Subject to General Provision Clause 3, "Limitation of Cost" the total cost to the Government, including all direct and indirect costs for the performance of this contract, shall not exceed $6,356,157 until and unless the contractor is notified in

DEF. EX 27 - 2

writing by the Contracting Officer that this ceiling amount has been increased.

Modification 33, effective date 7/1/94, added $270,393 indirect cost funding to cover FY 1994 obligations and modified Section G(2), the limitation of cost clause, as follows.

> Subject to General Provision Clause 3, "Limitation of Cost" the total cost to the Government, including all direct and indirect costs for the performance of this contract, shall not exceed $7,996,760 until and unless the contractor is notified in writing by the Contracting Officer that this ceiling amount has been increased.

Modification 34, effective date 9/7/94, added $23,618 indirect cost funding and modified Section G(2), the limitation of cost clause, as follows:

> Subject to General Provision Clause 3, "Limitation of Cost" the total cost to the Government, including all direct and indirect costs for the performance of this contract, shall not exceed $8,030,266 until and unless the contractor is notified in writing by the Contracting Officer that this ceiling amount has been increased.

Modification 35, effective date 9/30/94, added $1,495 indirect cost funding and modified Section G(2), the limitation of cost clause, as follows:

> Subject to General Provision Clause 3, "Limitation of Cost" the total cost to the Government, including all direct and indirect costs for the performance of this contract, shall not exceed $8,035,900 until and unless the contractor is notified in writing by the Contracting Officer that this ceiling amount has been increased.

Modification 39, effective date 5/1/95, incorporated the Model Agreement, Annual Funding Agreement, and their attachments and repealed previous contract language and added indirect cost funding of $328,505 for the budget period January 1, 1995 to December 1, 1995.

The Model Agreement incorporated by reference the provisions of Section 108(c) of the Indian Self-Determination and Education Assistance Act, which provides:

> (b)(4) "Subject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement incorporated by reference in subsection (f)(2). Such amount shall not be less than the applicable amount determined pursuant to section 106(a) of the Indian Self-Determination and Education Assistance Act.

The FY 1995 Annual Funding Agreement (AFA) provides in pertinent part:

> (d)(1) The amounts available under the Contract are summarized as follows: ...
> (N) indirect contract support $331,805 [non-recurring].

DEF. EX 27 - 3

ii. Indirect Contract Support Costs are to be initially funded at $328,505 which is currently available at the Area. The balance of Indirect Contract Support funding required, in accordance with the Contractor's approved negotiated indirect cost rate, shall be requested from Headquarters and provided to the Contractor before September 30, 1995. Funding of the balance needed shall be subject to the availability of appropriations.

(d)(3)(B) Funding for additional contract support costs shall be added to the AFA for the Contractor which includes Indian Self-Determination Fund direct and indirect type costs as well as Indirect Cost Shortfall fund resources. The amount of Indirect Cost Funding shall be based upon the Contractor's Indirect Cost Agreement which is applicable to this period of performance.

Modification 3, effective date 1/1/96, incorporated the FY 1996 AFA, and added $336,720 indirect cost funds. All other terms and conditions remained in effect.

**Factual Areas of Agreement and Disagreement**

A. Claim 1

Most of the allegations set forth under claim 1 are your characterizations of the parties' rights and duties under the Indian Self-Determination Act, not facts. These legal arguments will be discussed in the Decision section of this letter.

We agree with the following facts:

The FY 1993 indirect cost (IDC) rate was 21.8%.
The FY 1994 IDC rate was 20.30%.
The FY 1995 IDC rate was 25.80%.
The FY 1996 IDC rate was 21.30%.

We disagree with the following facts:

The total Program and direct Contract Support Base for FYs 1993-1996;
The indirect need generated by multiplying the indirect rate by the direct program base;
The amount of indirect cost funding awarded by IHS; and
The shortfalls/overpayments received by Contractor.

These amounts are set forth in Attachment 1.

