# Index to Appendix

| | Page |
|---|---|
| The Indian Self-Determination and Education Assistance Act, as amended, 25 U.S.C. §§ 450 *et seq*.—Excerpts from 25 U.S.C. §§ 450j-1, 450*l* and 450m-1 | A-2 |
| The Contract Disputes Act, as amended, 41 U.S.C. §§ 601 *et seq*.—Excerpts from 41 U.S.C. §§ 605 and 609 | A-14 |
| Bennie Cohoe, Executive Director, Ramah Navajo School Board, Inc., letter to Veronica Zuni, Contracting Officer, Indian Health Service (August 22, 2007) (requesting decision on 1997 Shortfall Claim) | A-18 |
| Bennie Cohoe, Executive Director, Ramah Navajo School Board, Inc., letter to Veronica Zuni, Contracting Officer, Indian Health Service (July 31, 2007) (requesting decision on 1997 Miscalculation Claim) | A-20 |
| *Tunica-Biloxi Tribe of Louisiana, et al., v. United States, et al.*, No. 1:02CV02413 (RBW) | |
| Doc. 21, *Plaintiffs' Motion to Certify Class* (excerpt) | A-25 |
| Doc. 82, *Defendants' Memorandum in Support of Motion to Dismiss* (excerpt) | A-36 |
| Doc. 95-1, *Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment as to 'Lump Sum Years' (1995-1997)* (excerpt) | A-38 |
| Doc. 110, *Memorandum of Points and Authority in Support of Plaintiffs' Motion for Partial Summary Judgment* (table of contents) | A-40 |
| Doc. 111, *Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment* (table of contents) | A-43 |
| *Ramah Navajo Chapter v. Lujan*, U.S.D.C. New Mexico No. 90CV0957 (LH/WWD), *Stipulated Order Allowing Intervention and Amendment of the Amended Complaint*, Doc. 347 (Sept. 30, 1999) | A-46 |
| *Pueblo of Zuni v. United States*, U.S.D.C. N.M. No. 01CV1046 (WJ/WPL), *Complaint*, Doc. 1 (Sept. 11, 2001) | A-48 |
| *Ramah Navajo Chapter v. Lujan*, No. 90CV0957 (LH/WWD), Order Doc. 96 (Oct. 1, 1993) | A-81 |

**The Indian Self-Determination and Education Assistance Act,**
**as amended, 25 U.S.C. §§ 450 *et seq*.**
**Excerpts from 25 U.S.C. §§ 450j-1, 450*l*, and 450m-1**
(bold emphasis added)

**25 U.S.C. § 450j–1. Contract funding and indirect costs**

**(a) Amount of funds provided**

(1) The amount of funds provided under the terms of self-determination contracts entered into pursuant to this subchapter shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract, without regard to any organizational level within the Department of the Interior or the Department of Health and Human Services, as appropriate, at which the program, function, service, or activity or portion thereof, including supportive administrative functions that are otherwise contractable, is operated.

**(2) There shall be added to the amount required by paragraph (1) contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—**

**(A) normally are not carried on by the respective Secretary in his direct operation of the program; or**

**(B) are provided by the Secretary in support of the contracted program from resources other than those under contract.**

(3)

(A) **The contract support costs that are eligible costs for the purposes of receiving funding under this subchapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of—**

(i) direct program expenses for the operation of the Federal program that is the subject of the contract, and

(ii) **any additional administrative or other expense related to the overhead incurred by the tribal**

**contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract,**

except that such funding shall not duplicate any funding provided under subsection (a)(1) of this section.

(B) On an annual basis, during such period as a tribe or tribal organization operates a Federal program, function, service, or activity pursuant to a contract entered into under this subchapter, the tribe or tribal organization shall have the option to negotiate with the Secretary the amount of funds that the tribe or tribal organization is entitled to receive under such contract pursuant to this paragraph.

. . .

**(b) Reductions and increases in amount of funds provided**

The amount of funds required by subsection (a) of this section—

(1) shall not be reduced to make funding available for contract monitoring or administration by the Secretary;

(2) shall not be reduced by the Secretary in subsequent years except pursuant to—

(A) a reduction in appropriations from the previous fiscal year for the program or function to be contracted;

(B) a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution;

(C) a tribal authorization;

(D) a change in the amount of pass-through funds needed under a contract; or

(E) completion of a contracted project, activity, or program;

(3) shall not be reduced by the Secretary to pay for Federal functions, including, but not limited to, Federal pay costs, Federal employee retirement benefits, automated data processing, contract technical assistance or contract monitoring;

(4) shall not be reduced by the Secretary to pay for the costs of Federal personnel displaced by a self-determination contract; and

(5) may, at the request of the tribal organization, be increased by the Secretary if necessary to carry out this subchapter or as provided in section 450j (c) of this title.

Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

**(c) Annual reports**

Not later than May 15 of each year, the Secretary shall prepare and submit to Congress an annual report on the implementation of this subchapter. Such report shall include—

(1) an accounting of the total amounts of funds provided for each program and the budget activity for direct program costs and contract support costs of tribal organizations under self-determination;

(2) an accounting of any deficiency in funds needed to provide required contract support costs to all contractors for the fiscal year for which the report is being submitted;

(3) the indirect cost rate and type of rate for each tribal organization that has been negotiated with the appropriate Secretary;

(4) the direct cost base and type of base from which the indirect cost rate is determined for each tribal organization;

(5) the indirect cost pool amounts and the types of costs included in the indirect cost pool; and

(6) an accounting of any deficiency in funds needed to maintain the preexisting level of services to any Indian tribes affected by contracting activities under this subchapter, and a statement of the amount of funds needed for transitional purposes to enable contractors to convert from a Federal fiscal year accounting cycle, as authorized by section 450j (d) of this title.

**(d) Treatment of shortfalls in indirect cost recoveries**

(1) Where a tribal organization's allowable indirect cost recoveries are below the level of indirect costs that the tribal organizations should have received for any given year pursuant to its approved indirect cost rate, and such shortfall is the result of lack of full indirect cost funding by any Federal, State, or other agency, such shortfall in recoveries

shall not form the basis for any theoretical over-recovery or other adverse adjustment to any future years' indirect cost rate or amount for such tribal organization, nor shall any agency seek to collect such shortfall from the tribal organization.

(2) N**othing in this subsection shall be construed to authorize the Secretary to fund less than the full amount of need for indirect costs associated with a self-determination contract.**

. . .

**(g) Addition to contract of full amount contractor entitled; adjustment**

**Upon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under subsection (a) of this section, subject to adjustments for each subsequent year that such tribe or tribal organization administers a Federal program, function, service, or activity under such contract.**

. . .

* * *

**25 U.S.C. § 450l. Contract or grant specifications**

**(a) Terms**

**Each self-determination contract entered into under this subchapter shall—**

**(1) contain, or incorporate by reference, the provisions of the model agreement described in subsection (c) of this section (with modifications where indicated and the blanks appropriately filled in),** and

(2) contain such other provisions as are agreed to by the parties.

**(b) Payments; Federal records**

Notwithstanding any other provision of law, the Secretary may make payments pursuant to section 1(b)(6) of such model agreement. As provided in section 1(b)(7) of the model agreement, the records of the tribal government or tribal organization specified in such section shall not be considered Federal records for purposes of chapter 5 of title 5.

**(c) Model agreement**

The model agreement referred to in subsection (a)(1) of this section reads as follows:

**"SECTION 1. AGREEMENT BETWEEN THE SECRETARY AND THE XXXXXX TRIBAL GOVERNMENT.**

"**(a) Authority and Purpose.—**

"**(1) Authority**.—**This agreement, denoted a Self-Determination Contract (referred to in this agreement as the 'Contract'), is entered into by** the Secretary of the Interior or **the Secretary of Health and Human Services (referred to in this agreement as the 'Secretary'), for and on behalf of the United States** pursuant to title I of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) and by the authority of the XXXXXX tribal government or tribal organization (referred to in this agreement as the 'Contractor'). **The provisions of title I of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) are incorporated in this agreement.**

"**(2) Purpose.**—**Each provision of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) and each provision of this Contract shall be liberally construed for the benefit of the Contractor to transfer the funding and the following related functions, services, activities, and programs (or portions thereof), that are otherwise contractable under section 102(a) of such Act, including all related administrative functions, from the Federal Government to the Contractor**: (List functions, services, activities, and programs).

"**(b) Terms, Provisions, and Conditions.—**

"**(1) Term.**—Pursuant to section 105(c)(1) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450j (c)(1)), the term of this contract shall be XX years. Pursuant to section 105(d)(1) of such Act (25 U.S.C. 450j (d)), upon the election by the Contractor, the period of this Contract shall be determined on the basis of a calendar year, unless the Secretary and the Contractor agree on a different period in the annual funding agreement incorporated by reference in subsection (f)(2).

"**(2) Effective date.**—This Contract shall become effective upon the date of the approval and execution by the Contractor and the Secretary, unless the Contractor and the Secretary agree on an effective date other than the date specified in this paragraph.

"**(3) Program standard.**—The Contractor agrees to administer the program, services, functions and activities (or portions thereof) listed in subsection (a)(2) of the Contract in conformity with the following standards: (list standards).

"**(4) Funding amount.—Subject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement incorporated by reference in subsection (f)(2). Such amount shall not be less than the applicable amount determined pursuant to section 106(a) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450j–1).**

"**(5) Limitation of costs.**—The Contractor shall not be obligated to continue performance that requires an expenditure of funds in excess of the amount of funds awarded under this Contract. If, at any time, the Contractor has reason to believe that the total amount required for performance of this Contract or a specific activity conducted under this Contract would be greater than the amount of funds awarded under this Contract, the Contractor shall provide reasonable notice to the appropriate Secretary. If the appropriate Secretary does not take such action as may be necessary to increase the amount of funds awarded under this Contract, the Contractor may suspend performance of the Contract until such time as additional funds are awarded.

"**(6) Payment.**—

"**(A) In general.**—Payments to the Contractor under this Contract shall—

"(i) be made as expeditiously as practicable; and "(ii) include financial arrangements to cover funding during periods covered by joint resolutions adopted by Congress making continuing appropriations, to the extent permitted by such resolutions.

"**(B) Quarterly, semiannual, lump-sum, and other methods of payment.**—

"**(i) In general.**—Pursuant to section 108(b) of the Indian Self-Determination and Education Assistance Act, and notwithstanding any other provision of law, for each fiscal year covered by this Contract, the Secretary shall

make available to the Contractor the funds specified for the fiscal year under the annual funding agreement incorporated by reference pursuant to subsection (f)(2) by paying to the Contractor, on a quarterly basis, one-quarter of the total amount provided for in the annual funding agreement for that fiscal year, in a lump-sum payment or as semiannual payments, or any other method of payment authorized by law, in accordance with such method as may be requested by the Contractor and specified in the annual funding agreement.

"**(ii) Method of quarterly payment.**—If quarterly payments are specified in the annual funding agreement incorporated by reference pursuant to subsection (f)(2), each quarterly payment made pursuant to clause (i) shall be made on the first day of each quarter of the fiscal year, except that in any case in which the Contract year coincides with the Federal fiscal year, payment for the first quarter shall be made not later than the date that is 10 calendar days after the date on which the Office of Management and Budget apportions the appropriations for the fiscal year for the programs, services, functions, and activities subject to this Contract.

"**(iii) Applicability.**—Chapter 39 of title 31, United States Code, shall apply to the payment of funds due under this Contract and the annual funding agreement referred to in clause (i).

" . . .

"**(9) Availability of funds.**—Notwithstanding any other provision of law, any funds provided under this Contract—

"(A) shall remain available until expended; and

"(B) with respect to such funds, no further—

"(i) approval by the Secretary, or

"(ii) justifying documentation from the Contractor,

shall be required prior to the expenditure of such funds.

". . .

"**(11) Federal program guidelines, manuals, or policy directives.**—Except as specifically provided in the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450 et seq.) the Contractor is not required to abide by program guidelines, manuals, or policy directives of the Secretary, unless otherwise agreed to by the Contractor and the Secretary, or otherwise required by law.

". . .

"**(14) Successor annual funding agreement.**—

"**(A) In general.**—Negotiations for a successor annual funding agreement, provided for in subsection (f)(2), shall begin not later than 120 days prior to the conclusion of the preceding annual funding agreement. Except as provided in section 105(c)(2) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450j (c)(2)) the funding for each such successor annual funding agreement shall only be reduced pursuant to section 106(b) of such Act (25 U.S.C. 450j–1 (b)).

"**(B) Information.**—The Secretary shall prepare and supply relevant information, and promptly comply with any request by the Contractor for information that the Contractor reasonably needs to determine the amount of funds that may be available for a successor annual funding agreement, as provided for in subsection (f)(2) of this Contract.

"**(15) Contract requirements; approval by secretary.**—

"**(A) In general.**—Except as provided in subparagraph (B), for the term of the Contract, section 2103 of the Revised Statutes (25 U.S.C. 81), section 16 of the Act of June 18, 1934 (48 Stat. 987, chapter 576; 25 U.S.C. 476), and the Act of July 3, 1952 (25 U.S.C. 82a), shall not apply to any contract entered into in connection with this Contract.

"**(B) Requirements.**—Each Contract entered into by the Contractor with a third party in connection with performing the obligations of the Contractor under this Contract shall—

"(i) be in writing;

"(ii) identify the interested parties, the authorities of such parties, and purposes of the Contract;

"(iii) state the work to be performed under the Contract; and

"(iv) state the process for making any claim, the payments to be made, and the terms of the Contract, which shall be fixed.