B. Claim 2

Most of the allegations set forth under claim 2 are your characterizations of the parties' rights and duties under the Indian Self-Determination Act, not facts. These legal arguments will be

discussed in the Decision section of this letter.

As a factual matter, you have provided us with no evidence whatsoever for your assertion that your indirect cost pool is largely fixed, nor that the inclusion of other federal agency programs in the direct cost base has caused the under-recoveries asserted the table attached to your claim as Exhibit 2, nor that the adjustments made in Exhibit 2 to the direct cost base or indirect cost pool are accurate.[1]

**Decision**

A. Claim 1

Claim 1 is denied because IHS has not breached any contractual or statutory obligation to pay indirect costs beyond those already awarded the Contractor.

For FYs 1993-1994, the contract contained a specific cost ceiling beyond which there would be no additional cost to the government. IHS has awarded the specified amounts of funding, and the Contractor does not allege to the contrary.

For FYs 1995 and 1996, your contract and annual funding agreement, as well as the Indian Self-Determination Act, explicitly condition the payment of funds on the availability of appropriations. See § 106(b), § 108(c)(b)(4), § 108(c)(c)(3). The Indian Self-Determination Act further provides that the Secretary is not required to reduce funding servicing other tribes in order to make funding available for self-determination contracts. § 106(b). In FY 1995 and 1996, there were insufficient funds available to the Albuquerque Area IHS to make additional indirect cost funds available to you without reducing funding for programs serving other Area tribes.

Although Congress enacted lump sum appropriations for health services for FY 1995 and 1996, the legislative history for those appropriations specified how much funding was "available" for contract support costs, and how much funding IHS was to use to provide health care to American Indians and Alaska Natives. In the FY 1999 appropriation act, Congress clarified that it did not intend that IHS pay any more for contract support costs than had been "earmarked" in the legislative history for the FY 1994-1998 appropriation acts. Section 314 of Public Law 105-277 provides as follows:

> Notwithstanding any other provision of law, amounts appropriated to or

---

[1]Moreover, the Indian Health Service takes issue with the allegation that it has "benefited" from the alleged underpayment of the Contractor. This is not a contract for the procurement of goods or services, where the IHS has received the benefit of a hard bargain. Instead, those appropriated funds have been paid to other Indian tribes for indirect costs associated with the operation of their programs.

DEF. EX 27 - 5

> earmarked in committee reports for the Bureau of Indian Affairs and the Indian Health Service by Public Law 103-138, 103-332, 104-134, 104-208, and 105-83 for payments to tribes and tribal organizations for contract support costs associated with self-determination or self-governance contracts, grants, compacts, or annual funding agreements with the Bureau of Indian Affairs or the Indian Health Service as funded by such Acts, are the total amounts available for fiscal years 1994 through 1998 for such purposes, except that, for the Bureau of Indian Affairs, tribes and tribal organizations may use their tribal priority allocations for unmet indirect costs of ongoing contracts, grants, self-governance compacts or annual funding agreements.

(emphasis added.)

Moreover, IHS does not have the authority to award more indirect cost funding, either as specific relief or as damages. IHS has paid the amounts "earmarked" by those Committee Reports for contract support costs and does not have the authority to make more funds available to you.

B. Claim 2

Claim 2 is also denied for the following reasons. First, as discussed above, the Contractor has presented no evidence that it has actually suffered an "adverse adjustment" of the kind described by the Court of Appeals for the Tenth Circuit in Ramah Navajo Chapter, Inc. v. Lujan, 112 F.3d 1455 (1997). Second, the claim does not accurately describe the scope of the Tenth Circuit's decision. The court did not rule that the use of OMB A-87 to calculate indirect cost rates for tribes and tribal organizations was per se illegal as of 1997, much less retroactively. Nor did the court make any ruling with respect to the Indian Health Service, which was not a party to the case.