"**(c) Obligation of the Contractor.**—

"**(1) Contract performance.**—Except as provided in subsection (d)(2), the Contractor shall perform the programs, services, functions, and activities as provided in the annual funding agreement under subsection (f)(2) of this Contract.

"**(2) Amount of funds.**—The total amount of funds to be paid under this Contract pursuant to section 106 (a) shall be determined in an annual funding agreement entered into between the Secretary and the Contractor, which shall be incorporated into this Contract.

"**(3) Contracted programs.**—Subject to the availability of appropriated funds, the Contractor shall administer the programs, services, functions, and activities identified in this Contract and funded through the annual funding agreement under subsection (f)(2).

". . .

"**(d) Obligation of the United States.**—

"**(1) Trust responsibility.**—

"**(A) In general.**—The United States reaffirms the trust responsibility of the United States to the XXXXXX Indian tribe(s) to protect and conserve the trust resources of the Indian tribe(s) and the trust resources of individual Indians.

"**(B) Construction of contract.**—Nothing in this Contract may be construed to terminate, waive, modify, or reduce the trust responsibility of the United States to the tribe(s) or individual Indians. The Secretary shall act in good faith in upholding such trust responsibility.

"**(2) Good faith**.—To the extent that health programs are included in this Contract, and within available funds, the Secretary shall act in good faith in cooperating with the Contractor to achieve the goals set forth in the Indian Health Care Improvement Act (25 U.S.C. 1601 et seq.).

"**(3) Programs retained.**—As specified in the annual funding agreement, the United States hereby retains the programs, services, functions, and activities with respect to the tribe(s) that are not specifically assumed by the Contractor in the annual funding agreement under subsection (f)(2).

"**(e) Other Provisions.**—

"**(1) Designated officials.**—Not later than the effective date of this Contract, the United States shall provide to the Contractor, and the Contractor shall provide to the United States, a written designation of a senior official to serve as a representative for notices, proposed amendments to the Contract, and other purposes for this Contract.

"**(2) Contract modifications or amendment.**—

"**(A) In general.**—Except as provided in subparagraph (B), no modification to this Contract shall take effect unless such modification is made in the form of a written amendment to the Contract, and the Contractor and the Secretary provide written consent for the modification.

"**(B) Exception.**—The addition of supplemental funds for programs, functions, and activities (or portions thereof) already included in the annual funding agreement under subsection (f)(2), and the reduction of funds pursuant to section 106 (b)(2), shall not be subject to subparagraph (A).

". . .

"**(f) Attachments.**—

"**(1) Approval of contract.**—Unless previously furnished to the Secretary, the resolution of the XXXXXX Indian tribe(s) authorizing the contracting of the programs, services, functions, and activities identified in this Contract is attached to this Contract as attachment 1.

"**(2) Annual funding agreement.**—

"**(A) In general.**—The annual funding agreement under this Contract shall only contain—

"(i) terms that identify the programs, services, functions, and activities to be performed or administered, the general budget category assigned, the funds to be provided, and the time and method of payment; and

"(ii) such other provisions, including a brief description of the programs, services, functions, and activities to be performed (including those supported by financial resources other than those provided by the Secretary), to which the parties agree.

"**(B) Incorporation by reference.**—The annual funding agreement is hereby incorporated in its entirety in this Contract and attached to this Contract as attachment 2."

* * *

**25 U.S.C. § 450m–1. Contract disputes and claims**

**(a) Civil actions; concurrent jurisdiction; relief**

**The United States district courts shall have original jurisdiction** over any civil action or claim against the appropriate Secretary arising under this subchapter and, s**ubject to the provisions of subsection (d) of this section and concurrent with the United States Court of Claims, over any civil action or claim against the Secretary for money damages arising under contracts authorized by this subchapter.** In an action brought under this paragraph, the district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 450f (a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

**(b) Revision of contracts**

The Secretary shall not revise or amend a self-determination contract with a tribal organization without the tribal organization's consent.

**(c) Application of laws to administrative appeals**

The Equal Access to Justice Act (Publc [1] Law 96–481, Act of October 1,[1] 1980; 92 [1] Stat. 2325, as amended), section 504 of title 5, and section 2412 of title 28 shall apply to administrative appeals pending on or filed after October 5, 1988, by tribal organizations regarding self-determination contracts.

**(d) Application of Contract Disputes Act**

**The Contract Disputes Act (Public Law 95–563, Act of November 1, 1978; 92 Stat. 2383, as amended) [41 U.S.C. 601 et seq.] shall apply to self-determination contracts**, except that all administrative appeals relating to such contracts shall be heard by the Interior Board of Contract Appeals established pursuant to section 8 of such Act (41 U.S.C. 607).

**(e) Application of subsection (d)**

Subsection (d) of this section shall apply to any case pending or commenced on or after March 17, 1986, before the Boards of Contract Appeals of the Department of the Interior or the Department of Health and Human Services except that in any such cases finally disposed of before October 5, 1988, the thirty-day period referred to in section 504 (a)(2) of title 5 shall be deemed to commence on October 5, 1988.

**The Contract Disputes Act,**
**as amended, 41 U.S.C. §§ 601 *et seq*.**

**Excerpts from 41 U.S.C. §§ 605, 609, and 611**

### 41 U.S.C. § 605. Decision by contracting officer

#### (a) Contractor claims

All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer. Each claim by a contractor against the government relating to a contract and each claim by the government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim. The preceding sentence does not apply to a claim by the government against a contractor that is based on a claim by the contractor involving fraud. The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor. The decision shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this chapter. Specific findings of fact are not required, but, if made, shall not be binding in any subsequent proceeding. The authority of this subsection shall not extend to a claim or dispute for penalties or forfeitures prescribed by statute or regulation which another Federal agency is specifically authorized to administer, settle, or determine. This section shall not authorize any agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud.

#### (b) Review; performance of contract pending appeal

The contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter. Nothing in this chapter shall prohibit executive agencies from including a clause in government contracts requiring that pending final decision of an appeal, action, or final settlement, a contractor shall proceed diligently with performance of the contract in accordance with the contracting officer's decision.

**(c) Amount of claim; certification; notification; time of issuance; presumption**

(1) A contracting officer shall issue a decision on any submitted claim of $100,000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period. For claims of more than $100,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

(2) A contracting officer shall, within sixty days of receipt of a submitted certified claim over $100,000—

(A) issue a decision; or

(B) notify the contractor of the time within which a decision will be issued.

(3) The decision of a contracting officer on submitted claims shall be issued within a reasonable time, in accordance with regulations promulgated by the agency, taking into account such factors as the size and complexity of the claim and the adequacy of the information in support of the claim provided by the contractor.

(4) A contractor may request the tribunal concerned to direct a contracting officer to issue a decision in a specified period of time, as determined by the tribunal concerned, in the event of undue delay on the part of the contracting officer.

(5) Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter. However, in the event an appeal or suit is so commenced in the absence of a prior decision by the contracting officer, the tribunal concerned may, at its option, stay the proceedings to obtain a decision on the claim by the contracting officer.

(6) The contracting officer shall have no obligation to render a final decision on any claim of more than $100,000 that is not certified in

accordance with paragraph (1) if, within 60 days after receipt of the claim, the contracting officer notifies the contractor in writing of the reasons why any attempted certification was found to be defective. A defect in the certification of a claim shall not deprive a court or an agency board of contract appeals of jurisdiction over that claim. Prior to the entry of a final judgment by a court or a decision by an agency board of contract appeals, the court or agency board shall require a defective certification to be corrected.

(7) The certification required by paragraph (1) may be executed by any person duly authorized to bind the contractor with respect to the claim.

. . .

* * *

**41 U.S.C. § 609. Judicial review of board decisions**

**(a) Actions in United States Court of Federal Claims; district court actions; time for filing**

(1) Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.

(2) In the case of an action against the Tennessee Valley Authority, the contractor may only bring an action directly on the claim in a United States district court pursuant to section 1337 of title 28, notwithstanding any contract provision, regulation, or rule of law to the contrary.

(3) Any action under paragraph (1) or (2) shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim, and shall proceed de novo in accordance with the rules of the appropriate court.

. . .

* * *

**41 U.S.C. § 611. Interest**

Interest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim pursuant

to section 605(a) of this title from the contractor until payment thereof. The interest provided for in this section shall be paid at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board.

* * *

RAMAH NAVAJO SCHOOL BOARD, INC

P.O. BOX 10 • PINE HILL, NEW MEXICO 87357 • (505) 775-3256 • FAX (505) 775-3240

EXECUTIVE OFFICE

August 22, 2007

Ms. Veronica Zuni
Albuquerque Area Office
Indian Health Service
5300 Homestead Road, N.E.
Albuquerque, NM 87110

Re: Request for Contracting Officer's Decision on Contract No. 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 for 1997

Dear Ms. Zuni:

Ramah Navajo School Board, Inc. (RNSB) hereby claims the right to immediate payment of $45,569, plus interest, due and owing for 1997 contract support costs under its mature contract no. 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 (now re-numbered as HHSI 242 2007 00007 C) with the United States. The Secretary of Health and Human Services, acting on behalf of the United States, in that contract with RNSB did not pay the contract support costs to which RNSB was entitled calculated in 1997 by using the indirect cost rate agreed to by the Indian Health Service.

This claim is additional to, and separate and distinct from, the claim RNSB presented to you on July 31, 2007, that the Secretary of Health and Human Services, acting on behalf of the United States, calculated indirect costs for this contract in 1997 by using a methodology that is inconsistent with the requirements of ISDA. This claim, by contrast, is that the United States failed to pay even the incorrectly calculated amount.

RNSB provides health care services under Title I of the Indian Self-Determination and Education Assistance Act, Public Law 93-638, as amended, 25 U.S.C. §§ 450 *et seq.* (ISDA), pursuant to contract no. 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. The Contract Disputes Act is applicable to this claim pursuant to Section 110 of ISDA, 25 U.S.C. § 450m-1(d).

Section (b)(4) of the contract requires payment of contract support costs as mandated by section 106(a) of ISDA, 25 U.S.C. § 450j-1(a).

In 1997, RNSB contracted with the United States to provide health services in exchange for payments pursuant to section 106(a)(1) of ISDA, 25 U.S.C. § 450j-1(a)(1), in the amount of $1,955,232. The Indian Health Service agreed to use RNSB's 1996 rate of 21.30% to calculate RNSB's entitlement to indirect costs for 1997. Applying the indirect cost rate of 21.30% to the Secretarial amount of $1,955,232 yields an indirect cost entitlement of $416,464. In fact, the United States paid RNSB only $370,895 for indirect costs, claiming unavailability of funds with which to pay the remaining $45,569.

The Supreme Court of the United States has held that in 1997, the excuse of unavailability of funds was not available to the United States for underpayment of indirect costs under ISDA contracts for the performance of IHS functions. *Cherokee Nation v. Leavitt*, 543 U.S. 631, 125 S. Ct. 1172 (2005).

Accordingly, the United States still owes RNSB $45,569 for indirect costs for 1997. By failing to pay this amount, the United States has violated its statutory and contractual obligations to RNSB.

This claim was withheld during the pendency of class certification proceedings in *Pueblo of Zuni v. United States*, No. 1:01-cv-01046-WJ-WPL in the U.S. District Court for the District of New Mexico. The class sought to be certified in that lawsuit consisted of "all tribes and tribal organizations contracting with IHS under the ISDA between the years 1993 to the present." Complaint, Sept. 11, 2001, ¶ 53. RNSB's claim here presented would have been among the claims included in the *Pueblo of Zuni* lawsuit had it been certified as a class action. On May 22, 2007, the Court denied class certification in that lawsuit.

Under the rule established by the U.S. Supreme Court in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S. Ct. 756 (1974), and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S. Ct. 2392 (1983), the time for presenting a contract dispute was tolled from September 11, 2001, to May 22, 2007, from the filing of the complaint in *Pueblo of Zuni* until the denial of class certification therein. This contract dispute is therefore timely.

RNSB therefore demands payment of the $45,569 in indirect costs that were not paid in 1997. We request a final contracting officer's decision under the Contract Disputes Act (CDA), 41 U.S.C. § 605, on this claim.

This claim is supported by the originals of contract no. 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, modifications thereto, the 1997 annual funding agreement and amendments thereto, and indirect cost rate agreement 97-P-141, of November 13, 1996, all of which are in the custody of the Government.

I certify that (1) this claim is made in good faith; (2) the supporting data are accurate and complete to the best of my knowledge and belief; (3) the amount requested accurately reflects the contract adjustment for which RNSB believes the Government is liable; and (4) I am duly authorized to certify the claim on behalf of RNSB.

Thank you for your prompt attention to this request for a final decision.

Sincerely yours,

Bennie Cohoe
Executive Director

xc: Michael P. Gross, MP Gross & Associates
Dan MacMeekin, MP Gross & Associates

RAMAH NAVAJO SCHOOL BOARD, INC

P.O. Box 10 • Pine Hill, New Mexico 87357 • (505) 775-3256 • Fax (505) 775-3240

EXECUTIVE OFFICE

July 31, 2007

Veronica Zuni
Contracting Officer
Albuquerque Area Office
Indian Health Service
5300 Homestead Road, NE
Albuquerque, New Mexico 87110

Re: Request for Contracting Officer's Decision on Contract No. HHSI 242 2007 00007 C under the Contract Dispute Act, 41 U.S.C. sec. 601 *et seq*. for 1997

Dear Ms. Zuni:

We request a contracting officer's decision under the Contract Disputes Act (CDA), 41 U.S.C. § 605, on the claim that the Secretary of Health and Human Services, acting on behalf of the United States, in its mature contract no. HHSI 242 2007 00007 C (previously numbered as 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) with the Ramah Navajo School Board, Inc. (RNSB), includes indirect contract support costs calculated under a methodology that is inconsistent with the requirements of the Indian Self Determination and Education Assistance Act, 25 U.S.C. §§ 450 *et seq*. (ISDA).