The contract provided that IHS would calculate indirect cost funding based on the indirect rate agreement. Section G(2)(E) of the initial award, in effect for FYs 1993 and 1994, explicitly forbade the IHS from making any other kind of adjustment to the indirect cost rate, such as removing other federal programs from the direct cost base, without advance approval from OIG. The AFAs in effect in FYs 1995-1996 provided that the indirect cost funding "shall be based upon the Contractor's Indirect Cost Agreement which is applicable to this period of performance." The Contractor never asked IHS to obtain, nor did IHS ever receive, approval from OIG to adjust the indirect cost rate. Even if the contract permitted IHS to make the rate adjustment the Contractor is requesting, IHS is not the Contractor's cognizant agency. It is not authorized to adjust rates negotiated under OMB Circular A-87 unless statutorily required. See OMB Circ. A-87 at E.1.

The Indian Self-Determination Act does not require IHS to adjust the indirect cost rate the Contractor negotiated with OIG to compensate the tribe for indirect costs allocable to other agencies that do not allow for full indirect cost recovery, even if the tribe would incur the same

amount of indirect costs in the absence of the other federal program. This situation has been described as "rate dilution." Instead, IHS is statutorily barred from awarding indirect cost funding for any cost shared with any other federal program. Although section 106(d)(1) prohibits using shortfalls in indirect cost funding by other federal, state, or other agencies as the basis for theoretical over-recoveries or other adverse adjustments of any future years' indirect cost rates, it is clear from the legislative history that this provision does not address "rate dilution." Instead, this provision addressed the liability of tribal contractors for uncollectible indirect costs from other federal agencies. When these "theoretical over-recoveries" were carried forward, the result was a lower indirect rate. See S. Rep. 100-274 at 32.

Despite the legislative history, the Tenth Circuit Court of Appeals held that section 106(d)(1) was ambiguous and that the tribal contractor's interpretation that it also prohibited rate dilution was plausible. Ramah Navajo Chapter, Inc. v. Lujan, 112 F.3d 1455, 1461-62 (10th Cir. 1997). However, Congress promptly acted to remove any ambiguity and amended the Indian Self-Determination Act to provide as follows:

> That, heretofore and hereafter and notwithstanding any other provision of law, funds available to the Indian Health Service in this Act or any other Act for Indian self-determination or self-governance contract or grant support costs may be expended only for costs directly attributable to contracts, grants and compacts pursuant to the Indian Self-Determination Act and no funds appropriated by this or any other Act shall be available for any contract support costs or indirect costs associated with any contract, grant, cooperative agreement, self-governance compact, or funding agreement entered into between an Indian tribe or tribal organization and the Indian Health Service.

Pub. L. 105-277, § 101(e) (1998), codified at 25 U.S.C. § 450j-2. In your claim, you have contended that your indirect cost pool is relatively inelastic, or, in other words, that it is composed of a group of costs that would not vary significantly, even if other federal programs were added or subtracted from the direct cost base. Even if IHS accepted this factual premise, IHS cannot use its funds to pay indirect costs that are "associated with" any other federal program, notwithstanding that the other federal program does not allow for full indirect cost recovery. The other federal programs in the direct cost base do incur indirect costs that are allocable to them independently of whether their governing statutes permit recovery. For this reason, IHS acted reasonably when it used the indirect rate agreement, pursuant to OMB Circular A-87, to allocate indirect costs to the IHS direct cost base.

Moreover, IHS did not violate either section 106(g) (referred to in your claim as section 106(f)), nor section 106(d)(2). IHS properly calculated the amount of indirect funds associated with the self-determination contract. Moreover, section 106(b) provides that, "notwithstanding any other provision in this subchapter," including these provisions, "the provision of funds under this subchapter," i.e. under this contract, "is subject to the availability of appropriations."

This is a final decision. You may appeal this decision to the Interior Board of Contract Appeals (IBCA), U.S. Department of the Interior, 4015 Wilson Boulevard, Arlington, VA 22203. If you decide to appeal, you shall, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the IBCA and provide a copy to the individual from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, and refer to the decision and contract number. Instead of appealing to the IBCA, you may bring an action in the U.S. Court of Federal Claims or in the United States District Court within 12 months of the date you receive this notice.