RNSB requests that the contracting officer (1) adjust and correct the terms of mature contract no. HHSI 242 2007 00007 C and reform the contract to comply with the requirements of ISDA; and (2) pay to RNSB the indirect costs it would have received in each year for which those adjustments and corrections were not made. RNSB also requests (3) that the Secretary of the Department of Health and Human Services revise and reform the system presently used to determine the indirect costs component of Contract Support Costs (CSC) required to be added to RNSB's contract on an annual basis under 25 U.S.C. § 450j-1(a)(2) and § 450j-1(g) so that the indirect cost rate used in that calculation is not diluted by the practices complained of below.

1 <u>Background</u>

RNSB provides health care services under Title I of ISDA pursuant to contract no. HHSI 242 2007 00007 C. The CDA is applicable to this dispute pursuant to Section 110 of ISDA, 25 U.S.C. § 450m-1(d) and section (b)(12)(B) of the contract.

> Section (b)(4) of the contract requires payment of contract support costs as mandated by section 106(a) of ISDA, 25 U.S.C. § 450j-1(a)

rec'd 8-3-07

When a contractor has an indirect cost rate, the Secretary by policy uses the rate to compute the contractors entitlement to indirect costs. RNSB has indirect costs rates to meet requirements for funding from other federal and state agencies. It uses the carry forward rate option, as do most other contractors, because it adjusts for over- and under-recoveries through future rate adjustments rather than by an actual exchange of checks. Within the carry forward system the other rate options are either too complicated or simply not available for RNSB to use to minimize the overall defects in the rate system described below.

As a practical matter, RNSB has no control over the methodology used to calculate indirect cost rates. The Secretary's written policies establish that he would use a similar methodology to calculate a lump sum to cover the indirect cost component of the contract required by ISDA if RNSB did not have an indirect cost rate.

RNSB has an indirect cost rate at present of 16.30% established by agreement dated February 13, 2007 and previously forwarded to you.

2. <u>The Procedure to Calculate Indirect Contract Support Rates Produces Indirect Contract Support Calculations Which Are Below The Level Required By The ISDA Statute.</u>

The methodology used to calculate RNSB's indirect contract support costs does not comply with the requirements of ISDA in the following respects:

(1) *RNC v. Lujan*. NBC employs a rate methodology that artificially and illegally depresses RNSB's indirect cost rate. The Secretary applies that depressed rate to RNSB's contracted Indian Health Service (IHS) program to calculate the Secretary's indirect contract support cost obligation under contract no. HHSI 242 2007 00007 C. The obligation is thereby reduced to less than what is required by ISDA. This rate depression is caused by including in the denominator of the indirect cost calculation the programs of federal agencies that have restrictions or prohibitions on the use of their funds to pay indirect costs. The effects of including these agencies in the base was thoroughly discussed and found to violate ISDA in *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997).

(2) *"Shortfall column" error*. NBC categorizes some of RNSB's under-recoveries from other programs as "shortfalls" and excludes them from RNSB's rate calculations. Because of this exclusion, when carry-forward adjustments are used in computing RNSB's new indirect cost rate in the second succeeding year, that new rate is artificially and illegally depressed, thereby reducing the Secretary's indirect contract support cost obligation under contract no. HHSI 242 2007 00007 C to less than what is required by ISDA. The use of a "shortfall column" is exclusive to ISDA contractors and is unauthorized by OMB Circular A-87 which established and guides the indirect cost rate system.

(3) *Double-dipping*. In calculating indirect cost rates, NBC double bills RNSB for perceived over-recoveries of indirect costs, reducing the rate (and therefore the indirect cost component of the contract) in the next rate cycle (two years hence) sufficiently to fully offset the supposed over-recovery, but then again subtracting the same amount in rate calculations in the next rate cycle (four years hence). This procedure also reduces the Secretary's indirect contract support cost obligation under contract no. HHSI 242 2007 00007 C to less than

what is required by ISDA. . This procedure aligns with the "Shortfall column" to prevent under-recoveries from benefitting from the double dipping mechanism thereby amplifying the harm of the "shortfall column". The effect of the two mechanisms is to reduce the contract price for indirect CSC below what is required under Sections 450j-1(a)(2) and 450j-1(g) of the ISDA.

(4) *Treating indirect costs spent as upper limit to indirect cost need.* In calculating RNSB's carry-forward adjustments, NBC treats indirect costs actually incurred by RNSB as the upper limit of any under-recovery carry-forward. NBC incorrectly assumes that what RNSB spent for indirect costs was the amount of indirect costs needed to run its contracted program at the level of service and efficiency at which the Secretary would have run the program. But RNSB knows that the Secretary, for the reasons set out in this contract dispute, does not provide that amount, so it would be imprudent for RNSB to spend that amount. RNSB is accordingly penalized by the assumption that what it spent for indirect costs is the upper limit of what it needed for indirect costs, resulting in a reduced under-recovery carry-forward and a lower rate when its indirect contract support costs are calculated in the next rate cycle.

(5) *Treating program funds used for reimbursing indirect costs as collections of indirect CSC in the carry forward procedure.* Because of chronic shortfalls in recovery of indirect contract support costs, RNSB has been forced to use program monies and its private resources to pay indirect costs. Only monies awarded to RNSB as contract support costs should be entered into carry forward calculations.[1]

Each of these practices is an "adverse adjustment" prohibited by section 106((d)(1) and (2) of ISDA, 25 U.S.C. § 450j-1(d)(1) and (2). These adverse adjustments reciprocally reinforce each other and are cumulative, compounding from year to year through the carry forward process. The practices confiscate savings achieved by RNSB through prudence and efficiency, in violation of 25 U.S.C. § 450j-1(a)(4) and section (b)(9) of contract no. HHSI 242 2007 00007 C.

3. <u>Money Damages or Monetary Relief and Reforms Required</u>

These adverse adjustments illegally reduce the Secretary's indirect contract support cost obligation under contract no. HHSI 242 2007 00007 C. The Secretary's failure to provide the indirect contract support costs required by section 106(a)(2) and (3) of ISDA, 25 U.S.C. § 450j-1(a)(2) and (3), and (g), has hurt delivery of our contracted program.

Accordingly, RNSB demands that the Secretary:

(1) adjust and correct the described adverse adjustments in the methodology used to calculate RNSB's indirect contract support costs and reform the contract to comply with the requirements of ISDA; and

---

[1] Documentation of damage from items 4 and 5 above is not included in this dispute. However, these practices do constitute adverse adjustments which will be imposed on RNSB in future as they have been in certain past years. They are therefore defects which should be corrected for both RNSB's and other contractors' benefit.

(2) FY 1997 for each year prior to making the foregoing adjustments and corrections, pay with interest added to RNSB the indirect costs it would have received had the adverse adjustments been corrected for that year.

According to RNSB's best estimates, the Secretary should have paid at least the following additional amounts of indirect contract support:

1997 $ 46,397

The damages all accrued under Contract No. HHSI 242 2007 00007 C. Although a new annual funding agreement is entered for each new fiscal year, they are required amendments to the base contract. For this reason this claim is continuing and damages accrue each year, as the defects complained of continue under the instant contract by virtue of IHS' contract support cost policy now in effect and the indirect cost rate system on which it is based.

I certify that (1) this claim is made in good faith, (2) the supporting data are accurate and complete to the best of my knowledge and belief, (3) the amount requested accurately reflects the contract adjustment for which RNSB believes the Government is liable, and (4) I am duly authorized to certify the claim on behalf of RNSB.

Thank you for your prompt attention to this request for a final decision.

Sincerely yours,

BENNIE COHOE

Executive Director

cc: Douglas J. Bourgeois, Director, National Business Center
Michael P. Gross, M.P. Gross & Associates, P.C.
Dan MacMeekin, M.P. Gross & Associates, P.C.

| | 03/22/2007 | RNSB ,INC. CUMULATIVE IMPACTS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 12/31/95 | 12/31/96 | 12/31/97 | 12/31/98 | 12/31/99 | 12/31/00 | 12/31/01 | 12/31/02 | 12/31/03 |
| 1 | IHS actual Base | **$ 1,496,944** | **$ 1,537,975** | **$ 1,531,178** | **$ 1,679,525** | **$ 2,029,752** | **$ 2,411,556** | **$ 2,229,056** | **$ 2,193,929** | **$ 2,568,729** |
| 2 | | | | | | | | | | |
| 3 | **GOVERNMENT RATE** | **25.80%** | **21.30%** | **17.20%** | **20.49%** | **19.33%** | **18.40%** | **17.30%** | **17.04%** | **30.17%** |
| 4 | | | | | | | | | | |
| 5 | Adjusted for Ramah vs Lujan | 1.04% | 0.37% | 0.28% | 1.20% | 0.94% | 0.93% | 0.28% | 0.61% | 1.45% |
| 6 | Adjusted for PL-100-297* | 0.08% | 1.42% | 1.38% | N/A | N/A | N/A | N/A | N/A | N/A |
| 7 | Adjusted for Double dipping | 1.65% | 1.94% | 1.37% | 0.71% | 0.62% | -0.45% | 0.37% | 0.13% | 0.99% |
| 8 | Adjusted for Shortfall | 0.00% | 0.00% | 0.00% | 2.21% | 1.41% | 0.98% | 1.21% | 1.15% | 1.16% |
| 9 | | | | | | | | | | |
| 10 | **Corrected Rate** | **28.57%** | **25.03%** | **20.23%** | **24.61%** | **22.30%** | **19.86%** | **19.16%** | **18.93%** | **33.77%** |
| 11 | | | | | | | | | | |
| 12 | ihs Claimed it Paid | $ 328,505 | $ 336,720 | $ 370,895 | $ 478,228 | $ 483,666 | $ 500,063 | $ 540,832 | $ 417,815 | $ 417,815 |
| 13 | | | | | | | | | | |
| 14 | Overrecovery Carryforward Paybaclk | $ 130,825 | $ 60,924 | $ 77,394 | $ 62,257 | $ 71,244 | $ 36,691 | $ 243,521 | $ 65,798 | $ 64,007 |
| 15 | | | | | | | | | | |
| 16 | Net Payment | $ 197,680 | $ 275,796 | $ 293,501 | $ 415,971 | $ 412,422 | $ 463,372 | $ 297,311 | $ 352,017 | $ 353,808 |
| 17 | | | | | | | | | | |
| 18 | Government Contract price ( line 1 x line11) | $ 386,212 | $ 327,589 | $ 263,363 | $ 344,135 | $ 392,351 | $ 443,726 | $ 385,627 | $ 373,846 | $ 774,986 |
| 19 | | | | | | | | | | |
| 20 | **IHS Corrected Contract price ( line 8 x line 12)** | **$ 427,677** | **$ 384,955** | **$ 309,757** | **$ 413,331** | **$ 452,635** | **$ 478,935** | **$ 427,087** | **$ 415,311** | **$ 867,460** |
| 21 | | | | | | | | | | |
| 22 | **Damages** | **$ 41,465** | **$ 57,366** | **$ 46,395** | **$ 69,196** | **$ 60,284** | **$ 35,209** | **$ 41,460** | **$ 41,465** | **$ 92,474** |
| 23 | | | | | | | | | | |
| 24 | **Cumulative Damages** | | | | | | | | | **$ 485,315** |

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**TUNICA-BILOXI TRIBE OF LOUISIANA and RAMAH NAVAJO SCHOOL BOARD, INC.**,

PLAINTIFFS,

vs.

**UNITED STATES OF AMERICA; TOMMY G. THOMPSON, Secretary of the United States Department of Health and Human Services; GALE A. NORTON, Secretary of the United States Department of The Interior; CHARLES W. GRIM, Interim Director of the Indian Health Service, United States Department of Health and Human Services; EARL E. DEVANEY, Inspector General, United States Department of the Interior; and TIMOTHY G. VIGOTSKY, Director, National Business Center, United States Department of the Interior**,

DEFENDANTS.