Sincerely,

/S/ DIEGO G. LUJAN

Diego G. Lujan
Contracting Officer

Enclosures:
cc: Michael P. Gross
General Counsel
460 St. Michael's Drive, Building 300
Santa Fe, New Mexico 87505-7602
Sandy Trent, Regional Attorney, Dallas
Jocelyn Beer, OGE, HQE, IHS
A. Yepa, OTS, AAO
M. Kauppila, Contract Specialist, OTS, AAO
J. Townsend, CPLO, OTS, AAO
J. Othole, CEO, ZSU

DEF. EX 27 - 8

h Navajo School Board, Inc.

| PROGRAM NAME | CONTRACT NO. | ANNUAL CONTRACT TOTAL | TOTAL PROGRAM AND DIRECT CONTRACT SUPPORT BASE | ADJUSTMENT PASS-THROUGH OTHER | FINAL ADJUSTED BASE | TYPE INDIRECT COST RATE | INDIRECT NEED | IDC AWARDED | OVER (SHORTFALL) DIFFERENCE |
|---|---|---|---|---|---|---|---|---|---|
| 3 Pine Hill Health Center | 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 | $ 1,504,177.00 | $ 1,280,126.00 | $ - | $ 1,280,126.00 | 21.80% | $ 279,067.47 | $ 224,051.00 | $ (55,016.47) |
| 4 Pine Hill Health Center | 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 | $ 1,724,801.00 | $ 1,429,295.00 | $ - | $ 1,429,295.00 | 20.30% | $ 290,146.89 | $ 295,506.00 | $ 5,359.11 |
| 5 Pine Hill Health Center | 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 | $ 2,115,598.00 | $ 1,787,093.00 | $ - | $ 1,787,093.00 | 25.80% | $ 461,069.99 | $ 328,505.00 | $ (132,564.99) |
| 6 Pine Hill Health Center | 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 | $ 2,188,208.00 | $ 1,851,488.00 | $ - | $ 1,851,488.00 | 21.30% | $ 394,366.94 | $ 336,720.00 | $ (57,646.94) |
| CUMULATIVE TOTALS | | $ 7,532,784.00 | $ 6,348,002.00 | $ - | $ 6,348,002.00 | | $ 1,424,651.29 | $1,184,782.00 | $ (239,869.29) |

Calculations do not exclude Pass-throughs

61

DEF. EX 27 - 9

RAMAH NAVAJO SCHOOL BOARD
PINE HILL HEALTH CLINIC
CONTRACT NO: 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
PREVIOUS CONTRACT: 242-
TERM: 8/18/88 - Indefinite (Mature Status)