Civil Action No. 02-2413 (RBW)

**PLAINTIFFS' MOTION TO CERTIFY CLASS UNDER RULE 23(b)(2) and (b)(3) AND INCORPORATED MEMORANDUM OF LAW**

**TABLE OF CONTENTS**


INTRODUCTION ....................................................1

I. STANDARD FOR CERTIFICATION ....................................................2

II. NATURE OF CASE ....................................................3

III. THE PROBLEMS ADDRESSED IN THIS LAW SUIT ....................................................6

A. Calculation of Indirect Costs Rates....................................................6

B. Carry-forward Adjustments....................................................10

IV. THE EFFECTS OF THE INCORRECT RATE CALCULATIONS ....................................................11

V, THE CLASS ....................................................13

VI. THE CRITERIA FOR CERTIFICATION OF THE CLASS ARE MET ....................................................13

A. The GAO Report, Affidavits and Declarations, and Other Attached Documents Establish Satisfaction of All the Criteria ....................................................13

B. These Factual Allegations Establish All the Elements Required By Rule 23 ....................................................16

Subpart (a)....................................................16

1. The class must be so numerous that joinder of all members is practical ..........16

2. There are questions of fact and law common the the class ....................................................17

3. The claims of the representative must be typical to those of the members ......18

4. The representative will fairly and adequately protect the interest of the class .19

Subpart (b)(1)....................................................19

A. Separate lawsuits would create a risk of inconsistent or varying Adjudications which would establish incompatible standards of Conduct for the party opposing the class ....................................................19

B. Dispositions as to the class which as a practical matter dispose of

Their interest or would substantially impair or impeded their ability To protect those interests....21

Subpart (b)(2)....21

The party opposing the class has acted or refused to act on grounds Generally applicable to the class, thereby making appropriate final Injunctive relief or corresponding declaratory relief with respect to The class as a whole....21

Subpart (b)(3)....21

The court finds that questions of law or fact common to the class Predominate over any questions affecting only individual members And that a class action is superior to other methods for the fair and Efficient adjudication of the controversy....21

C. Competency of Class Counsel....22

VI. NOTICE....22

VII. CONCLUSION....23

## INTRODUCTION

Plaintiffs Tunica-Biloxi Tribe of Louisiana (Tunica) and Ramah Navajo School Board, Inc. (RNSB or Ramah), by and through their counsel, respectfully move under Rule 23(b)(2) and (b)(3), Federal Rules of Civil Procedure, for certification of a class action.

Concurrence of opposing counsel has been requested but denied.

The class sought to be certified consists of

> All entities contracting with the United States through the Secretary of Health and Human Services and the Director of the Indian Health Service (IHS) as agents for the United States pursuant to the Indian Self-Determination and Education Assistance Act of 1975, Public Law 93-638, 25 U.S.C. §§450-450n, as amended ("ISDA"), and comparable sub-titles for compacting tribes, whose contracts contain an indirect cost rate determined in negotiation with the Office of the Inspector General (OIG) of the United States Department of the Interior, or its successor, the National Business Center ("NBC") of the Department of the Interior.

This is essentially the same class certified in *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) with regard to ISDA contracts with the Secretary of the Interior. *See,* USDC N Mex No. CIV 90-0957 LH/WWD, October 1, 1993 (Attachment 1 to this Motion). (Although the District Court subsequently ruled against the Ramah Navajo Chapter on the merits in that action, Memorandum and Order, Nov. 4, 1993, the Tenth Circuit reversed that decision.) The Secretary of the Interior and the Secretary of Health and Human Services share identical obligations under ISDA. This case seeks to apply the same rule of law to ISDA contracts entered by the Secretary of Health and Human Services ("IHS contracts") that applies to the ISDA contracts of the Secretary of the Interior.

*Co. v. Green,* 395 U.S. 977, 89 S.Ct. 2131 (1969) ("if there is to be an error made, let it be made in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require"); *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194 (1969) (to similar effect).

## II. NATURE OF THE CASE

The claim in this case arises from the United States'[1] failure to calculate the proper amount of contract support costs (CSC) which the Indian Self-Determination Act (ISDA) mandates be added to Plaintiffs' contracts under 25 U.S.C. §450j-1(a)(2) and §450j-1(g).

ISDA is not a grant program; it especially is not a discretionary grant program. Rather, it is a program whereby the United States contracts with tribes and tribal organizations to operate federal programs and carry out federal responsibilities. If a tribe or tribal organization seeks to operate a program and meets criteria set out in the statute, the Secretary of Health and Human Services "is directed" to enter into these contracts. 25 U.S.C. §450f(a)(1). As set forth in its findings, the ISDA is designed to eliminate "prolonged Federal domination of Indian self-determination programs" and give Indian tribes and their communities an "effective voice in the planning and implementation of programs for the benefit of Indians." 25 U.S.C. §450(a)(1). In 1968, the Special Senate Subcommittee on Indian Education issued a landmark report "INDIAN EDUCATION: A NATIONAL TRAGEDY—A NATIONAL CHALLENGE, S. Rept. No. 91-501[2]. In July

[1] Under 25 U.S.C. §450*l*(c) Model Agreement §1(a)(1), the United States is the contracting party; the Secretary acts as the United States' agent.

[2] The Report found that "the dominant policy of the Federal Government towards the American Indian has been one of coercive assimilation. The policy has resulted in:

This function of the OIG was transferred to the National Business Center ("NBC") in November 2002. The Secretary adopted the negotiation of an indirect cost rate as the means for determining the amount to be included for indirect CSC, as mandated by 25 U.S.C. §450j-1(g). The rate calculation follows guidelines set forth in government circulars OMB A-87, OMB A-122, and OASC-10. Affidavit of Marcel Kerkmans, Attachment 3 to this Motion; GAO Report (Att. 2), at 6.

## III. THE PROBLEMS ADDRESSED IN THIS LAW SUIT

### A. Calculation of Indirect Cost Rates

The issue in this case arises when Indian ISDA contractors supplement their IHS programs with funds from other federal agencies. This is a perfectly legitimate practice and its legality and efficacy are not in question.

The problem created by other agencies' programs would not exist had the Secretary[5] not decided, along with his counterpart, the Secretary of the Interior, to use the indirect cost rate system of federal cost accounting in OMB Circulars A-87 and A-122 as the means for computing the mandatory indirect contract support costs component of ISDA funding. The choice was fateful because of the coincidence of three factors:

1. The indirect cost rate system requires inclusion of all programs in the base, including those of agencies which do not pay indirect costs;
2. The fact all other federal agencies do not pay or heavily restrict payment of indirect costs; and
3. The fixed or inelastic nature of most ISDA contractors' indirect cost pools

---

5 Except where specifically indicated otherwise, references to "the Secretary" in

ensures diminution of contractors' rates.

The OMB circulars were designed for cost accounting purposes, not for computing statutorily-mandated contract funding levels.[6] Because funds for most contractors come from a variety of sources, a category of administrative expenses called indirect costs was created for those expenditures that cannot be easily allocated to discrete programs. The indirect cost rate is calculated by dividing the contractor's total indirect cost pool – those costs of administration not easily allocated to discrete programs[7]– by the contractor's total direct program costs from all sources in the direct cost base. The ratio between the pool and the direct base is the indirect cost rate. The Secretary multiplies the indirect cost rate by the IHS program base to compute the contractor's indirect contract support costs under 25 U.S.C. §450j-1(a)(2) – (5), just as the Secretary of the Interior did in *Ramah v. Lujan,* 112 F.3d at 1457-1459.

The problem stems from the methodology's assumption that each contractor has recovered allocated shares of the indirect cost pool from each funding source in the direct cost base. If a contractor receives one tenth of its base from a particular agency, the system assumes that the contractor actually recovers one tenth of its indirect costs from that agency in addition to its program base. Most agencies prohibit or generally restrict payment of indirect costs from

---

this motion refer to the Secretary of Health and Human Services.

6 There are three types of indirect cost rates. The most prevalently used is the "fixed with carry forward method" described in President's Council on Integrity and Efficiency. "AUDIT OF METHODS OF REIMBURSING INDIAN ORGANIZATIONS FOR INDIRECT COSTS INCURRED", September 1987 ("President's Council Audit"), at 5 (Attachment 6 to this Motion). Although most contractors employ fixed with carry forward rates, the next largest category is "provisional-final". The rate-setting methodology for provisional rates is identical to the fixed rate methodology with respect to including other federal programs in the base.

7 25 U.S.C. §450b(f)

their grants. So, for ISDA contractors, the methodology's assumption is false, as the Secretary well knows. President's Council Audit, Att. 4, at 1, 34.

Under 25 U.S.C. §450j-1(g), the Secretary is required to "add to the contract the full amount of funds to which the contractor is entitled under subsection [450j-1(a)]". But by assuming, incorrectly, that each agency actually pays its fair share, the Secretary assures recovery by the contractor of less than the amount needed to run the contracted HIS program. Indirect cost pools of ISDA contractors are generally fixed. *Ramah v. Lujan,* 112 F.3d at 1461 ("As the Act itself recognizes, and as the facts in this case demonstrate, indirect costs are not readily allocable to a particular grant or program, and therefore tend to be fixed rather than variable."). By dividing a more-or less fixed numerator (the pool) by addition of (non-paying) agencies to the base, the rate goes down.

For example, if an ISDA contractor has programs totaling $1,000 from the IHS, no funds from other agencies, and a negotiated indirect cost pool of $500, its indirect cost rate is 50% (500 ÷ 1000 = .5). IHS is obligated to add $500 to the program base for a total contract price of $1,500. If this same contractor adds programs of other federal agencies to its base in the amount of $250, the fixed nature of the pool means that the pool will remain at or near $500. (The contractor still needs only one CEO; and its insurance costs, facilities, phone, and legal costs, etc. will not vary appreciably.) The methodology adopted by the Secretary therefore produces an indirect cost rate of 40% (500 ÷ 1250 = .4). Following the circulars' procedures, IHS then computes its indirect contract support cost obligation to be only $400 (1000 x .4 = $400). But since the other agencies do not pay indirect costs, the contractor actually recovers only $400 of the $500 needed to operate the IHS programs. The contractor winds up $100 short of the §450j-

1(a)(2) amount.

The result is that the contract price computed by the Secretary does not comply with the mandate of the statute in 25 U.S.C. §450j-1(g) to "add to the contract the full amount of funds to which the contractor is entitled under subsection (a) of this section [25 U.S.C. §450j-1(a)]". This phenomenon affects each ISDA contractor which receives grants or contracts from other federal agencies. The problem is generally discussed in the GAO Report (Att. 2), at 44-45, and in Senate Report No. 100-274 (Att. 12), at 12 (accompanying Public Law 100-472). *See also* President's Council's Audit (Att. 4). The problem is also the basis for the Tenth Circuit's ruling in *Ramah v. Lujan*, 112 F.3d at 1463:

> We therefore agree with plaintiff that the 1988 amendments to the Act mandate that tribes executing self-determination contracts receive full funding for all reasonable contract support costs associated with self-determination contracts . . . We further conclude defendants unreasonably interpreted the Act by applying the pre-amendment indirect costs formula to determine the amount of indirect costs funding plaintiff would receive for fiscal year 1989. In applying the pre-amendment formula, defendants included in the direct costs base the funds plaintiff received from [other federal agencies]. *Although inclusion of these funds in the direct cost base would have been proper if those programs included funding for their apportioned share of the indirect costs pool, the uncontroverted facts indicate that they did not. By including the [other agencies'] funds in the direct cost base, defendants effectively and knowingly reduced the amount of funding they would provide to plaintiff to cover the indirect costs pool and thereby deprived plaintiff of full indirect costs funding for fiscal year 1989.*

(Emphasis added.) This suit seeks to apply the same findings and conclusions to the Secretary's identical use of indirect cost rates.

**B. Carry-forward Adjustments**

Most contractors choose the "fixed with carry forward" option for indirect costs rates (see footnote 6) because it promises adjustments in succeeding years for under-recoveries of indirect costs in the base year, reducing the risk that the contractor will fail to recover its full administrative costs. The second problem in this suit, not directly presented in *Ramah v Lujan*, has to do with these carry-forward adjustments. See Kerkmans Affidavit (Att. 3); Declaration of Jim Hooper, Jr. (Hooper Declaration), Attachment 5 to this Motion; Declaration of Douglas Burke (Burke Declaration), Attachment 6 to this Motion.

Here, OIG violates the methodology of Circulars A-87 and A-122 to the Plaintiffs' detriment by carrying forward over-recoveries but not under-recoveries. Over-recoveries depress the indirect cost rate in the succeeding year; under-recoveries increase the rate. *Id.* By not carrying forward under-recoveries, OIG deprives contractors of the benefits contemplated by the fixed with carry-forward method.

OIG also defines carry-forwards inconsistently with ISDA. Program funds – which the contractor, by necessity, often is forced to divert to pay for indirect costs – are treated as "indirect cost recoveries" which lead to adverse carry-forward adjustments. Both the under-over recovery problem and this one have a snowball effect, increasing the contractor's shortfalls in succeeding years and causing the contractor to spend even more of its program monies for administrative costs. GAO Report (Att. 2), at 49-50. This is contrary to the ISDA's central purpose to maintain program levels. *See* S. Rept. No. 100-274 (Att. 12), at 16. Moreover, contrary to the prohibitions in 25 U.S.C. §450j-1(d), the Secretary and OIG treat the estimated recovery of indirect costs, namely, the negotiated indirect cost pool, as actually having been

recovered, even though the contractor may have recovered only a fraction of the negotiated pool amount. *See* Kerkmans Affidavit (Att. 3), Hooper Declaration (Att. 5); and President's Council Audit (Att. 4), at 6. How carry-forwards are supposed to be calculated is touched upon in the GAO Report (Att. 2), at 74-76. By not carrying forward under-recoveries and by treating program funds used for indirect costs as recoveries of contract support costs, OIG and the Secretary deprive contractors of the benefits of the "fixed with carry forward" method and exacerbate the original rate-calculation error.

## IV. THE EFFECTS OF THE INCORRECT RATE CALCULATIONS

Unless the United States pays the true cost of running these programs to the contractor, Plaintiffs and other contractors are forced to reduce programs, go into debt, or eschew other federal programs altogether.