| FUNDING BREAKOUT | ACTION TOTAL | H&C BASE | SAP & COMPONENTS | IDC | DCS | CHR EMS | MENTAL HEALTH | DENTAL | OTHER | CONTRACT TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| AWARD FY88 | $498,897.00 | $472,841.00 | $26,056.00 | | | | | | | $498,897.00 |
| MOD 1FY88 | $28,103.00 | | $16,343.00 | $11,760.00 | | | | | | $527,000.00 |
| MOD 2 FY89 | $11,760.00 | | | $11,760.00 | | | | | | $538,760.00 |
| MOD 3 FY89 | $106,904.00 | $101,320.00 | | $5,584.00 | | | | | | $645,664.00 |
| MOD 4 FY89 | $63,421.00 | | $46,261.00 | $17,160.00 | | | | | | $709,085.00 |
| MOD 5 FY89 | $541,151.00 | $541,151.00 | | | | | | | | $1,250,236.00 |
| MOD 6 FY90 | $47,336.00 | | | | | $47,336.00 | | | | $1,297,572.00 |
| MOD 7 FY90 | $943,839.00 | $531,483.00 | $64,602.00 | $282,270.00 | | $63,484.00 | | | $2,000.00 | $2,241,411.00 |
| MOD 8 FY90 | $15,318.00 | | $2,573.00 | | | $12,745.00 | | | | $2,256,729.00 |
| MOD 9 FY91 | $55,917.00 | | | | | $55,917.00 | | | | $2,312,646.00 |
| MOD 10 FY91 | $17,187.00 | | | | | | | | $17,187.00 | $2,329,833.00 |
| MOD 11 FY91 | $28,987.00 | | | | | $28,987.00 | | | | $2,358,820.00 |
| MOD 12 FY91-mat statu | $151,707.00 | $123,830.00 | | $27,877.00 | | | | | | $2,510,527.00 |
| MOD 13 FY91 | $955,409.00 | $657,732.00 | $84,025.00 | $139,386.00 | $72,166.00 | | | | $2,100.00 | $3,465,936.00 |
| MOD 14 FY91 | $10,588.00 | | $311.00 | $10,277.00 | | | | | | $3,465,936.00 |
| MOD 15 FY91 | $55,703.00 | | | $36,632.00 | | $19,071.00 | | | | $3,532,227.00 |
| MOD 16 FY92 | $15,000.00 | | | | | | | $15,000.00 | | $3,547,227.00 |
| MOD 17 FY92 | $17,187.00 | | | | | | $17,187.00 | | | $3,564,414.00 |
| MOD 18 FY92 | $64,058.00 | | | | | $64,058.00 | | | | $3,628,472.00 |
| MOD 19 FY92 | $2,376.00 | | | | | | | | $2,376.00 | $3,630,848.00 |
| MOD 20 FY92 | $1,212,943.00 | $778,490.00 | $87,280.00 | $217,643.00 | $76,083.00 | $22,258.00 | $883.00 | $16,000.00 | $14,306.00 | $4,843,791.00 |
| MOD 21 FY92 | $1,511.00 | | | | | $1,511.00 | | | | $4,845,302.00 |
| MOD 22 FY92 | $30,516.00 | | $25,000.00 | $231.00 | | | | $769.00 | $4,516.00 | $4,875,818.00 |
| MOD 23-correct acct data | | | | | | | | | | $4,875,818.00 |
| MOD 24 FY92 | ($29,092.00) | ($29,092.00) | | | | | | | | $4,846,726.00 |
| MOD 25 FY93 | $174,325.00 | | | $14,877.00 | $159,448.00 | | | | | $5,021,051.00 |
| MOD 26-canceled | | | | | | | | | | $5,021,051.00 |
| MOD 27-extend term | | | | | | | | | | $5,021,051.00 |
| MOD 28 FY93 | $1,335,106.00 | $790,905.00 | $127,153.00 | $209,174.00 | $78,725.00 | $90,533.00 | $18,716.00 | $17,800.00 | $2,100.00 | $6,356,157.00 |
| MOD 29 FY93 | $24,585.00 | | | | | $3,243.00 | | | $21,342.00 | $6,380,742.00 |
| MOD 30-correct acct data | | | | | | | | | | $6,380,742.00 |
| MOD 31-incorp FTCA | | | | | | | | | | $6,380,742.00 |