The problem has another dimension as well. Money not paid to IHS contractors for contract support remains in the Secretary's control and is thereby available to pay his in-house administrative costs. One of the main intentions of Congress in passing ISDA—to reduce the federal bureaucracy managing Indian programs—is thereby defeated. *See* S. Rept. No. 100-274 (Att. 12), at 7-8. The Secretary's indirect cost rate system provides an unauthorized means for shoring up the bureaucracy at the expense of tribes and tribal organizations. This consequence of the indirect cost rate system is not mentioned in the GAO Report but stands as a principal feature of the present controversy, bearing directly on the expected defense that the agency does not have available funding from Congress to pay full indirect contract support costs to Plaintiffs or the Class.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TUNICA-BILOXI TRIBE OF LOUISIANA;<br>RAMAH NAVAJO SCHOOL BOARD, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES of AMERICA;<br>MICHAEL O. LEAVITT, Secretary of the<br>United States Department of Health and Human<br>Services; GALE A. NORTON, Secretary of the<br>United States Department of the Interior,<br><br>Defendants. | Case No. 1:02CV02413<br>Judge Reggie B. Walton<br>Magistrate Judge Deborah A. Robinson |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**INTRODUCTION**

Plaintiffs, Tunica-Biloxi Tribe and Ramah Navajo School Board, are parties to self-determination contracts with the Secretary of the U.S. Department of Health and Human Services ("HHS"), as authorized by the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. §§ 450 et seq. Pursuant to their self-determination contracts, Plaintiffs have assumed responsibility for running certain health care programs from the Indian Health Service ("IHS"), an agency of HHS. At issue in this lawsuit are claims that the Secretary annually underfunded certain cost components of Plaintiffs' contracts.

After considering Defendants' Motion to Dismiss in 2004, this Court dismissed some of Plaintiffs' claims and ordered limited jurisdictional discovery. Before the Court was able to determine whether it had jurisdiction to order monetary relief for certain surviving claims, the case was stayed pending a ruling in a related case before the Supreme Court. In early 2005, the

Supreme Court issued a decision in Cherokee Nation v. Leavitt, 543 U.S. 631, __, 125 S. Ct. 1172, 1178-81 (2005), and held that when (1) the Secretary promised a specific amount in an ISDA contract for indirect CSC (as it had for the Cherokee plaintiffs), and (2) appropriations were legally available for that purpose, the Secretary could not defend against a breach of contract claim by arguing that it had insufficient appropriations. Moreover, the Court held that when Congress appropriated unrestricted, lump-sum appropriations, these appropriations were legally available to satisfy contractual promises. See 125 S. Ct. at 1180.

In light of this Court's 2004 Order and the recent decision of the Supreme Court, Defendants now renew their motion to dismiss and move to dismiss all of the remaining claims for lack of subject matter jurisdiction and for failure to state a claim. Distinct from the breach claims at issue in Cherokee, Plaintiffs are asking this Court to reopen their contracts--all long since performed--and alter their terms and funding amounts to include additional funds on the basis of a purported inconsistency with the ISDA. But not only are the terms and funding amounts in Plaintiffs' contracts fully consistent with the ISDA, Plaintiffs have waived, and are estopped from raising, these overdue claims. The expectations of the parties have long been settled, and IHS no longer has the authority to obligate any additional funding to either Tunica or Ramah's contracts at issue in this lawsuit. By failing to take advantage of the judicial review provisions of the ISDA before the contract was executed, Plaintiffs acquiesced to the funding levels in their contracts and cannot now ask the Court to rewrite them. Under these circumstances, any claims or contentions that the ISDA requires a different level of funding have been extinguished and the terms and conditions of the actual ISDA agreements control the duties of the parties. In other words, "contracting parties must be held to their agreements." Madigan

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TUNICA-BILOXI TRIBE OF LOUISIANA;<br>RAMAH NAVAJO SCHOOL BOARD, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES of AMERICA;<br>MICHAEL O. LEAVITT, Secretary of the United States Department of Health and Human Services; P. LYNN SCARLETT, Acting Secretary of the United States Department of the Interior,<br><br>Defendants. | ) | Case No. 1:02CV02413<br>Judge Reggie B. Walton<br>Magistrate Judge Deborah A. Robinson |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO 'LUMP SUM YEARS' (1995-1997)**

## INTRODUCTION AND SUMMARY OF ARGUMENTS

Plaintiffs have moved for partial summary judgment in this putative class action. They assert that the Secretary of Health and Human Services (HHS) has violated the Indian Self Determination Act (ISDA) in Indian Health Service (IHS) self-determination contracts. The crux of plaintiffs' argument is that OMB Circular A-87, a method elected by Plaintiffs for calculating indirect contract support costs (CSC) in their IHS contracts, violates the ISDA. Under Plaintiffs' theory, IHS is required to pay not only for the indirect costs of running IHS programs, but must foot the bill for non-IHS programs as well. Underscoring the inequity of the relief Plaintiffs seek is the fact that IHS programs typically comprise less than half of a given tribal contractor's portfolio of programs. If the Court ruled as Plaintiffs desire, tribal contractors could assume 90% non-IHS contracts, but shift the entirety of the indirect costs associated with those contracts to IHS. Shifting costs from one agency to another is antithetical to appropriations law, but the logic of Plaintiffs' argument would accomplish precisely that perverse outcome.

With this motion, Plaintiffs hope to evade scrutiny of the dubious merits of their contention that "the IHS methodology violates the ISDA" by invoking the judicial doctrine of collateral estoppel or issue preclusion. Specifically, Plaintiffs rely upon a Tenth Circuit decision involving a different contracting agency: the Department of the Interior (Interior or DOI). That case concerned ISDA contracts with the Bureau of Indian Affairs (BIA), a component of Interior. The BIA contracts at stake in that litigation were funded by Interior's appropriations, formed under Interior's regulations and contracting policies, and involved Interior's programs.

Contrary to Plaintiffs' assertions, HHS neither stands in privity with Interior, nor is HHS bound based on Plaintiffs' characterization of the United States as "the real party in interest." Neither HHS nor IHS was a named defendant in the BIA contract litigation. Plaintiffs did not challenge

Case 1:02-cv-02413-RBW Document 110 Filed 12/21/2006 Page 1 of 40

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TUNICA-BILOXI TRIBE OF LOUISIANA, and RAMAH NAVAJO SCHOOL BOARD, INC.,**<br><br>PLAINTIFFS,<br><br>vs.<br><br>**UNITED STATES OF AMERICA; MICHAEL O. LEAVITT, Secretary of the United States Department of Health and Human Services; DIRK KEMPTHORNE, Secretary of the United States Department of the Interior,**<br><br>DEFENDANTS. | ) | **No. 1:02CV02413 (RBW)**<br><br>**MAGISTRATE JUDGE DEBORAH A. ROBINSON** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Case 1:02-cv-02413-RBW Document 110 Filed 12/21/2006 Page 2 of 40

**TABLE OF CONTENTS**

Table of Authorities . . . . . iii

Table of Evidentiary Materials . . . . . vii

New Exhibits Filed With This Motion . . . . . vii

Previously Filed Materials by Docket Number . . . . . x

Summary of Argument . . . . . 1

Standard for Summary Judgment . . . . . 2

Question Presented . . . . . 3

Argument . . . . . 3

I. Introduction . . . . . 3

II. ISDA Is Meant to Allow Tribes to Operate Their Own Programs Without Diminution . . . . . 4

III. *RNC v. Lujan* Has Preclusive Effect . . . . . 8

A. *RNC v. Lujan* Decided the Same Rate-Making Issue Presented Here . . . . . 8

B. *Stauffer* and *Mendoza* Establish the Principles of Mutuality . . . . . 8

C. The United States Was the Principal Party and Real Party in Interest in *RNC v. Lujan*, As It Is Here . . . . . 10

D. The Issue of Inclusion of Non-Paying Agencies in The Rate Base Was Fully Litigated in *RNC v. Lujan* . . . . . 12

IV. Defendants Systematically Under-Calculate Indirect Costs . . . . . 13

A. The A-87 System is a Cost Allocation and Accounting Tool . . . . . 13

B. Inclusion of Non-Paying Agencies in the Base Improperly Ensured That Plaintiffs Would Not Recover Their Full Entitlement to Indirect Contract Support Costs (The Rule In *RNC v. Lujan*) . . . . . 15

C. Defendants' Manipulations of Carry-Forward Adjustments Improperly Decrease the Rate Fraction by Reducing the Numerator . . . . . 17

1. Calculating carry-forward under-recoveries and over-recoveries without regard to contract price violates ISDA . . . . . 19

2. Characterizing under-recoveries as "shortfalls" and excluding them from calculations causes most under-recoveries not to be carried forward . . . . . 20

3. Double-counting over-recoveries reduces the contract price over again . . . . . 21

4. Treating program monies diverted to indirect costs as indirect cost recoveries . . . . . 22

5. Treating tribal monies used for indirect costs as indirect cost recoveries . . . . . 23

6. Illegally considering Public Law 100-297 education grants in the carry-forward computations . . . . . 23

7. Other manipulations . . . . . 23

CONCLUSION . . . . . 24

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TUNICA-BILOXI TRIBE OF LOUISIANA;<br>RAMAH NAVAJO SCHOOL BOARD, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES of AMERICA;<br>MICHAEL O. LEAVITT, Secretary of the United States Department of Health and Human Services; DIRK KEMPTHORNE, Secretary of the United States Department of the Interior,<br><br>Defendants. | Case No. 1:02CV02413<br>Judge Reggie B. Walton<br>Magistrate Judge Deborah A. Robinson |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I. Standard for Motion to Dismiss for Lack of Subject Matter Jurisdiction . . . . . . . . . . . . 15

II. Standard for Motion to Dismiss for Failure to State a Claim . . . . . . . . . . . . . . . . . . . . . 16

III. Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I. SOME OF THE CLAIMS AGAINST HHS SECRETARY LEAVITT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION . . . . . . . . . . 17

II. SECRETARY LEAVITT SHOULD BE GRANTED SUMMARY JUDGMENT BECAUSE IHS FULLY PERFORMED UNDER PLAINTIFFS' CONTRACTS . . . . . 19

A. IHS Fully Performed Under Tunica's Contracts . . . . . . . . . . . . . . . . . . . . . . . . . 20

B. IHS Fully Performed Under RNSB's Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III. SECRETARY LEAVITT SHOULD BE GRANTED SUMMARY JUDGMENT BECAUSE PLAINTIFFS' CONTRACTS DO NOT VIOLATE ISDA . . . . . . . . . . . . 22

IV. SECRETARY LEAVITT SHOULD BE GRANTED SUMMARY JUDGMENT ON ALL CONTRACT YEARS AFTER 1997 BECAUSE CONGRESS HAS LIMITED THE TOTAL AMOUNT OF CSC THAT IHS CAN AWARD . . . . . . . . . . 26

V. SECRETARY LEAVITT SHOULD BE GRANTED SUMMARY JUDGMENT BECAUSE PLAINTIFFS' INDIRECT COST RATES DO NOT VIOLATE THE ISDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

A. The Nature and Treatment of Indirect Costs Under Federal Law . . . . . . . . . . . . 28

1. Federal appropriations law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2. Federal cost allocation principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B. The ISDA Allows IHS to Use Indirect Cost Rates, Negotiated under OMB A-87, in Making Indirect CSC Awards . . . . . . . . . . . . . . . . . . . . . . . . . 35

1. Ramah Navajo Chapter v. Lujan, 112 F.3d 1455 (10th Cir. 1997) . . . . . 37

2. Immediate congressional response to Ramah Navajo Chapter . . . . . . . . 39

3. The decision in RNC does not apply to Plaintiffs . . . . . . . . . . . . . . . . . . 41

a. Plaintiffs' costs are not fixed . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

b. Plaintiffs recover indirect costs from other federal agencies . . . . 45

C. The Rate Adjustment Proposed by Plaintiffs Is Contrary to the ISDA . . . . . . . . 45

VI. SECRETARY LEAVITT SHOULD BE GRANTED SUMMARY JUDGMENT BECAUSE PLAINTIFFS HAVE WAIVED, AND ARE ESTOPPED FROM RAISING, ANY CLAIM THAT THEIR CONTRACTS VIOLATE THE ISDA . . . . . 48

A. Plaintiffs Have Waived Any Claim to Additional Funding . . . . . . . . . . . . . . . . . 48

B. Plaintiffs Are Estopped from Claiming Additional Funding . . . . . . . . . . . . . . . . 52

VII. ALL CLAIMS AGAINST DOI SECRETARY KEMPTHORNE SHOULD BE DISMISSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

A. Plaintiffs Have Failed to Exhaust Their Administrative Remedies . . . . . . . . . . . 54

B. Plaintiffs Have Waived Any Challenge to Their Rate Agreements . . . . . . . . . . . 55

C. The Standing and Ripeness Doctrines Mandate Dismissal of All Years For Which Plaintiffs Do Not Have Indirect Cost Rates . . . . . . . . . . . . . . . . . . . . 56

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Attached

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**RAMAH NAVAJO CHAPTER,**

Plaintiff,

vs. CIV No. 90-0957 LH/WWD

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

SEP 30 1999

CLERK

**BRUCE BABBITT**, Secretary of the Interior; **KEVIN GOVER**, Assistant Secretary of the Indian Affairs; **ROBERT J. WILLIAMS**, Acting Inspector General; **U.S. DEPARTMENT OF THE INTERIOR**; and **THE UNITED STATES OF AMERICA**,

Defendants.