DEF. EX 27 - 10

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MOD 32 FY93 | ($29,839.00) | ($29,839.00) | | | | | | | | | $6,350,903.00 |
| MOD 33 FY94 | $1,645,857.00 | $832,230.00 | $127,043.00 | $270,393.00 | $238,931.00 | $98,413.00 | $19,184.00 | $56,663.00 | $3,000.00 | $7,996,760.00 |
| MOD 34 FY94 | $33,506.00 | $8,600.00 | | $23,618.00 | | | | | $1,288.00 | $8,030,266.00 |
| MOD 35 FY94 | $5,634.00 | | | $1,495.00 | | $4,139.00 | | | | $8,035,900.00 |
| MOD 36 FY94 | $3,490.00 | | | | | | | | $3,490.00 | $8,039,390.00 |
| MOD 37 FY94 | $36,314.00 | | | | | | $34,921.00 | | $1,393.00 | $8,075,704.00 |
| MOD 38-chg perform per | | | | | | | | | | $8,075,704.00 |
| MOD 39 FY95, MA | $2,071,299.00 | $1,048,250.00 | $129,614.00 | $328,505.00 | $384,095.00 | $101,024.00 | $19,468.00 | $57,343.00 | $3,000.00 | $10,147,003.00 |
| MOD 1 FY95 | $10,181.00 | | | | | | | | $10,181.00 | $10,157,184.00 |
| MOD 2 FY95 | $34,118.00 | | | | $22,090.00 | | | | $12,028.00 | $10,191,302.00 |
| MOD 3 FY96, AFA | $2,137,813.00 | $1,048,250.00 | $129,610.00 | $336,720.00 | $406,180.00 | $100,780.00 | $55,933.00 | $57,340.00 | $3,000.00 | $12,329,115.00 |
| MOD 4 FY96 | $8,593.00 | | | | | | $2,540.00 | $6,053.00 | | $12,337,708.00 |
| MOD 5 FY96 | $69,741.00 | $48,300.00 | | | | $4,040.00 | | | $17,401.00 | $12,407,449.00 |
| MOD 6 FY96 | ($27,939.00) | ($27,939.00) | | | | | | | | $12,379,510.00 |
| TOTALS: | $12,379,510.00 | $6,896,512.00 | $865,871.00 | $1,945,362.00 | $1,437,718.00 | $717,539.00 | $168,832.00 | $226,968.00 | $353,180.00 | |

PAYMENT INFORMATION

| | | PAYMENTS MADE | BALANCE IN PYMT SYSTEM |
|---|---|---|---|
| APS PYMT: | $6,350,903.00 | $6,350,903.00 | $0.00 |
| PMS PYMT: | $6,028,607.00 | $6,028,607.00 | $0.00 |
| TOTALS: | $12,379,510.00 | $12,379,510.00 | $0.00 |

prepared 9/20/01



DEF. EX 27 - 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TUNICA-BILOXI TRIBE OF LOUISIANA and RAMAH NAVAJO SCHOOL BOARD, INC., PLAINTIFFS, vs. UNITED STATES OF AMERICA, *et al.*, DEFENDANTS. | ) | No.: 1:02CV02413 (RBW) Magistrate Judge Deborah A. Robinson |

PLAINTIFFS' RESPONSE TO

DEFENDANTS' STATEMENT OF MATERIAL FACTS

Plaintiffs, as directed by Local Civil Rules 7.1(h) and 56.1, here respond to Defendants' Statement of Material Facts (Dkt. No. 111, at 73-85; "*Dfts' Facts*") filed in support of their motion to dismiss or for summary judgment.

A. In general, Plaintiffs agree that the material facts that make this litigation appropriate for summary judgment are not in dispute. Plaintiffs, however, disagree with Defendants as to which facts are material.

B. Defendants state that Indian Health Service ("IHS") promised to pay Plaintiffs specified amounts of contract support cost funding for specified years, citing contracts and contract modifications for those years. *Dfts' Facts* 9, 14, 19, 23, 27, 31, 35, 41, 43, 48, 53, 58, 63, 68, 73, 78, 83. Plaintiffs do not dispute that the amounts recited in those paragraph are generally accurate. The contract prices in those contracts and contract modifications were incorrectly calculated because indirect cost rates were miscalculated.

The promise to pay in each instance was a promise by the United States, not by the IHS, as documented in the contracts and contract modifications cited by Defendants.

C. Defendants state that the IHS paid Plaintiffs the amounts of contract support cost funding specified in the contracts and contract modifications for the specified years. *Dfts' Facts* 10, 15, 20, 24, 28, 32, 36, 42, 44, 49, 54, 59, 64, 69, 74, 79, 84. Plaintiffs do not dispute that the payments recited in those paragraphs are generally accurate. Those payments were not sufficient to liquidate Defendants' obligations under the Indian Self-Determination Act ("ISDA") because the contract price was not calculated in conformity with the requirements of that Act. That the IHS paid something does not mean it paid the amounts due under ISDA. Further, the recited payments do not reflect actual net payment because offsets for prior year over-recoveries have not been taken into account. *See* 4th Kerkmans Decl. (Exhibit 19 to Plaintiff's Opposition) ¶¶ 15-25; 3d Martinez Decl.; 2d Donham Decl.; 4th (5th) Burke Decl. (Exhibits 19, 20, 18, and 21, respectively, to Plaintiff's Opposition).