**STIPULATED ORDER ALLOWING INTERVENTION AND AMENDMENT OF THE AMENDED COMPLAINT**

This matter came before the Court on the stipulation of the parties, and the Court being apprised in the premises, **IT IS ORDERED, ADJUDGED AND DECREED** THAT

The motion of the named Plaintff Ramah Navajo Chapter to amend the amended complaint to add a claim for shortfalls of indirect costs from the commencement of Fiscal Year 1994 forward, the so-called "second tier claim" for that period is GRANTED.

The motion of the Oglala Sioux Tribe to intervene as a named party Plaintiff to serve with the Ramah Navajo Chapter representing the Class as to the "second tier claim" for that period is also GRANTED with the proviso that the Movant Oglala Sioux Tribe's motion, insofar as it states a claim or claims for "second tier shortfalls" for Fiscal Years prior to FY 1994, is WITHDRAWN but may be filed again WITHOUT PREJUDICE within six (6) months of the entry of this order and any defense based on laches, limitations, or similar affirmative defense which may otherwise be available to the Defendants on these claims shall be tolled as to the period from the date the motion to intervene was originally filed until the date of timely refiling. Defendants have agreed

347

to provide information regarding indirect cost shortfalls and payment to the Class for FY 1992 and FY 1993 in an informal manner so as to expedite the parties' assessment of the factual basis for Movants' original pleadings as to the "second tier claims" for those years. Nothing in this order shall, however, prevent or bar any party from taking formal discovery under the Federal Rules of Civil Procedure.

Plaintiff Ramah Navajo Chapter shall modify the proposed Amendment to First Amended Complaint by Interlineation to change FY 1992 to FY 1994 in Paragraph 28. Oglala Sioux Tribe shall modify its proposed Civil Complaint in Intervention to change FY 1992 to FY 1994 in Paragraphs 11 and 15 and delete Paragraph 17. Any other defense to the modified Complaint in Intervention and the Amended Complaint that Defendants may wish to assert is not limited or waived in any manner by their consent to this Stipulated Order.

Defendants are directed to answer or otherwise respond to the modified Complaint in Intervention and the Amended Complaint within thirty (30) days after service of the modified Complaint in Intervention and the Amended Complaint.

United States District Judge

Submitted:

s/Michael P. Gross
Michael P. Gross
Class Counsel
460 St. Michael's Drive, #300
Santa Fe, New Mexico 87505
(505) 983-6686
(505) 986-1367 (fax)

John W. Zavitz
Defendants Counsel
Post Office Box 607
Albuquerque, New Mexico 87103
(505) 224-1505
(505) 346-7205 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED
U.S. DISTRICT COURT
DIST. OF NEW MEXICO

01 SEP 10 PM 3:24

ALBUQUERQUE

PUEBLO OF ZUNI, on behalf of itself and all others similarly situated,

Plaintiff,

v.

UNITED STATES OF AMERICA; TOMMY THOMPSON, Secretary of the United States Department of Health and Human Services; and MICHAEL H. TRUJILLO, Director of the Indian Health Service, United States Department of Health and Human Services,

Defendants.

Case No. CIV 01-

CIV-01 1046LH

LORENZO F. GARCIA

**COMPLAINT**

Plaintiff, for itself and all other members of the class described below, complain and allege as follows:

**I.**
**INTRODUCTION**

1. This class action for money damages is brought under the Indian Self-Determination and Education Assistance Act of 1975 (ISDA), as amended, 25 U.S.C. § 450 *et seq*. During the period covered by this Complaint the ISDA required the defendants through the Indian Health Service, to enter into certain annual contracts with the plaintiff and other Indian Tribes represented by the class, and further required that the contract price include "contract support costs." Despite the command of the ISDA, the

defendants (1) failed to properly calculate the Tribes' "contract support cost" requirements, (2) failed to pay the properly calculated amounts required to be paid, and (3) failed to fully pay even the Tribes' undercalculated "contract support cost" requirements. This class action is brought to recover money damages for defendants' failure to pay the plaintiff and the class the full contract support costs required to be paid: (1) under the ISDA and (2) under contracts between the Indian Health Service and the plaintiff entered into pursuant to the ISDA.

The damages claims asserted herein arise out of the defendants' breach of the plaintiff's and the class's statutory rights under the ISDA, and the defendants breach of the plaintiff's and the class's contractual rights under their annual contracts. The period covered by the Complaint is federal fiscal years 1993 to the present.

## II.
## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 25 U.S.C. § 450m-1 (actions or claims for money damages arising under contracts authorized by the ISDA), 28 U.S.C. § 1362 (actions brought by Indian Tribes) and 28 U.S.C. § 1331 (actions arising under federal law).

3. Venue in this civil action against officers and employees of the United States acting in their official capacity is proper in this District under 28 U.S.C. § 1391(e) because the plaintiff resides in this District.

## III. PARTIES

4. Plaintiff Pueblo of Zuni is a federally recognized Indian Tribe with tribal headquarters situated in Zuni, New Mexico. Pursuant to the terms of the ISDA, the Pueblo of Zuni has at all times relevant to this Complaint operated tribal health programs under various self-determination contracts and annual funding agreements entered into with the Indian Health Service.

5. Defendant United States is sued because the claims asserted herein involve statutory and contractual obligations of the United States and seek damages against the United States for breach of those obligations. Defendant Tommy Thompson is the Secretary of the United States Department of Health and Human Services (DHHS). Under the Indian Self-Determination Act, Congress has imposed upon the Secretary various statutory and contractual obligations that are the subject of this action. Defendant Michael H. Trujillo is the Director of the Indian Health Service, the Department's agency that exercises primary responsibility for administering the United States' trust programs serving Indian Tribes. The Secretary has delegated most of his responsibilities under the Indian Self-Determination Act to the Director. Secretary Thompson and Director Trujillo are officers or employees of the United States, and they are sued here in their official capacities and collectively referred to herein interchangeably as "the Secretary" or "IHS."

## IV. GENERAL ALLEGATIONS

**The Indian Self-Determination Act**

6. Pursuant to the ISDA, IHS enters into "self-determination contracts," "self-governance compacts," and annual funding agreements (also referred to collectively herein as "ISDA contracts") with tribes and tribal organizations. Self-determination contracts are entered into by the parties thereto under the authority of Title I of the ISDA, Pub. L. 93-638, as amended, 25 U.S.C. § 450 *et seq.* (hereinafter referred to as "Title I"). Self-governance compacts have been entered into by the parties thereto either under the authority of Title III of the ISDA, Pub. L. 101-472, as amended, reproduced at 25 U.S.C.A. § 450f note (2000 Supp.) (hereafter "Title III"), or since August 2000 under Title V of the ISDA, 25 U.S.C. § 458aaa *et seq.* A self-determination contract, a self-governance compact or an annual funding agreement is a binding contractual agreement between the Government and an Indian Tribe under which the Tribe undertakes the daily administration of one or more designated federal programs serving the Tribe, such as an IHS hospital, an IHS clinic or an IHS community health program. Each year IHS enters into hundreds of ISDA contracts. The same Act also applies to the Bureau of Indian Affairs (BIA).

7. The ISDA requires that the contract price of any ISDA contract shall include an amount "not less than the appropriate Secretary would have otherwise provided for the operation of the program or portions thereof for the period covered by the contract. . . ." 25 U.S.C. § 450j-1(a)(1). *See also* 25 U.S.C. § 458aaa-7(c) (requiring Secretary to pay amounts specified in 25 U.S.C. § 450j-1(a)(1)-(5); Title III, § 303(a)(6). This amount is commonly referred to as the "Secretarial amount."

8. This "Secretarial amount," however, does not reflect the full cost of

administering the contracted IHS programs. This is partly so because many of the administrative resources drawn upon by IHS in support of its operations are located in entirely different departments or agencies of the federal government. These include various functions carried out by the Office of Personnel Management, the Merit Systems Protection Board, the General Services Administration, the General Accounting Office, the various Inspectors General, the Treasury Department, and various other DHHS agencies. This is also partly so because applicable law or prudent management impose upon Tribes administering ISDA contracts certain requirements not borne by IHS in its administration of its own operations (such as the duty to complete annual audits under the Single Agency Audit Act, 31 U.S.C. § 7501, *et seq*., and the need to carry certain forms of insurance).

9. Tribes with ISDA contracts also incur more costs than the Secretary because the agencies historically imposed upon Tribes additional overhead burdens "more stringent than the requirements that are imposed on the Federal agencies themselves," S. Rep. No. 100-274 at 9 (1987), such as requirements for program reporting.

10. Due to the facts noted in paragraphs 8-9 of this Complaint, without additional funding a Tribe administering an ISDA contract cannot deliver the same level of services to IHS beneficiaries that IHS could deliver when operating the same program that is the subject of the ISDA contract. Absent additional funding, such Tribes are compelled to divert federal program funds to pay for these administrative functions,

effectively penalizing the beneficiaries of a Tribe that operates an IHS program under an ISDA contract. *See* United States General Accounting Office, REPORT TO CONGRESSIONAL COMMITTEES: INDIAN SELF-DETERMINATION ACT, SHORTFALLS IN INDIAN CONTRACT SUPPORT COST NEED TO BE ADDRESSED at 40 (June 1999).

11. Most of the additional costs incurred by Tribes under the ISDA are known as "indirect costs." Historically, neither the Indian Health Service nor the Bureau of Indian Affairs has fully paid all tribal indirect cost requirements associated with ISDA contracts. Congress recognized the difficulties caused by the underfunding of contract support costs in 1988 and amended the ISDA that year to address these problems. In doing so the Senate Committee on Indian Affairs declared that:

> Full funding of tribal indirect costs associated with self-determination contracts is essential if the federal policy of Indian Self-Determination is to succeed.

S. Rep. No. 100-274 (1987), at 13. It observed that:

> [T]he single most serious problem with implementation of the Indian self-determination policy has been the failure of the Bureau of Indian Affairs and the Indian Health Service to provide funding for the indirect costs associated with self-determination contracts.

*Id*. at 8. To address this problem, Congress added to the Act detailed provisions requiring that contracts include a carefully defined amount for "contract support costs" over and above the "Secretarial amount."

**<u>Contract Support Costs.</u>**

12. In addition to the Secretarial amount, and to address the matters noted

in paragraphs 8-11 of this Complaint, the ISDA requires that the contract price include "contract support costs." The ISDA directs that:

> There shall be added to the amount required by paragraph (1) contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which –
>
> (A) normally are not carried on by the respective Secretary in his direct operation of the program; or
>
> (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

25 U.S.C. § 450j-1(a)(2). The ISDA directs that contract support costs "shall be added" to the Secretarial amount as part of the contract price. *Id.* The ISDA further provides that:

> The contract support costs that are eligible costs for the purposes of receiving funding under this Act shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of –
>
> (i) direct program expenses for the operation of the Federal program that is the subject of the contract, and
>
> (ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract, except that such funding shall not duplicate any funding provided under [25 U.S.C. § 450j-1(a)(1)].

25 U.S.C. § 450j-1(a)(3)(A). The ISDA further requires that:

> During the initial year that a self-determination contract is in effect, the amount required to be paid under [25 U.S.C. § 450j-1(a)(2)] shall include startup costs consisting of the reasonable costs that have been incurred or will be incurred on a one-time basis pursuant to the contract necessary –
>
> (A) to plan, prepare for, and assume operation of the program, function, service, or activity that is the subject of the contract; and
>
> (B) to ensure compliance with the terms of the contract and prudent management.

25 U.S.C. § 450j-1(a)(5).

13. The ISDA provides that a contractor's right to full contract support costs as part of the contract price is a statutory right:

> Upon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under [25 U.S.C. § 450j-1(a)], subject to adjustments for each subsequent year that such tribe or tribal organization administers a Federal program, function, service, or activity under such contract.

25 U.S.C. § 450j-1(g).

14. Contract support cost needs are specified in Section 106(a)(2) and are defined in Section 106(a)(3) of the ISDA. 25 U.S.C. § 450j-1(a)(2), (a)(3). They are also further defined in various IHS circulars describing how such costs are calculated, including ISDM 94-02, IHS Circular 96-04, IHS Circular 2000-01, and IHS Circular 2001-05.

15. The Indian Self-Determination Act Amendments of 1994, Pub. L. 103-413, amended the ISDA to require that "[e]ach self-determination contract entered into under [the ISDA] shall – (1) contain, or incorporate by reference, the provisions of the

model agreement described in subsection (c). . . ." 25 U.S.C. § 450*l*(a). The terms of the model agreement, set forth in 25 U.S.C. § 450*l*(c), are commonly known as "the model contract." These terms were incorporated into all of the Pueblo of Zuni's self-determination contracts that are the subject of this action.

16. Section 1(b)(4) of the model contract, set forth at 25 U.S.C. § 450*l*(c), restates in contractual terms the statutory right of all self-determination contractors to the full "contract support costs" specified in 25 U.S.C. § 450j-1(a):

> Subject to the availability of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement incorporated by reference in subsection (f)(2). Such amount shall not be less than the applicable amount determined pursuant to section 106(a) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450j-1).

**IHS Calculation of Contract Support Cost Requirements**

17. From fiscal years 1993 to the present, IHS has calculated the contract support cost requirements of tribes and tribal organizations contracting under Title I or compacting under Titles III or V under several successive sets of agency guidelines known as Indian Self-Determination Memorandum (ISDM) 92-2, and IHS Circulars 96-04, 2001-01 and 2001-05. These guidelines provide agency personnel with "instructional guidance on determining amounts of required contract support costs," and they "detail[ ] procedures for calculating CSC requirements." *See* IHS Circular 2001-05 at 1.