D. Defendants state that the IHS and Plaintiffs agreed to use particular indirect cost rates negotiated between Plaintiffs and the Department of the Interior to calculate indirect cost rates for particular years and that IHS did in fact use those rates to calculate indirect cost funding for those years, subject to later adjustment for over-recoveries. *Dfts' Facts* 11, 12, 16, 17, 21, 22, 25, 26, 29, 30, 33, 34, 37, 38, 45, 46, 50, 51, 55, 56, 60, 61, 65, 66, 70, 71, 75, 76, 80, 81, 85, 86. Plaintiffs do not dispute that the IHS used the negotiated rates to calculate indirect cost funding for those years. The indirect cost rates as calculated, however, did not meet the statutory requirement to provide contract support

costs sufficient for the contractor to operate the program at the level at which the Secretary would have operated it. Under the fixed-with-carry-forward rates used by Plaintiffs, later adjustments were to be made for over-recoveries or for under-recoveries. Without an indirect cost rate (or a lump-sum agreement based on the same rules), Plaintiffs could not receive the indirect contract support costs to which they are entitled under ISDA.

E. Defendants state the indirect costs provided by IHS to Plaintiffs in specified years exceeded IHS's "proportional share" of the actual indirect costs of Plaintiffs in those years. *Dfts' Facts* 13, 18, 47, 52, 57, 62, 67, 72, 77, 82. Plaintiffs do not dispute that statement, but it is immaterial. Defendants' obligation is to provide indirect contract support costs sufficient for the contractor to operate the program at the level at which the Secretary would have operated it; it is not to provide a mathematical percentage of Plaintiffs' actual indirect costs. Actual indirect costs incurred in a particular year are irrelevant to the United States contractual obligation for indirect costs in that year.

F. Defendants state that Plaintiffs did not challenge their indirect cost rates by appealing them through the Department of the Interior's appeal process. *Dfts' Facts* 6, 7. There is no requirement under the Contract Disputes Act, 41 U.S.C. §§ 601 et seq. requiring exhaustion of administrative remedies outside of those in that Act. Further, IHS policy made an appeal futile. Dkt. No. 81, exhs. 13, 14.

G. Defendants state that Plaintiffs did not force the Secretary of Health and Human Services to decline their contract proposals, suspend performance of a contract, or retrocede a program to IHS because of insufficient funding. *Dfts' Facts* 39, 40, 87, 88.

ISDA does not require that Plaintiffs take any of those actions to vindicate their rights under ISDA.

H. Defendants recite the apportionment, obligation, and statutory withdrawal of IHS contract support cost funds for all IHS ISDA contractors for fiscal years 1998 through 2003. *Dfts' Facts* 89-106. Plaintiffs do not dispute the accuracy of the numbers recited. Those numbers are irrelevant to the existence and liquidation of United States contractual obligations to Plaintiffs for the specified years. Defendant Secretary has never sought an appropriation sufficient to meet the need for indirect contract support costs. *See* excerpts from annual Justifications of Estimates submitted by the U.S. Department of Health & Human Services, Indian Health Service, to the congressional appropriations committees, collected in Exhibit 12 to Plaintiffs' Opposition. The Secretary has never complied with his statutory duty , 25 U.S.C. § 450j-1(c)(2), to formally report to Congress each year on deficiencies in contract support cost funding. Dkt. No. 110, exhibit 19, at 3-4.