**Indirect Contract Support Costs**

18. Contract support costs are comprised of "indirect costs" and "direct" contract support costs. *See*, *e.g.*, IHS Circular 96-04, at 2, 5-8. Indirect costs, on average comprise 80% of the total contract support cost requirements calculated by IHS. *See*, *e.g.*, President's Budget Request Fiscal Year 1997, Indian Health Service Justification of Estimates for Appropriations Committees at IHS-80 (1996).

19. Most tribes and tribal organizations carrying out ISDA contracts negotiate an annual "indirect cost rate" with the Tribe's "cognizant agency," which is the Department of the Interior's Office of Inspector General for "virtually all" ISDA contracts. President's Budget Request Fiscal Year 1999, Indian Health Service Justification of Estimates for Appropriations Committees, at IHS-118). With rare exception these negotiations occur under OMB Circular A-87. IHS then calculates each Tribe or tribal organizations' annual indirect contract support cost requirement associated with an IHS ISDA contract by multiplying the contractor's indirect cost rate by the Secretarial amount included in the contract (subject to appropriate adjustments reflected in the indirect cost rate agreement).

20. IHS's reliance on the unadjusted indirect cost rate negotiated with the Department of the Interior's Office of Inspector General, or on any other unadjusted indirect cost rate issued by any other cognizant federal agency of a tribal contractor, understates the full indirect cost requirement Congress directed the Secretary to pay in the ISDA. In 1997 the Tenth Circuit held that reliance by the federal government on such rates to calculate indirect contract support cost requirements, without further adjustment to account for agencies that by law pay no indirect costs (or pay less than the full amount

dictated by such unadjusted rate), is contrary to the ISDA's command that:

> Nothing in this subsection shall be construed to authorize the Secretary to fund less than the full amount of need for indirect costs associated with a self-determination contract.

*Id. See Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997). The IHS has at all times relevant to this Complaint engaged in the same practice in calculating ISDA indirect contract support cost requirements as was struck down by the Tenth Circuit in *Ramah*.

**Direct Contract Support Costs**

21. "Direct" contract support costs, unlike "indirect costs," are contract support costs which are directly and readily attributable to a single IHS ISDA contracted program (or group of such programs). Direct contract support costs include the additional "direct program expenses for the operation of the Federal program that is the subject of the contract," 25 U.S.C. § 450j-1(a)(3)(A)(i), and may include such costs as workers' compensation payments, unemployment taxes, and insurance. IHS calculates direct contract support cost requirements under the IHS guidelines identified in paragraph 17 of this Complaint.

**General Shortfalls in IHS Contract Support Cost Shortfalls**

22. With the possible exception of one year, the defendants have during the 1990s and through fiscal year 2000 consistently underfunded tribal contractors' full tribal contract support cost requirements as calculated by IHS (including IHS's undercalculated indirect contract support cost requirements, as described in paragraph 20 of this Complaint). Tribes were generally told by IHS that they had no right to additional

contract support costs over and above those amounts that IHS actually paid in a given year.

23. At no time during the period FY 1993 to the present has the President, the Secretary or IHS ever requested from Congress the full amount of the contract support cost requirements associated with all tribal contracts. At no time during the period FY 1993 to the present has the Secretary reported to Congress the full contract support cost requirement associated with all tribal contracts, contrary to 25 U.S.C. § 450j-1(c) of the ISDA.

**The Lump-Sum Years.**

24. During the period FY 1993 through FY 1997, Congress funded IHS through a lump-sum appropriation that was legally available to carry out the ISDA, including to pay contract support costs. In each such year, an expenditure out of the lump-sum appropriation to pay full contract support costs associated with ISDA contracts in effect that year was within the purpose of the appropriation, the amount of the appropriation and the timing of the appropriation's availability. IHS, in fact, used a portion of each such year's appropriations to pay such costs. At no time covering the period FY 1993 through FY 1997 did any appropriations Act of Congress limit the amount IHS could spend for contract support cost purposes. *E.g.*, Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321-189 (1996); Omnibus Consolidated Appropriations Act for FY 1997. Although throughout this period various Congressional appropriations committees

recommended that IHS spend various amounts of its lump-sum appropriations for contract support cost purposes; *see, e.g.*, H.R. Rep. No. 104-173 at 97 (1995); at 3; *see also* S. Rep. No. 104-125, at 94 (1995), at 4; S. Rep. No. 104-319 at 90 (1996), at 3; *see also* H.R. Rep. No. 104-625 (1996); none of these recommendations was ever enacted into law. None of these recommendations constituted an earmark or cap on the amount of appropriations legally available in the covered year to pay contract support costs. Throughout this period, IHS lump-sum appropriations were legally available to pay in full all contract support cost requirements associated with tribal contracts.

25. "Availability," a term of art in appropriations law, refers to the legality of an agency's expenditure of its appropriated funds. *See* I U.S. General Accounting Office, Office of the General Counsel, *Principles of Federal Appropriations Law* 2-4 (1991), (explaining that the statement "whether appropriated funds are or are not 'legally available' for a given obligation or expenditure . . . is simply another way of saying that a given item is or is not a legal expenditure").

26. In fiscal years 1993 through 1997 the Secretary had ample lump-sum appropriations from which to pay the Tribes their contract support cost entitlements. And if appropriated funds were legally "available" to pay the Tribes their contract support cost requirements, the Secretary had no delegated authority or discretion under the ISDA to refuse payment on ISDA contracts.

27. The last, unnumbered sentence of 25 U.S.C. § 450j-1(b) (hereinafter the "§ 106(b) availability clause") provides as follows:

> Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

The § 106(b) availability clause specifically limits the Secretary's authority to disburse funds to those funds that are legally available to pay amounts specified in ISDA contracts and required to be paid under the ISDA.

28. At the close of each of fiscal years 1993 through 1997 IHS had multi-million dollar unobligated balances and multi-million dollar obligated but unliquidated balances. This was still the case during FY 1997 for each of these fiscal years. During FY 1997 IHS shared with the IHS Contract Support Cost Work Group a document entitled "'Procedures for Allocating Prior Year Unobligated Balances to Satisfy CSC Shortfalls." In this document IHS outlined the procedures by which such balances could be applied to pay prior year contract support shortfalls. IHS subsequently declined to carry out these procedures.

29. Despite the legal availability of its entire lump-sum appropriation in FY 1993 through FY 1997, IHS annually elected to limit the total amounts it would pay for contract support costs. In each such year, IHS limited the total amount it would pay for such contract support costs to (1) the amount specifically designated in each annual appropriations act for the Indian Self-Determination (ISD) Fund (a fund which Congress authorized be spent without fiscal year limitation), and (2) the amount recommended by various appropriations committees to be spent for such purposes. IHS designated the

first sum of money for "Pool No. 1" and divided the second sum of money into Pool 2 and Pool 3. ISDM 92-2, at 2-5; IHS Circular 96-04, at 9-12. Beyond these "pools," IHS paid no additional contract support costs on ISDA contracts. IHS limited such contract support in this manner even though Congress did not earmark or cap the amount IHS could pay for such costs. The only effect of the annual congressional designation of an Indian Self-Determination Fund was to authorize IHS to expend the Fund over the course of two or more fiscal years; it did not limit the total amount IHS could spend for contract support costs associated with new or expanded ISDA contracts.

30. The Indian Self-Determination Fund was established by Congress in each of fiscal years 1993 through 1997 to pay "the transitional costs of initial or expanded" tribal ISDA contracts. *See, e.g.*, Pub. L. 104-208, 110 Stat. 3009, 3009-213 (1996). IHS applied the funds so designated to pay contract support costs associated with new or expanded ISDA contracts. Due to IHS's decision to limit such funds each year to the amount designated in the ISD Fund (as specified in paragraph 29 of this Complaint), IHS in 1993 established the "ISD Queue." The ISD Queue was also termed a "priority list." (IHS Circular 96-04, at 10.) The ISD Queue was a list of IHS programs generally ranked by the fiscal year when a Tribe first took over the operation of an IHS program under an ISDA contract. IHS Circular 96-04, at 10-11; ISDM 92-2, at 5.

31. In each of fiscal years 1993 through 1998 IHS paid out the ISD Fund by paying the full amount of each tribal contractor's contract support cost requirements, as calculated by IHS, associated with those contracts covering programs listed at the top

of the ISD Queue, until the amount appropriated to the ISD Fund for that fiscal year was exhausted. At that point, other ISDA contracted programs received no contract support cost payments that year associated with that program. Each succeeding fiscal year, IHS removed from the Queue the programs that had received contract support costs the previous year, and IHS then advanced those remaining programs that had not. Under the IHS policy, only if a program advanced high enough on the ISD Queue in a given year so that it could be paid out of the ISD Fund that year would contract support costs associated with that program be paid that year. ISDM 92-2, at 5; IHS Circular 96-04, at 10-11. Beginning with FY 1999 IHS abandoned the "ISD Queue" system. In fiscal years 1993 through 1997, IHS failed to pay scores of tribal contractors tens of millions of dollars in any contract support cost requirements whatsoever associated with their contracted programs listed on the IHS Queue.

32. For ISDA contracted IHS programs other than those described in paragraphs 30-31, in each of fiscal years 1993 through 1997 IHS paid only so much in contract support costs as was recommended by various appropriations committees of Congress. IHS generally divided these funds into two pools, called Pool 2 and Pool 3. Pool 2 consisted of the same amount IHS paid out in the prior year to all ISDA contracts (other than one-time, non-recurring contract support costs). Pool 3 consisted of the difference between Pool 2 and the amount recommended for contract support cost payments that year by various appropriations committees. In fiscal years 1993 through 1997, IHS failed to pay scores of tribal contractors tens of millions of dollars in their full contract support cost requirements (even as miscalculated by IHS, *see* paragraph 20 of

this Complaint).

33. The defendants' actions in funding less than the full contract support cost requirements of tribal contractors over a period of many years is documented in (1) the 1999 report of the General Accounting Office identified in paragraph 10 of this Complaint; (2) IHS annual contract support cost shortfall reports prepared pursuant to section 106(c) of the ISDA (25 U.S.C. 450j-1(c)) but never forwarded to Congress as required by the ISDA; (3) IHS's budget justifications submitted to Congress as part of the President's annual budget request; (4) various additional reports prepared by IHS including special reports requested by committees of Congress; and (5) individual documentation IHS annually provides to tribal contractors stating each tribal contractor's calculated annual contract support cost requirements and each tribal contractor's annual payment.

34. The IHS annual contract support cost shortfall report is an annual report prepared each spring. In this annual report, IHS summarizes how much IHS has calculated as each Tribe's requirement to meet its full contract support cost requirements in the prior year, how much IHS paid against that requirement, and the resulting shortfall, if any. In this report IHS also summarizes the full contract support cost requirement IHS has calculated for each Tribe in the current year, the amounts it has paid or expects to pay in the current year against those needs, and the shortfall (if any) it expects in the current year. Further, the annual contract support shortfall report projects any similar shortfall IHS anticipates in the next fiscal year.

35. The IHS shortfall reports compiled each year are prepared by each

of the twelve IHS Area Offices individually for each Tribe situated within each Area Office. The IHS Area Offices then forward their determinations of final contract support cost requirements to the IHS Headquarters, where the information is reviewed and compiled by the Office of Tribal Self-Governance, the Office of Tribal Programs, the Office of Management Support and the Division of Financial Management. The purpose of these reports is to meet the Secretary's duty under Section 106(c) of the ISDA to furnish to Congress an annual accounting of the full contract support cost requirements of contracting Tribes, as determined by IHS, and to provide an accounting of the amount of contract support cost funds that were paid according to IHS in that year. 25 U.S.C. § 450j-1(a)(1). In preparing each report IHS (either centrally or through its various Area Offices) calculates on an individual contract basis the amount of contract support costs required to fully fund tribal contract support cost requirements in the covered year, according to the instructions set forth in IHS's circulars regarding contract support costs. Each IHS shortfall report is accompanied by detailed appendices which include tribal-specific information relevant to the determination of contract support cost requirements for every tribal contractor in the United States.

36. In each of fiscal years 1993 through 1997 IHS determined the total amount it would make available for contract support cost payments that year shortly after the enactment of each year's annual appropriation for IHS. At no time contemporaneous with these determinations did IHS ever undertake a detailed analysis of the balance of its appropriation for purposes of determining how much in additional contract support cost

funding could be paid to tribes with ISDA contracts that year.

**The "Cap" or Earmark Years.**

37. In each of fiscal years 1998 to the present Congress has limited the availability of appropriations IHS may spend to pay contract support costs due on ISDA contracts, by limiting such payments in the relevant appropriations acts to "not to exceed" a certain sum. The sums so appropriated have been insufficient to meet the full contract support cost requirements of all tribal ISDA contractors even at the understated amounts IHS calculated as specified in paragraph 20 of this Complaint.

38. The insufficient appropriations made to IHS to pay contract support costs in fiscal years 1998 to the present do not limit or excuse the federal government's continuing liability for the full contract price specified in the ISDA and in the plaintiff's contracts and funding agreements. The ISDA's § 106(b) availability clause limits the Secretary's ability to liquidate and pay the government's contractual and statutory obligations under the ISDA, but it does not limit the United States's liability for the contract price specified in the ISDA and in the plaintiff's contracts.

39. Even in years when sufficient appropriations were not available to the Secretary to pay all contracted amounts for contract support costs, the United States remained liable for the full amount specified in the ISDA and the ISDA contracts. The ISDA requires the Secretary to enter into binding contracts in advance of appropriations acts for specified amounts, including amounts for contract support costs. The duty and authority of the Secretary to enter into ISDA contracts is not limited to available

appropriations.