I. Defendants state that Plaintiffs' indirect cost pools are not fixed. *Dfts' Facts* 107, 108. Plaintiffs do not allege that their indirect cost pools are fixed. They do allege that for most contractors, the indirect cost pools are generally fixed. *2d Amd. Complt.* (Dkt. No. 11, ¶ 21). Failure to recover the entire pool by logic and definition adversely affects all programs in the base. Because it consists of common costs, failure to collect the entire pool harms the contractor even were the pool entirely variable. The indirect cost pools of Tunica and RNSB, like those of most ISDA contractors, remain relatively constant over time and do not fluctuate in direct proportion to fluctuations in the direct

cost base. *See Plaintiffs' Statement of Material Facts* (Dkt. No. 110)(*Plfs' Facts*) and sources there cited; 4th Burke Decl., Exhibit 6 to Plaintiffs' Opposition. So long as a contractor's indirect cost pool is not entirely variable, the failure to recover the entire pool harms every program in the direct cost base. A cost that is entirely variable is a direct cost, not an indirect cost.

J. Defendants state that IHS programs comprised "only approximately 15-23%" of RNSB's direct cost base in 1995-2002 and "only approximately 38-46%" of Tunica's base in 1995-1997. *Dfts' Facts* 109, 110. Plaintiffs do not dispute these percentages but they are irrelevant. Of some relevance is the percentage of the base comprised of programs funded by the two ISDA agencies, BIA and IHS. For 1995-2002, ISDA programs constituted between 67.8% and 77.6% of RNSB's federal direct cost base. 2d Martinez Decl. (Dkt. No. 110, exhibit 3), exh. 3, at IHS4753, IHS4763, IHS4765, IHS4769, IHS4771, IHS5192; Dkt. No. 111, exhibit 20, at 9. For 1995-2005, ISDA programs constituted between 60.9% and 90.2% of Tunica's federal direct cost base. 3d Burke Declaration, supplemental exhibit 9 (Dkt. No. 116), IDC proposals for FY 1998-2003, at 11-18; for FY 2006, at 9; (Dkt. No. 119), IDC proposal for FY 2007 at 9.

K. Defendants state that "many non-IHS agencies" provide indirect cost funding and that Plaintiffs recovered indirect costs from non-IHS programs in specified years. *Dfts' Facts* 111-113. Plaintiffs do not dispute these facts but they are irrelevant. What is relevant is that the ISDA contracting agencies—IHS and the Bureau of Indian Affairs—are the only agencies that are required by statute to provide, as part of the contract price, indirect cost funding that supplements the direct cost component of the contract price.

Many non-ISDA agencies do not allow payment of indirect costs out of contract or grant funds. *Plfs' Facts* ¶ 29, and sources there cited. Of the non-ISDA agencies that do allow payment of indirect costs, many limit the percentage of contract or grant funds that may be used to pay indirect costs. *Id.* The United States and the contractor agree that the entire indirect cost pool is the minimum necessary to operate all programs in the base. *Id.* ¶ 21, and sources there cited. If the contractor cannot recover the entire indirect cost pool, every program in the base is harmed.

L. Defendants state that RNSB did not submit a contract dispute related to its 1997 contract. *Dfts' Facts* 1. RNSB did not submit a contract dispute for 1997 but did submit a claim for its 1999 and 2001 contracts. The contract prices for the 1997 and 1999 contracts were determined, in part, by carry-forward calculations, so RNSB did submit a contract dispute "related to" its 1997 contract. *See* US Exh. 26, filed in support of its motion (Dkt. No. 111).

M. Defendants state that Plaintiff RNSB did not submit a CDA claim related to its 1998 contract on the basis of "the carry-forward claim." *Defs. Facts* 4. RNSB filed a contract dispute with its contracting officer on August 31, 2001, challenging all shortfalls in collection of contract support costs and rate-making. US Exh. 25, filed in support of its motion (Dkt. No. 111). Carry-forwards are part of the rate-making process and are subsumed within the rate-making challenge. 4th Kerkman's Decl. (Exhibit 19 to Plaintiffs' Opposition) ¶ 10.

N. Defendants state that in RNSB's December 21, 2005, contract dispute, RNSB did not seek any additional contract support funding for 1999-2003 on the basis of "the