40. Under the ISDA, a tribal contractor has a contractual right to a specific amount of contract support costs as part of the contract price. Both the Secretary's authority and his mandatory duty to award a tribal contract at this price, including full contract support costs, is not conditional on the availability of appropriations. While an insufficiency of appropriations to IHS may excuse IHS from providing full contract support cost payments on tribal contracts, it does not eliminate the obligation of the United States for the full contract price.

41. The mandatory funding provisions of § 450j-1(a), by providing the Secretary with legislative authorization to create obligations in advance of an appropriation, create what is referred to in the jargon of federal appropriations law as "contract authority." Failure by Congress to appropriate sufficient funds to meet those obligations does not limit the United States's liability to pay the specified amount of the obligation. The ISDA unconditionally mandates that the full amount of funding for contract support costs must be added to the contract as a part of the contract price and specifically requires the Secretary to bind the United States to that amount through contract.

42. This action seeks an award of money damages arising out of the defendants' failure to pay full contract support costs. This action does not seek specific performance, and it does not seek the payment of contract support costs not previously paid. The court's authority to award "money damages" under 25 U.S.C. § 450m-1 of the

ISDA is independent of the continuing availability (or lack thereof) of older appropriations to pay additional contract support costs. Money damages will be awarded from the Permanent Judgment Fund created by 31 U.S.C. § 1304. The Fund is not controlled by IHS and it is not dependent on appropriations to IHS. Rather, the Fund establishes a central, government-wide judgment fund from which judicial tribunals administering or ordering judgments, awards, or settlement may order payments without being constrained by concerns of whether adequate funds exist at the agency level to satisfy any judgment.

43. IHS has no authority to pay a judgment entered in this case. Such damages may by law only be paid from the Judgment Fund.

## V.
## SPECIFIC FACTS CONCERNING THE PUEBLO OF ZUNI

44. The Zuni Reservation encompasses about 450,000 acres, located in the west-central part of New Mexico. The Pueblo of Zuni is one of the largest and most remote of the nineteen New Mexico Indian Pueblos. The Village of Zuni contains the Pueblo's population center and is the site of all governmental, educational, health and social service organizations. Veronica E. Velarde Tiller, *Tiller's Guide to Indian Country* at 470 (1996) (*Tiller's Guide*).

45. The Pueblo of Zuni's principal town was founded in about 1350 and its Reservation was established by Executive Order in 1877. Additional lands were added to the Reservation in 1917, 1935, and 1949. The Pueblo adopted a Constitution under section 16 of the Indian Reorganization Act, 25 U.S.C. § 476. The governing

body of the Pueblo of Zuni is the Tribal Council, made-up of the Governor, the Lieutenant Governor, and Six Tribal Council members, all of whom are elected to four-year terms. *Tiller's Guide.*

46. The Pueblo of Zuni currently employs 504 people, including 54 individuals in positions serving the health program.

47. Since before 1993, the Pueblo of Zuni has operated various federal IHS programs benefitting the Zuni people, through self-determination contracts authorized under Title I of the ISDA. The contracted programs have been operated for the benefit the approximately 10,000 members of the Pueblo, most of whom live on the Zuni Reservation. At all times relevant to this Complaint, these contracted programs included, among others: the Otitis Media (Audiology) program (Contract Nos. 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 and 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); the Community Health Representative program (Contract Nos. 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 and 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); the Emergency Medical Service (EMS) program (Contract Nos. 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); the Model Diabetes Project (Wellness Program) (Contract Nos. 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 and 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); the Teen Health Program (Contract Nos. 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 and 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); and the Zuni Recovery Center (substance abuse services) program (Contract Nos. 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, 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 and 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). Since at least FY 1995 to the present, each of these contracts has been in the form of a Model Contract and Annual Funding Agreement.

48. The Pueblo of Zuni's self-determination contracts and annual funding agreements with the United States, together with the ISDA, entitle the Pueblo to all

contract support costs described in 25 U.S.C. § 450j-1(a) for the Pueblo's contracts from fiscal years 1993 through 1998.

49. Under the Pueblo of Zuni's self-determination contracts and annual funding agreements for the period fiscal years 1993 through 1998; 25 U.S.C. § 450j-1(a); and other applicable law, the Pueblo of Zuni had a contractual and legal right to be paid collectively on all its ISDA contracts where shortfalls occurred.

50. Indirect and direct contract support costs in an amount totaling at least $1,256,968, plus an additional sum representing the difference between the amount due for indirect costs as calculated by IHS and the amount due for indirect contract support costs as properly calculated pursuant to the ISDA and the Tenth Circuit's mandate in the *Ramah* litigation. Of this amount, IHS paid no more than $932,773, leaving a total amount of unpaid contract support costs of at least $324,213.

51. By multiple letters dated April 16, 2001, covering each annual funding agreement, the Pueblo of Zuni submitted timely claims with IHS for damages for the contract support costs not paid to the Pueblo under its various contracts and funding agreements. Each claim was filed pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 601 *et seq.* and 25 U.S.C. § 450m-1(c) of the ISDA. Each claim made by the Pueblo of Zuni was under $100,000. As to each claim the agency contract officer had sixty days from receipt to issue a decision. 41 U.S.C. § 605(c)(1). As of the date of the filing of this Complaint, more than 100 days had passed since the submission of the claims. Since the IHS contracting officer has to date not issued a decision on any of the

claims, the claims have now been denied by operation of law. 41 U.S.C. § 605(c)(5). This Complaint is therefore timely insofar as it arises under the CDA. 41 U.S.C. § 609(a)(3); 25 U.S.C. § 450m-1(a), (c).

## VI.
## CLASS ACTION ALLEGATIONS

52. This action is brought by plaintiff as a class action, on its own behalf and on behalf of all others similarly situated, under the provisions of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure for money damages and other relief as the Court deems appropriate, including costs and attorneys' fees.

53. The class so represented by plaintiff in this action, and of which plaintiff is itself a member, consists of "all tribes and tribal organizations contracting with IHS under the ISDA between the years 1993 to the present."

54. According to IHS's contract support cost shortfall report covering fiscal year 1999 ("IHS 1999 Report"), 329 Tribes situated in 35 states then operated ISDA contracts for the administration of various IHS hospitals, clinics and other federal health care programs.

55. Of these 329 tribal contractors, at least 296 Tribes have experienced shortfalls in the payment of their contract support cost requirements as calculated by IHS. This includes (1) at least 131 Tribes that were at the time of the IHS 1999 Report listed on the IHS Queue and that were underpaid in FY 1999, (2) at least 142 Tribes that in FY 1999 only experienced shortfalls in contract support costs associated with older "ongoing" contracted programs, and (3) at least 23 Tribes that did not experience

shortfalls in FY 1999 but did experience shortfalls in one or more earlier years.

56. The class is so numerous that joinder of individual members in this action is impracticable.

57. There are common questions of law and fact involved in this action that affect the rights of each member of the class in the same way, and the relief sought is common to the entire class. Each ISDA contract has an identical clause regarding the availability of appropriations. Each class member experienced a contract support shortfall in the same way, for the same reason, under the same IHS policies. Further, each class member's claim raises the same legal issue: whether the Indian Self-Determination Act, and the ISDA contracts that implement the Act, require the federal government to pay the Tribes the full contract price including the full amount of the "shortfalls" they experienced in the designated years, including (but not limited to) the amounts acknowledged in IHS's own reports. The class satisfies Rule 23(a)'s commonality requirement.

58. The claims of the plaintiff Pueblo of Zuni, are typical of the claims of the class in that the claims of all members of the class, including plaintiff, are based on the same statutes, legal theories, basic contract terms, and course of conduct. Like all other class members, the Pueblo of Zuni's claim is that the ISDA requires the government to calculate and pay full contract support costs associated with ISDA contracts, once a contract is executed and performance has commenced. The Pueblo of Zuni's claimed injuries arise out of the same precise course of conduct and events that

led to the underpayments experienced by all other class members over the full class period. Further, there is no antagonism among class members, for any judgment awarded (if any) will be payable from the Permanent Judgment Fund established in 31 U.S.C. § 1304, just as was the case in *Ramah v. Babbitt*, 50 F. Supp.2d 1091 (D.N.M. 1999). The class satisfies Rule 23(a)'s typicality requirement.

59. The named plaintiff is the representative party for the class, and is able to, and will, fairly and adequately protect the interests of the class. The named plaintiff Tribes have no antagonistic or conflicting interests with those of the class and class counsel is qualified, experienced and able to conduct the proposed litigation. The attorneys for plaintiff are experienced and capable in litigation in the field of contract support costs under the ISDA, having *inter alia* successfully represented the plaintiff Tribes in *Ramah Navajo School Board & Puyallup Tribe v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996); *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala*, 988 F. Supp. 1306 (D. Or. 1997), on reconsideration, 999 F. Supp. 1395 (D. Or. 1998), on remand, 58 F. Supp.2d 1191 (D. Or. 1999), pending on appeal, Nos. 98-36022 and 99-35951 (9th Cir.); and *Shalala v. Cherokee Nation of Oklahoma*, No. 00-1056 (Fed. Cir., Feb. 25, 2000, unpublished order dismissing government's appeal from a determination of liability for unpaid contract support costs). In addition, plaintiff counsel represents plaintiffs in *Cherokee Nation of Oklahoma and Shoshone-Paiute Tribes of Nevada v. United States*, No. 99-092 (E.D. Okla.), pending on appeal No. 01-7106 (10th Cir.); certain Division of Cost Allocation class members in *Ramah Navajo Chapter v. Babbitt*,

No. 90-0957 (D.N.M.); and a similar class of all Tribes contracting with the BIA in *Pueblo of Zuni v. United States*, No. 00-365 LH/WWD (D.N.M.) All of these cases involved or currently involve similar legal issues pertaining to contract support costs. Neither the Pueblo of Zuni nor its counsel herein have any interests that might cause them not to vigorously pursue the claims stated herein.

60. This action is properly maintained as a class action inasmuch as the questions of law and fact common to all members of the class predominate over any questions affecting individual members. Here, the claims stem from a common course of conduct. The basic claim for unpaid contract support cost is the same for all class members: they all claim that the ISDA entitles them to full funding. So, too, is the government's central defense the same: that appropriations have allegedly not been available to fully pay all Tribes their contract support cost needs, and that any such unavailability relieves the government of liability. The common issues thus "dominate this litigation," and are both determinative and dispositive. The class satisfies rule 23(b)(3)'s "predominance" requirement.

61. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. This case involves a course of conduct that was identical with regard to all members of the class. In addition, (1) the members of the class do not have a strong interest in controlling the prosecution of their separate claims, (2) there is relatively little litigation concerning the controversy already commenced by members of the class, (3) it is desirable to concentrate this litigation in the interests of

judicial economy, and (4) the class is manageable. If individual actions were commenced in this Court by members of the class, the Court would ultimately be called upon to address the precise same legal issues as are presented in this action. The same would be true of other individual actions commenced in other districts. Therefore, a class action is a superior means for the fair and efficient resolution of the controversy.

62. The class meets the requirements of Rule 23(b)(1). Separate actions by tribes and tribal organizations against the defendants asserting the claims set forth herein (1) would create a risk of establishing incompatible standards of conduct for the defendants, and (2) would also create a risk of individual adjudications which would, as a practical matter, be dispositive of the interests of other tribes and tribal organizations, and would substantially impair or impede the ability of such other tribes and tribal organizations to protect their interests.

63. The class meets the requirements of Rule 23(b)(2). The defendants have both acted and refused to act on grounds generally applicable to the class, making appropriate final injunctive relief and declaratory relief with respect to the class as a whole.

64. Each class member's damages can accurately be calculated by reviewing an extensive array of IHS documents, including, *inter alia*, internal IHS shortfall reports; IHS's ISD Queue reports; IHS's comprehensive fiscal year 1999 final determination regarding the contract support costs needs of all Tribes then remaining on the Queue from prior years; IHS's similar comprehensive reports for fiscal years 2000 and 2001; IHS field data supporting said reports; and indirect cost data maintained, in

part, by the Department of Interior Office of Inspector General. Quantifying damages can be accomplished efficiently and accurately in this class action, both globally for the class and individually for each class member, given extensive existing agency data and analyses concerning annual tribal contract support cost requirements.

65. The claims asserted by the class do not include claims for the failure of the defendants to pay contract support costs for reasons specific to an individual tribe, such as (but not limited to) disagreements concerning the proper method for determining a particular tribe's contract support cost entitlements due to a dispute over particular items of cost.

**FIRST CAUSE OF ACTION**
**(VIOLATION OF ISDA)**

66. Plaintiff realleges paragraphs 1 through 65 as if fully set forth herein.

67. The failure of the defendants to pay the Pueblo of Zuni full contract support costs associated with all IHS programs operated, administered and managed by the Pueblo in fiscal years 1993 to the present, including the failure of the defendants to properly calculate indirect contract support costs as determined in *Ramah Navajo Chapter v. Lujan*,112 F.3d 1455 (10th Cir. 1997), constitutes multiple violations of the statutory requirements imposed upon the defendants under: 25 U.S.C. §§ 450j-1(a)(2), (3) & (5), 450j-1(b), 450j-1(c)(2), and 450j-1(g), all of ISDA Title I; and other applicable federal law.

68. The failure and refusal of the defendants to pay the plaintiff class full contract support costs associated with all IHS programs operated, administered and