**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TUNICA-BILOXI TRIBE OF LOUISIANA;
RAMAH NAVAJO SCHOOL BOARD, INC.,

Plaintiffs,

v.

UNITED STATES of AMERICA;
MICHAEL O. LEAVITT, Secretary of the United States Department of Health and Human Services; DIRK KEMPTHORNE, Secretary of the United States Department of the Interior,

Defendants.

Case No. 02-2413 (RBW/DAR)

**DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

Pursuant to Rules 12(b)(1) and 56 of the Federal Rules of Civil Procedure, Defendants United States, Michael O. Leavitt, Secretary of the U.S. Department of Health and Human Services, and Dirk Kempthorne, Secretary of the U.S. Department of the Interior, by and through undersigned counsel, hereby move this Court for an order dismissing many of the claims in the Second Amended Complaint and the Supplemental Complaint for lack of subject matter jurisdiction and for an order granting summary judgment to them on the remaining claims. The facts and law supporting this Motion are set forth in the accompanying Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss and for Summary Judgment and an attached Local Rule 7.1(h) Statement of Material Facts.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director

/s/Rachel J. Hines
______________________________

RACHEL J. HINES (D.C. Bar #424774)
HANNAH Y.S. CHANOINE
Federal Programs Branch, Room 7314
Civil Division
Mailing Address
P.O. Box 883
Washington, DC 20044
Delivery Address
20 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 514-5532
Facsimile: (202) 318-7604
E-mail: rachel.hines@usdoj.gov
E-mail: hannah.chanoine@usdoj.gov

Dated: April 20, 2008

Counsel for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TUNICA-BILOXI TRIBE OF LOUISIANA;<br>RAMAH NAVAJO SCHOOL BOARD, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES of AMERICA;<br>MICHAEL O. LEAVITT, Secretary of the United States Department of Health and Human Services; DIRK KEMPTHORNE, Secretary of the United States Department of the Interior,<br><br>Defendants. | Case No. 02-2413 (RBW/DAR) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PAGE

INTRODUCTION. . . . . 1

STATUTORY BACKGROUND. . . . . 2

FACTUAL AND PROCEDURAL BACKGROUND. . . . . 9

STANDARDS FOR REVIEW. . . . . 15

I. Standard for Motion to Dismiss for Lack of Subject Matter Jurisdiction. . . . . 15

II. Standard for Summary Judgment. . . . . 16

ARGUMENT. . . . . 17

I. THE COURT LACKS SUBJECT MATTER JURISDICTION OVER MANY OF PLAINTIFFS' CLAIMS. . . . . 17

A. Some of Plaintiffs' Claims Must Be Dismissed for Lack of Presentment. . . . . 17

B. Plaintiffs Lack Standing to Pursue Their "Shortfall Claims". . . . . 18

C. Plaintiffs' Claims Against Secretary Kempthorne Are Moot. . . . . 20

D. Plaintiffs' Claims Against Secretary Kempthorne Must Be Dismissed for Failure to Exhaust Administrative Remedies. . . . . 21

II. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS BECAUSE THEY FULLY PERFORMED UNDER PLAINTIFFS' CONTRACTS. . . . . 22

A. IHS Fully Performed Under Tunica's Contracts. . . . . 23

B. IHS Fully Performed Under RNSB's Contracts. . . . . 24

III. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS BECAUSE PLAINTIFFS' CONTRACTS DO NOT VIOLATE THE ISDA. . . . . 25

IV. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS ON ALL CONTRACT YEARS AFTER 1997 BECAUSE CONGRESS HAS LIMITED THE TOTAL AMOUNT OF CSC THAT IHS CAN AWARD. . . . . 29

V. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS BECAUSE PLAINTIFFS' INDIRECT COST RATES DO NOT VIOLATE THE ISDA. . . . . 31

A. The Nature and Treatment of Indirect Costs Under Federal Law. . . . . 32

1. Federal appropriations law.. . . . . 32

2. Federal cost allocation principles.. . . . . 34

B. The ISDA Allows IHS to Use Indirect Cost Rates, Negotiated under OMB A-87, in Making Indirect CSC Funding Awards. . . . . 38

1. Ramah Navajo Chapter v. Lujan, 112 F.3d 1455 (10th Cir. 1997). . . . . 41

2. Immediate congressional response to RNC. . . . . 43

3. The decision in RNC does not apply to Plaintiffs. . . . . 45

a. Plaintiffs' costs are not fixed. . . . . 46

b. Plaintiffs recover indirect costs from other federal agencies. . . . . 48

C. The Rate Adjustment Proposed by Plaintiffs Is Contrary to the ISDA. . . . . 49

VI. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS BECAUSE PLAINTIFFS HAVE WAIVED, AND ARE ESTOPPED FROM RAISING, ANY CLAIMS THAT THEIR CONTRACTS OR THEIR INDIRECT COST RATES VIOLATE THE ISDA. . . . . 52

A. Plaintiffs Have Waived Any Claims to Additional Funding. . . . . 52

B. Plaintiffs Are Estopped from Claiming Additional Funding. . . . . 56

C. Plaintiffs Have Waived Any Claims Related to their Indirect Cost Rates. . . . . 58

VII. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS BECAUSE THE AWARD OF ADDITIONAL CSC WOULD BE A WINDFALL. . . . . 59

CONCLUSION. . . . . 60

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

Advanced Materials, Inc. v. Perry, 108 F.3d 307 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . 24

Alabama v. Shalala, 124 F. Supp. 2d 1250 (M.D. Ala. 2000). . . . . . . . . . . . . . . . . . . . . . . 32, 33

Aleutian Constructors v. United States, 24 Cl. Ct. 372 (1991). . . . . . . . . . . . . . . . . . . . . . . . . 53

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505 (1986). . . . . . . . . . . . . . . . . 16

Andrade v. Lauer, 729 F.2d 1475 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Appeal of USD Techs., Inc., ASBCA No. 31305, 1987 WL 40766 (Mar. 12, 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Arizona v. Thompson, 281 F.3d 248 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Babbitt v. Oglala Sioux Tribal Pub. Safety Dep't, 194 F.3d 1374 (Fed. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30

Barnes v. Cohen, 749 F.2d 1009 (3d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Beethoven.com LLC v. Librarian of Cong., 394 F.3d 939 (D.C. Cir. 2005). . . . . . . . . . . . . . . . 19

Beta Sys., Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988). . . . . . . . . . . . . . . . . . . . 22, 55

Beverly Cmty. Hosp. Ass'n v. Belshe, 132 F.3d 1259 (9th Cir. 1997). . . . . . . . . . . . . . . . . 43, 44

Brown v. Marquette Sav. & Loan Ass'n, 686 F.2d 608 (7th Cir. 1982). . . . . . . . . . . . . . . . . . . 43

Brown v. Thompson, 374 F.3d 253 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Cannon v. Univ. of Chicago, 441 U.S. 677, 99 S. Ct. 1946 (1979). . . . . . . . . . . . . . . . . . . . . . 25

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986). . . . . . . . . . . . . . . . . . . . . . . . 17

Cherokee Nation v. Thompson, 311 F.3d 1054 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . 6, 13

Cherokee Nation v. Leavitt, 543 U.S. 631, 125 S. Ct. 1172 (2005). . . . . . . . . . . . . . . . . . . passim

City of Houston v. Dep't of Hous. & Urban Dev., 24 F.3d 1421 (D.C. Cir. 1994). . . . . . . . . . . 29

Coast Fed. Bank v. United States, 323 F.3d 1035 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . 22

ConocoPhillips v. United States, 501 F.3d 1374 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . 52,57

Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586 (Fed. Cir. 1987). . . . . . . . . . . . 18

Dep't of Soc. Serv. v. Sullivan, No. 89-15091, 1990 WL 81840 (9th Cir. June 18, 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Do-Well Mach. Shop, Inc. v. United States, 870 F.2d 637 (Fed. Cir. 1989). . . . . . . . . . . . . 52, 53

E. Walters & Co. v. United States, 576 F.2d 362 (Cl. Ct. 1978). . . . . . . . . . . . . . . . . . . 52, 56, 57

Elden v. United States, 617 F.2d 254 (Ct. Cl. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

England v. The Swanson Group, Inc., 353 F.3d 1375 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . 17

Fed. for Am. Immigration Reform, Inc. v. Reno, 897 F. Supp. 595 (D.D.C. 1995). . . . . . . . . . . 15

Flink/Vulcan v. United States, 63 Fed. Cl. 292 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

GHS Health Maint. Org., Inc. v. United States, 76 Fed. Cl. 339 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Granite Constr. Co. v. United States, 962 F.2d 998 (Fed. Cir. 1992). . . . . . . . . . . . . . . . . . . . . 20

Greenlee County v. United States, 487 F.3d 871 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 29

Haig v. Agee, 453 U.S. 280, 101 S. Ct. 2766 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Hartford Accident & Indem. Co., 130 Ct. Cl. 490 (1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Herbert v. Nat'l Acad. of Scis., 974 F.2d 192 (D.C. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . 15

Hermes Consol., Inc. v. United States, 58 Fed. Cl. 409 (2003). . . . . . . . . . . . . . . . . . . . . 52, 55, 57

Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 119 S. Ct. 755 (1999). . . . . . . . . . . . . . . . . . . 25

John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750 (2008). . . . . . . . . . . . . . . . . . . . . 17

Kentucky ex rel. Cabinet for Human Res. v. United States, 16 Cl. Ct. 755 (1989). . . . . . . . . . . 35

LSi Serv. Corp. v. United States, 422 F.2d 1334 (Ct. Cl. 1970). . . . . . . . . . . . . . . . . . . . . . . . 24

Lincoln v. Vigil, 508 U.S. 182, 113 S. Ct. 2024 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135 (1973). . . . . . . . . . . . . . . . . . . . . . 55

Liquilux Gas Corp. v. Martin Gas Sales, Inc., 979 F.2d 887 (1st Cir. 1992). . . . . . . . . . . . . . . 43

Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130 (1992). . . . . . . . . . . . . . . . 18, 19

MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405 (1992). . . . . . . . . . . . . . . . . . 55

Madigan v. Hobin Lumber Co., 986 F.2d 1401 (Fed. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . 2

Maine v. Shalala, 81 F. Supp. 2d 91 (D. Me. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 33, 35

Marine Mammal Conservancy, Inc. v. Dep't of Agric., 134 F.3d 409
(D.C. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Martin v. United States, 20 Cl. Ct. 738 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

McCreary v. Offner, 1 F. Supp. 2d 32 (D.D.C. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

Menominee Indian Tribe v. United States, No. 07-812, 2008 WL 680379
(D.D.C. Mar. 14, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Mexican Intermodal Equip., S.A. de C.V. v. United States, 61 Fed. Cl. 55 (2004). . . . . . . . . . 52

Neder v. United States, 527 U.S. 1, 119 S. Ct. 1827 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 110 S. Ct. 2465 (1990). . . . . . . . . . . . . . . . 32

Oglesby v. United States Dep't of Army, 920 F.2d 57 (D.C. Cir. 1990).. . . . . . . . . . . . . . . . . . 19

PCL Const. Servs., Inc. v. United States, 41 Fed. Cl. 242 (1998). . . . . . . . . . . . . . . . . . . . . . . . . 53

Piamba Cortes v. Am. Airlines, Inc., 177 F.3d 1272 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . 44

Porter v. Comm'r, 856 F.2d 1205 (8th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Pueblo of Zuni v. United States, 243 F.R.D. 436 (D.N.M. 2007). . . . . . . . . . . . . . . . . . . . . . . . 15

Pueblo of Zuni v. United States, No. 01-1046 (D.N.M.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Pueblo of Zuni v. United States, 467 F. Supp. 2d 1066 (D.N.M. 2006). . . . . . . . . . . . . . . . . . . . 17

Pueblo of Zuni v. United States, 467 F. Supp. 2d 1114 (D.N.M. 2006). . . . . . . . . . . . . . . . . . . . 26

RNC v. Babbitt, No. 90-0957 (D.N.M. Nov. 4, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

RNSB v. Shalala, No. 94-914 (D.N.M.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Ramah Navajo Chapter v. Lujan, 112 F.3d 1455 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . passim

Ramah Navajo Chapter v. Norton, No 90-957 (D.N.M. 2006). . . . . . . . . . . . . . . . . . . . 27, 30, 42

Ramah Navajo Sch. Bd. v. Babbitt, 87 F.3d 1338 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . 27, 30

Ramah Navajo Sch. Bd. v. United States, No. 08-19C (C.F.C.). . . . . . . . . . . . . . . . . . . . . . . . 14

Red Lion Broad. Co. v. FCC, 395 U.S. 367, 89 S. Ct. 1794 (1969). . . . . . . . . . . . . . . . . . . . . . 43

Renda Marine, Inc. v. United States, 509 F.3d 1372 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . 17

Reservation Ranch v. United States, 39 Fed. Cl. 696 (1997). . . . . . . . . . . . . . . . . . . . . . . . . 52, 57

Rochester Pure Waters Dist. v. EPA, 960 F.2d 180 (D.C. Cir. 1992). . . . . . . . . . . . . . . . . . . . . 32

SMS Data Prods. Group, Inc. v. United States, 19 Cl. Ct. 612 (1990). . . . . . . . . . . . . . . . . . . . 17

Samish Indian Nation v. United States, 419 F.3d 1355 (Fed. Cir. 2005). . . . . . . . . . . . . . . 26, 58

Seaboard Lumber Co. v. United States, 903 F.2d 1560 (Fed. Cir. 1990). . . . . . . . . . . . . . . 52, 57

Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 107 S. Ct. 2332 (1987). . . . . . . . . . . 54

Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 96 S. Ct. 1917 (1976).. . . . . . . . . . . . . . . . . 18

Sociotechnical Research Applications, Inc. v. Whitman, No. 01-1232,
2002 WL 123557 (Fed. Cir. Jan. 30, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Southern Ute Indian Tribe v. Leavitt, No. 05-988 (D.N.M. June 15, 2007). . . . . . . . . . . . . . . . 28

State of Ohio Rehab. Serv. Comm'n v. United States Dep't of Educ.,
No. 95-4213, 1996 WL 665608 (6th Cir. Nov. 14, 1996). . . . . . . . . . . . . . . . . . . . . . . 35

Titan Corp. v. West, 129 F.3d 1479 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Union Pac. R.R. Co. v. United States, 847 F.2d 1567 (Fed. Cir. 1988). . . . . . . . . . . . . . . . . . . 57

United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488 (D.C. Cir. 2004). . . . . . . . . . . 44

United States v. Barnes, 295 F.3d 1354 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. Montgomery County, 761 F.2d 998 (4th Cir. 1985). . . . . . . . . . . . . . . . . . 43, 44

Wash. Legal Found. v. U.S. Sentencing Comm'n, 17 F.3d 1446 (D.C. Cir. 1994).. . . . . . . . . . 25

Whittaker Elec. Sys. v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . 52, 57

Wilbur v. CIA, 355 F.3d 675 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Worth v. Jackson, 377 F. Supp. 2d 177 (D.D.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc., 454 U.S. 464, 102 S. Ct. 752 (1982).. . . . . . . . . . . . . . . . . . . . . . . . . . 18

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 9, cl. 7.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 56

U.S. Const. art. III, § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**FEDERAL STATUTES**

25 U.S.C. § 13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

25 U.S.C. § 450. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

25 U.S.C. § 450b. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 38

25 U.S.C. § 450f. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

25 U.S.C. § 450j.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30

25 U.S.C. § 450j-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

25 U.S.C. § 450j-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43, 44

25 U.S.C. § 450j-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 43

25 U.S.C. § 450*l*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

25 U.S.C. § 450m-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 17, 54

28 U.S.C. § 1295. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 U.S.C. § 1407. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28 U.S.C. § 2501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

31 U.S.C. § 1301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 32, 33

41 U.S.C. § 601 . . . . . . . . . . 5, 12

41 U.S.C. § 605. . . . . . . . . . 5, 17

41 U.S.C. § 609. . . . . . . . . . 17

41 U.S.C. § 612. . . . . . . . . . 56

42 U.S.C. § 1601 . . . . . . . . . . 3

42 U.S.C. § 2001. . . . . . . . . . 3

Indian Self-Determination & Educ. Assistance Act Amendments of 1988,
Pub. L. No. 100-472, 102 Stat. 2285 (1988). . . . . . . . . . 38

Indian Self-Determination Act Amendments of 1994,
Pub. L. No. 103-413, 108 Stat. 4250 (1994). . . . . . . . . . 39

Dep't of the Interior & Related Agencies Appropriations Act,
Pub. L. No. 105-83, 111 Stat. 1543 (1997). . . . . . . . . . 6, 29

Omnibus Consol. & Emergency Supp. Appropriations Act, 1999,
Pub. L. No. 105-277, 112 Stat. 2681 (1998). . . . . . . . . . 29

Consol. Appropriations Act, 2000, Pub. L. No. 106-113,
1 113 Stat. 1501 (1999). . . . . . . . . . 29

Dep't of the Interior & Related Agencies Appropriations Act, 2001,
Pub. L. No. 106-291, 114 Stat. 922 (2000). . . . . . . . . . 29

Dep't of the Interior & Related Agencies Appropriations Act,
Pub. L. No. 107-62, 115 Stat. 411 (2001). . . . . . . . . . 29

Dep't of the Interior & Related Agencies Appropriations Act,
Pub. L. No. 108-7, 117 Stat. 11 (2003). . . . . . . . . . 29

**FEDERAL REGULATIONS**

2 C.F.R. § 225.20. . . . . . . . . . 9, 35, 57

25 C.F.R. § 900.8. . . . . . . . . . 3

25 C.F.R. § 900.12. . . . . . . . . . 5, 27

25 C.F.R. § 900.16. . . . . . . . . . 3

25 C.F.R. § 900.18. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25 C.F.R. § 900.22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25 C.F.R. § 900.31. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 54

25 C.F.R. § 900.32. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25 C.F.R. § 900.37. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

25 C.F.R. §§ 900.150-900.176. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 54

25 C.F.R. §§ 900.215-900.230. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

43 C.F.R. § 4.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20, 58

35 Fed. Reg. 18797 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**<u>LEGISLATIVE MATERIAL</u>**

140 Cong. Rec. H11140, 103rd Cong., 2d Sess.,
1994 WL 553621 (Oct. 6, 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

H.R. Rep. No. 105-609 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

S. Rep. No. 100-274, 1988 U.S.C.C.A.N. 2620 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**<u>FEDERAL RULES</u>**

Rule 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Rule 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15

Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

**<u>MISCELLANEOUS</u>**

5 A Charles A. Wright & Arthur R. Miller, <u>Fed. Practice & Proc.</u> § 1366 (2d ed. 1990). . . . . . 15

## INTRODUCTION

The Tunica-Biloxi Tribe ("Tunica") and The Ramah Navajo School Board ("RNSB"), Plaintiffs in this case, are parties to self-determination contracts with the Secretary of the U.S. Department of Health and Human Services ("HHS"), as authorized by the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. §§ 450 et seq. Pursuant to their contracts, Plaintiffs have assumed responsibility for running certain health care programs from the Indian Health Service ("IHS"), an agency of HHS. At issue in this lawsuit are claims that the Secretary underfunded certain cost components of Plaintiffs' contracts, called indirect contract support costs ("CSC"). A review of Plaintiffs' contracts, however, demonstrates that IHS has fully performed its contractual obligations. To avoid application of the actual terms of their contracts, Plaintiffs instead allege that the contract's funding amounts, and formulas used to derive the amounts, violate the ISDA.

As a threshold matter, many of Plaintiffs' claims must be dismissed for lack of subject matter jurisdiction. Plaintiffs have failed to properly present many of their claims through the Contract Disputes Act's ("CDA") mandatory administrative process. In addition, Plaintiffs lack standing to pursue certain of their claims, and the claims related to their indirect cost rates are moot and subject to dismissal for failure to exhaust administrative remedies.

Defendants are also entitled to summary judgment on the merits of Plaintiffs' claims. First, the ISDA does not dictate contract amounts; it directs the parties to negotiate the contract amounts. Once an agreement is negotiated and signed, the parties are bound by its terms. While the ISDA has many procedural protections for Tribes and Tribal organizations, it does not provide for the relief Plaintiffs seek here: the retroactive reopening of the contracts to allow for the inclusion of additional funding. In other words, "contracting parties must be held to their

agreements." Madigan v. Hobin Lumber Co., 986 F.2d 1401, 1404 (Fed. Cir. 1993). An ISDA contractor that believes that the indirect costs specified in a contract (ISDA or otherwise) are insufficient thus must make a critical decision at the outset: (1) accept the contract, the administration of which causes the contractor to incurs costs beyond those provided for in the contract and find other means to cover these costs, or (2) decide not to accept the contract. While it may be a difficult choice, the decision is the contractor's alone. One of the goals of self-determination--particularly given limited federal and Tribal resources--is to allow Tribes and Tribal organizations, and not the federal government, to make the hard choices about what programs and services will best serve their members. While a Tribe or Tribal organization has the choice to accept or decline a contract or grant, the ISDA and federal appropriations law do not allow government contractors to shift the costs of programs that do not provide sufficient funding to the health care programs run under IHS contracts. Congress intended IHS programs to be charged only the costs that relate to and are directly attributable to IHS programs.

Second, Plaintiffs' claims related to the funding methodology also lack merit. As to IHS, its use of indirect cost rates, negotiated under Office of Management and Budget Circulars, is fully endorsed by the ISDA. But even if their use violated the ISDA, Plaintiffs have acquiesced in the use and validity of these rates and thus have waived any claims for additional CSC. Plaintiffs are likewise not entitled to a remedy, as they recovered far more CSC from IHS than they expended on IHS programs. On these many bases, the Court should grant Defendants' Motion to Dismiss and for Summary Judgment.

## STATUTORY BACKGROUND

The Indian Self-Determination and Education Assistance Act. In 1975, Congress enacted the Indian Self-Determination and Education Assistance Act ("ISDA"), a statute that was

designed to foster Indian self-government by permitting the transfer of certain federal programs to Tribal governments and other Tribal organizations. See 25 U.S.C. §§ 450, 450a. The ISDA directs both the Secretary of HHS and the Secretary of DOI, upon the request of an Indian Tribe, to enter into "self-determination contracts." See id. § 450f(a)(1); id. § 450b(i) (defining "Secretary"). A self-determination contract is a contract for "the planning, conduct and administration of programs or services which are otherwise provided [by IHS or DOI] to Indian tribes and their members pursuant to Federal law." Id. § 450b(j).

At issue in this lawsuit are Plaintiffs' self-determination contracts with IHS. IHS provides health care services to American Indians and Alaska Natives throughout the United States, either directly under the Snyder Act and the Indian Health Care Improvement Act, see 25 U.S.C. § 13; 42 U.S.C. §§ 1601, 2001(a), or by providing funding and support to Tribes and Tribal organizations under ISDA contracts. See Lincoln v. Vigil, 508 U.S. 182, 185, 113 S. Ct. 2024, 2027 (1993). Although the ISDA applies equally to agencies within DOI, this matter involves the duties and responsibilities of the Secretary of HHS and IHS, and thus the statutory references cited hereinafter will refer solely to these parties.

ISDA Contract Formation. Under the ISDA, if a Tribe or Tribal organization wishes to take over the planning, conduct, or administration of programs or services which are otherwise provided by IHS, it may submit a proposal to the Secretary. See 25 U.S.C. § 450f(a)(2). The proposal must contain, inter alia, the amount of funding requested for the contract. See 25 C.F.R. § 900.8(h). The Secretary thereafter has 90 days either to (1) approve the proposal and proposed funding levels and award the contract, or (2) issue a written notification declining all or part of the proposal for one of five justifications found in § 450f(a)(2). See 25 U.S.C.

§ 450f(a)(2); 25 C.F.R. § 900.16. If the Secretary does not take action on a contract proposal within 90 days, the proposal is deemed approved. See 25 C.F.R. § 900.18.

Declination of Contract Proposals. The Secretary may decline, in part or in full, a contract proposal on one of five statutory bases. See 25 U.S.C. § 450f(a)(2); see also 25 C.F.R. § 900.22 (reciting statutory bases). In issuing a partial or full contract "declination," the Secretary must "state any objections in writing[,]" "provide assistance to the tribal organization to overcome the stated objections," and provide the organization with an administrative appeals process. See id. § 450f(b); 25 C.F.R. § 900.31. This administrative appeals process is set forth in 25 C.F.R. §§ 900.150-900.176. The Tribe or Tribal organization may also initiate a federal court action under 25 U.S.C. § 450m-1(a). See 25 U.S.C. § 450f(b).

Direct Review by a Federal Court. Section 450m-1(a) gives federal courts the power to review a Secretary's declination decision for its compliance with ISDA and, if the decision is in error, to enjoin the Secretary "to reverse the declination finding . . . or to compel the Secretary to award and fund an approved self-determination contract." Id. § 450m-1(a). The conclusion of a action challenging a declination is an order affirming the decision of the Secretary or an order compelling the Secretary to enter into a contract. An ISDA contract is thus formed if either (1) the parties are in agreement about the terms of the contract and the Secretary awards the contract, or (2) a reviewing court orders the Secretary to award the contract.

The ISDA Contract. Each ISDA contract has three components: the contract itself, modifications or amendments to the contract, and, since 1995, annual funding agreements ("AFAs"). See id. § 450*l* (providing for a model contract); id. § 450*l*(c)(e)(2) (providing for written modifications to the contract); id. §§ 450*l*(c)(b)(4), (c)(f)(2) (providing for an AFA). The funding levels for an ISDA contract are generally described in the AFA.

Although many self-determination contracts remain in effect for more than one year, Tribal contractors must submit AFA proposals each year, which are then subject to individualized negotiations with the Secretary. See id. § 450j-1(a)(3)(B); 25 C.F.R. § 900.12. If the parties are unable to agree on the appropriate funding level, the Secretary can decline the proposal in part or in full under the declination procedures described above. See 25 C.F.R. § 900.32. The Tribal contractor has the right either to seek review through the administrative appeals process or by a direct federal court action. See 25 U.S.C. § 450f(b).

Contract Disputes. Once the parties execute (sign) an ISDA contract and AFA, all disputes arising under it are subject to the Contract Disputes Act ("CDA"). See id. §§ 450m-1(a), (d). The CDA is found at 41 U.S.C. §§ 601 et seq., and requires, inter alia, that before a claim may be brought in federal court, it must first be timely presented to a contracting officer at the relevant agency. See 41 U.S.C. § 605(a); see also 25 C.F.R. §§ 900.215-900.230 (explaining the exhaustion requirement for ISDA CDA claims).

Funding of an ISDA Contract. Funding under an ISDA contract includes two components–the Secretarial amount and CSC. The Secretarial amount includes expenses for a broad array of functions and activities that support the delivery of health services. See 25 U.S.C. § 450j-1(a)(1) (the "amount of funds . . . shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs"). Because the Secretarial amount does not necessarily cover all of the administrative or operating expenses of a particular program, a self-determination contract generally also includes CSC funding for certain administrative or operating expenses. See id. § 450j-1(a)(2).

CSC can be further broken down into three categories. See id. § 450j-1(a)(3)(A). First, there are direct CSC, which are administrative costs of the contracted-for program, such as

unemployment taxes or workers' compensation insurance. See id. § 450j-1(a)(3)(A)(i); id. § 450b(c). Second, in the initial year of a contract, CSC may include "startup costs consisting of the reasonable costs that have been incurred or will be incurred on a one-time basis." Id. § 450j-1(a)(5). Finally, there are indirect CSC, at issue here, which are administrative costs that are shared by several different programs or services. See id. § 450j-1(a)(3)(A)(ii); id. § 450b(f).

The ISDA permits payment of only those CSC that are reasonable in light of the activities to be conducted. See id. § 450j-1(b). The ISDA directs that IHS's ISDA appropriations "may be expended only for costs directly attributable to [ISDA contracts or grants] and no funds . . . shall be available for any [CSC] associated with [any non-IHS contracts or grants]." Id. § 450j-3. Finally, IHS's payment of CSC, like all funding under the ISDA, is subject to the availability of appropriations. See id. § 450j-1(b); id. § 450j(c).

Insufficient CSC Appropriations and IHS's Policy Response. Since before 1995, Congress has provided funding each fiscal year to IHS for, among other things, self-determination contracts and their associated CSC. In fiscal years before 1998, Congress did not specifically limit the amount of the IHS lump-sum appropriation that could be awarded for CSC. See Cherokee Nation v. Thompson, 311 F.3d 1054, 1058-59 (10th Cir. 2002), rev'd, 543 U.S. 631 (2005). IHS allocated CSC on the basis of recommendations in committee reports accompanying the appropriations. See id. IHS followed Congress's recommendation because it had competing health care obligations and priorities, such as running hospitals and clinics for Tribes that did not wish to enter into self-determination contracts. Starting in 1998, Congress "capped" the amount of funds available for CSC, and this amount has since been the basis for CSC allocations. See, e.g., Dep't of the Interior & Related Agencies Appropriations Act, Pub. L. No. 105-83, 111 Stat. 1543, 1582-83 (1997) (Ex. 39).

Since at least 1995, IHS's total allocations for CSC have been insufficient to fund the total amount requested by all Tribal contractors for CSC in all years at issue in this lawsuit. See Declaration of Thomas Thompson ¶ 6 (Ex. 4). Thus, IHS has had to develop policies for how the annual appropriation for CSC should be allocated equitably among Tribal contractors. These policies, developed with full Tribal participation, have been memorialized in a series of guidance memoranda or Circulars.[1] IHS Memoranda and Circulars are not binding on contractors; they set forth the guidelines that IHS officials follow for ISDA contracting and the funding of CSC.

As a starting place for negotiating indirect CSC, contractors either may use an indirect cost rate (discussed in more detail below) or may negotiate what are called "indirect-type costs" directly with IHS. See Declaration of Ralph Ketcher ¶ 32 (Ex. 1); Declaration of Veronica Zuni ¶ 73 (Ex. 2). Additionally, IHS has implemented pilot projects for CSC awards that allow contractors to negotiate unique CSC funding terms. (Ex. 34 at 26.) For the years at issue in this case, Tunica and RNSB have submitted to IHS indirect cost rates as the starting point for calculating indirect CSC.

Indirect Cost Rates. Indirect cost rates are not issued by IHS, but by federal government agencies designated by OMB to negotiate rates (called a "cognizant agency"). Indirect cost rates are the result of a negotiation that is independent from contracting under the ISDA. See 2 C.F.R. Pt. 225, App. A, § A.6; Declaration of Deborah Moberly ¶¶ 4, 37 (Ex. 3). DOI is Tunica and RNSB's cognizant agency. See 2d Supp. Am. Compl. ¶ 12; Moberly Dec. ¶ 40 (Ex. 3).

---

[1] The most recent Circular, IHS CSC Circular No. 2004-03 (applicable in 2005) is attached as Exhibit 34. The earlier Circulars, ISD Memorandum 92-2 (adopted in 1992), IHS CSC Circular No. 96-04 (adopted in 1996), IHS CSC Circular No. 2000-01 (adopted in January 2000), and IHS CSC Circular No. 2001-05 (applicable to 2002, 2003, and 2004 ISDA awards), can be found at http://www.ihs.gov/PublicInfo/Publications/IHSManual/Circulars_index.cfm

The indirect cost rate negotiation is guided by general cost principles set forth in circulars developed by the Office of Management and Budget ("OMB"), OMB A-21, 2 C.F.R. Pt. 220 (for educational organizations), OMB A-87, 2 C.F.R. Pt. 225 (for State, Local, and Tribal governments), and OMB A-122, 2 C.F.R. Pt. 230 (for nonprofit organizations). Although the Circulars provide guidance for different types of organizations, the principles are the same: indirect costs must be equitably allocated among the programs that benefit from the costs. The Circulars provide a means to determine the maximum amount of indirect costs that can be charged to a federal award, unless more or less is permitted by law. See 2 C.F.R. pt. 225, App. A § A.1; Moberly Dec. ¶ 4 (Ex. 3). The Circulars, however, are not intended "to identify the circumstances or dictate the extent of Federal or [contractor] participation in the financing of a particular program or project." 2 C.F.R. Pt. 225, App. A, § A.1; see also Maine v. Shalala, 81 F. Supp. 2d 91, 96 n.4 (D. Me. 1999) (noting that provisions of law explicitly supercede general cost principles in circulars). Because Tunica and RNSB's rates at issue in this suit were negotiated under OMB-87, all references are to OMB A-87.

Negotiating Indirect Cost Rates. A Tribal contractor that wishes to obtain an indirect cost rate (or rates) must first submit an indirect cost rate proposal to its cognizant agency. See 2 C.F.R. Pt. 225, App. E, § D.1.a. The proposal "must be developed (and, when required, submitted) within six months after the close of the [contractor's] fiscal year, unless an exception is approved by the cognizant Federal agency." Id. App. E, § D.1.d. Once the contractor has submitted an indirect cost rate proposal, the cognizant agency will review, negotiate, and ultimately approve an indirect cost rate or rates. See id. App. E, § E.1. A rate agreement is then signed by the contractor and a representative of the cognizant agency. See id. App. E, § E.3. Once the agreement is signed, the rate is available to all federal agencies for their use. See id.

The Use of Indirect Cost Rates. Once a rate is generated, it may be applied to the portion of the direct cost base associated with each program to determine the maximum amount of costs that can be equitably allocated to the program. The rate, however, is for allocating costs, and the Circulars specify that there is no right to or expectation of actual recovery of those costs created by the rate methodology. See id. § 225.20; Moberly Dec. ¶¶ 4, 56 (Ex. 3). A funding agency (such as IHS, BIA, or USDA) may or may not use an indirect cost rate as the basis for the actual reimbursement for or award of indirect costs. See 2 C.F.R. § 225.20. The amount actually recoverable from any government agency is determined by reference to the law and contractual requirements of the underlying contract or grant. See id.

Dispute Processes. OMB also provides for a dispute resolution process in the event that there is a disagreement between a contractor and the cognizant agency in negotiating an indirect cost rate. "If a dispute arises in a negotiation of an indirect cost rate (or other rate) between the cognizant agency and the [contractor], the dispute shall be resolved in accordance with the appeals procedures of the cognizant agency." Id., App. E, § F.4. The appeals procedure for DOI is found at 43 C.F.R. §§ 4.1 et seq.

**FACTUAL AND PROCEDURAL BACKGROUND**

The Plaintiffs. The Tunica-Biloxi Tribe of Louisiana ("Tunica") is a federally-recognized Tribe located in the State of Louisiana. (2d Am. Compl. ¶ 8.) Since before 1995, Tunica has had a self-determination contract with the Secretary to run a comprehensive health service program for its members. See id. Tunica's contracts at issue in this case cover fiscal years 1995-2001 (a 1995 Contract, a 1996 Contract in effect until 2000, and a 2000 Contract, in effect throughout 2001). (Exs. 6-8.) The other plaintiff, The Ramah Navajo School Board ("RNSB"), is a New Mexico non-profit corporation established by the Ramah Navajo Chapter of

the Navajo Nation. (2d Am. Compl. ¶ 9.) Since 1975, RNSB has had a self-determination contract to run a health clinic. See id. RNSB's contracts at issue in this case cover fiscal years 1995-2003 (a 1995 Contract in effect in 1995 and 1996, a 1997 Contract in effect in 1997-1999, a 2000 Contract in effect in 2000-2002, and a 2003 Contract in effect in 2003). (Exs. 9-12.)

Both Plaintiffs negotiate indirect cost rates with DOI, acting through DOI's National Business Center ("NBC"). See Moberly Dec. ¶ 40 (Ex. 3). On February 4, 1997, DOI and Tunica finalized Tunica's 1995 negotiated indirect cost rate. (Ex. 13.) On March 5, 1997, DOI and Tunica finalized Tunica's 1996 negotiated indirect cost rate. (Ex. 14.) On November 1, 2007, DOI and Tunica finalized Tunica's 1997-2007 negotiated indirect cost rates. (Ex. 15.)

On November 20, 1995, DOI and RNSB finalized RNSB's 1995 negotiated indirect cost rate. (Ex. 16.) On November 13, 1996, DOI and RNSB finalized RNSB's 1996 negotiated indirect cost rate. (Ex. 17.) On December 21, 2004, DOI and RNSB finalized RNSB's 1997 negotiated indirect cost rate. (Ex. 18.) On October 20, 2005, DOI and RNSB finalized RNSB's 1998-2002 negotiated indirect cost rates. (Ex. 19.) On October 31, 2005, DOI and RNSB finalized RNSB's 2003 negotiated indirect cost rate. (Ex. 20.)

Tunica's Administrative Claims. On April 2 and September 27, 2001, Tunica submitted contract dispute claims to IHS related to its contracts and AFAs in effect between 1995 and 2001. (Ex. 23-24.) Tunica raised three legal theories to support its claims. The first was that IHS had underfunded indirect CSC generated by its indirect cost rate ("Claim One" or "the shortfall claim"). The second challenged the calculation of its indirect cost rate, relying on Ramah Navajo Chapter v. Lujan, 112 F.3d 1455 (10th Cir. 1997) ("Claim Two" or "the RNC" claim). The third challenged the rate methodology as not making adjustments for funding shortfalls ("Claim Three" or "the carry-forward claim"). A Table of Tunica's claims follows.

| | Claim One | Claim Two | Claim Three | Total | Record Cite |
|---|---|---|---|---|---|
| **1995** | $5,768.00 | $13,938.00 | $8,206.00 | $27,912.00 | Ex. 24 |
| **1996** | $24,683.00 | $15,221.00 | $8,965.00 | $48,869.00 | Ex. 23 |
| **1997** | $21,220.00 | $14,966.00 | $8,815.00 | $45,001.00 | Ex. 23 |
| **1998** | $31,600.00 | $15,893.00 | $9,361.00 | $56,854.00 | Ex. 23 |
| **1999** | $14,706.00 | $15,513.00 | $9,138.00 | $39,357.00 | Ex. 23 |
| **2000** | $29,566.00 | $15,906.00 | $9,369.00 | $54,841.00 | Ex. 23 |
| **2001** | $12,036.00 | $15,191.00 | $8,947.00 | $36,174.00 | Ex. 23 |

RNSB's Administrative Claims. On August 31, 2001, RNSB submitted contract dispute claims to IHS related to its contracts in effect between 1993-1996. (Ex. 26.) RNSB raised only Claims One and Two, as described above.[2] RNSB did not submit any claims related to its 1997 contract. On December 30, 2003, RNSB submitted an additional contract dispute to IHS for 1998, which again raised only Claims One and Two. (Ex. 28.) On September 21, 2005, RNSB submitted a third claim letter related to its contracts in effect between 1999-2003. (Ex. 29.) In this letter, RNSB discussed Claims One, Two, and Three but included only the total amount claimed, without providing a specific amount claimed for each theory for relief.

| | Claim One | Claim Two | Claim Three | Total | Record Cite |
|---|---|---|---|---|---|
| **1995** | $205,817.00 | $68,644.00 | -- | $274,461.00 | Ex. 26 |
| **1996** | $57,647.00 | $52,163.00 | -- | $109,810.00 | Ex. 26 |
| **1997** | -- | -- | -- | -- | |
| **1998** | $40,643.20 | $68,208.42 | -- | $108,852.00 | Ex. 28 |
| **1999** | | | | $203,241.00 | Ex. 29 |
| **2000** | | | | $188,545.00 | Ex. 29 |
| **2001** | | | | $-19,245.00 | Ex. 29 |
| **2002** | | | | $299,008.00 | Ex. 29 |
| **2003** | | | | $305,395.00 | Ex. 29 |

[2] RNSB has since dismissed its claims for 1993 and 1994 and thus they are not discussed.

The Complaints. This case was originally filed in the District of New Mexico, but before the Defendants answered, Plaintiffs voluntarily dismissed and re-filed their Complaint here in the District of Columbia. The operative complaints are the Second Amended Complaint, filed February 26, 2003, and the Supplemental Complaint, filed July 5, 2006. The Second Amended Complaint describes this suit as one "for breach of contract under the Contract Disputes Act, 41 U.S.C. § 601 et seq., and the special jurisdictional provisions of the Indian Self-Determination and Education Assistance Act, as amended, 25 U.S.C. §§ 450-450n. . . ." (2d Am. Compl. ¶ 1.) It claims that Defendants violated ISDA's funding provisions applicable to indirect CSC under the three legal theories raised by Plaintiffs in some, but not all, of their CDA claims. See id. The Third Claim alleges breach of trust. (2d Am. Compl. ¶¶ 42-46.) Plaintiffs seek "money damages for underpayment of Indirect Contract Support Costs", a declaration that the "methods employed by the Defendants for computing and paying each class members' entitlement to Indirect [CSC]" are in violation of ISDA and Plaintiffs' contracts, and accordingly, an injunction. (2d Am. Compl. at 15-16.)

This Court's Order of January 22, 2004. On March 31, 2003, Defendants filed a Motion to Dismiss the Second Amended Complaint (docketed as #13). In a Memorandum Opinion of December 9, 2003, amended January 22, 2004, the Court dismissed parts of the First and Second Claims and all of the Third Claim. See Tunica, slip op. at 8-15 (docketed at #48). Specifically, the Court held that the ISDA, 25 U.S.C. § 450m-1(d) made all contract disputes subject to the CDA, and that compliance with the CDA is a jurisdictional prerequisite to a suit for money damages under the ISDA. See id. at 8-10. The Court held that each claim for breach for each year must be properly presented. See id. at 13-15. The Court then dismissed all claims not presented to an IHS contracting officer, noting that Plaintiffs had already conceded that no

claims prior to fiscal years 1995 were at issue in this suit. See id. at 9-10, 15. Thus, all that remained were Tunica's claims for 1995-2001 funding and RNSB's claims for 1995 and 1996 funding. See id. at 15, nn.13, 17.

For purposes of resolving the remaining claims and assessing the extent of its jurisdiction to award monetary relief, the Court ordered limited jurisdictional discovery and supplemental briefing into the factual availability of appropriated funds for years at issue in this suit. See id. at 26. The Court also ordered supplemental briefing on "whether there was an agreement between the parties that a certain rate would be applicable to fiscal years subsequent to 1996, in the absence of a new agreement." Id. at 29. All other claims related to the Secretary's alleged duty to request additional appropriations for CSC and the breach of trust claim were dismissed. See id. at 37-40. Upon reconsideration of the dismissal of all claims related to the Secretary's duty to request additional appropriations, the Court reaffirmed its prior holdings (docketed as #45).

The parties thereafter conducted limited jurisdictional discovery, but before re-briefing the remaining issues, the Supreme Court granted certiorari in Cherokee Nation v. Leavitt. The Court stayed this case pending Cherokee's resolution.

Cherokee Nation v. Leavitt. In Cherokee, the Supreme Court first had to determine the nature of an ISDA contract. See 543 U.S. 631, 638-39, 125 S. Ct. 1172, 1178-79 (2005). The government argued that an ISDA contract is not a contractually binding agreement, but a unique, government-to-government agreement to which general contract law did not apply. See 543 U.S. at 638, 125 S. Ct. at 1178. Rejecting this argument, the Court held that ISDA contracts are like any other procurement contract in which the government is bound by its promises. See id. Next, the Court had to assess a single defense raised by the Secretary to the specific contracts at issue in that case, e.g., that the Secretary did not have sufficient appropriations to pay the

amounts promised in the plaintiffs' contracts. See 543 U.S. at 640-43, 125 S. Ct. at 1179-81. It was undisputed that the Secretary had failed to pay the funding amounts in the contracts of the two Cherokee plaintiffs. See 543 U.S. at 636, 125 S. Ct. at 1177 ("The Government does not deny that it promised to pay the relevant contract support costs. Nor does it deny that it failed to pay."). Given these circumstances, the Court held that (1) when the Secretary promised a specific amount in an ISDA contract for indirect CSC, and (2) when appropriations were legally available for that purpose, the Secretary could not defend against a breach of contract action by arguing that it had insufficient appropriations. See 543 U.S. at 642-46; 125 S. Ct. at 1178-83. Moreover, the Court held that when Congress appropriated an unrestricted, lump-sum appropriation, that appropriation was legally available to satisfy contractual promises. See 543 U.S. at 642; 125 S. Ct. at 1180. After the Supreme Court's decision, the stay was lifted in this case, and the case proceeded to briefing and additional discovery, culminating in this Motion to Dismiss and for Summary Judgment.[3]

Ramah Navajo School Board v. United States, No. 08-19C (C.F.C.). On January 11, 2008, RNSB filed a lawsuit in the Court of Federal Claims, seeking additional CSC ("Claim

[3] On December 12, 2005, the Court ordered Defendants to file any appropriate dismissal motions. On January 12, 2006, Defendants filed a Renewed Motion to Dismiss and on January 13, 2006, Plaintiffs filed a Motion for Partial Summary Judgment. After taking discovery, Defendants filed an Opposition to Plaintiffs' Motion and, on May 27, 2006, a Cross-Motion for Summary Judgment. Plaintiffs thereafter took discovery on Defendants' Cross-Motion. On June 5, 2006, the Court dismissed the motions without prejudice and, later, directed the re-filing of dispositive motions by December 21, 2006. On December 21, 2006, Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment, and Plaintiffs filed a Motion for Partial Summary Judgment. On March 17, 2008, the Court dismissed both motions without prejudice and ordered that they be updated and re-filed.

One") under its 1993-2003 AFAs. The United States has moved to dismiss the Complaint as duplicative, as the claims asserted therein fall within the claims asserted in this case.[4]

## STANDARDS FOR REVIEW

### I. Standard for Motion to Dismiss for Lack of Subject Matter Jurisdiction.

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a claim on the ground that the court lacks jurisdiction over the subject matter. Where necessary, "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992). Accordingly, a motion to dismiss for lack of jurisdiction that relies on matters outside the pleadings, such as a declaration or other documents, should not be converted to a Rule 56 motion for summary judgment. See Fed. for Am. Immigration Reform, Inc. v. Reno, 897 F. Supp. 595, 600 n.6 (D.D.C. 1995), aff'd, 93 F.3d 897 (D.C. Cir. 1996); see also 5A Charles A. Wright &

---

[4] The Court of Claims lawsuit is RNSB's third lawsuit in which it has sought additional CSC under its 1993 AFA (this case, the Claims Court case, and RNSB v. Shalala, No. 94-914 (D.N.M.)), and its second lawsuit claiming additional CSC under its 1994-2003 AFAs (this case and the Claims Court case). Beyond these three lawsuits, RNSB and its counsel have repeatedly sought to adjudicate their claims in more than one forum. In 2005, Plaintiffs unsuccessfully attempted to consolidate this case with other cases pending in the District of New Mexico, first by moving for transfer and consolidation under the multi-district litigation statute, 28 U.S.C. § 1407, and then by moving to intervene and file an identical complaint in Pueblo of Zuni v. United States, No. 01-1046 (D.N.M.). The Judicial Panel for Multi-District Litigation denied the multidistrict motion (Order docketed as #75). Likewise, the Zuni court denied Plaintiffs' motion to intervene. Thereafter, counsel for Plaintiffs moved for appointment as class counsel and for creation of a sub-class in Zuni. On May 22, 2007, the Court denied Zuni's motion for class certification as well as Plaintiffs' counsel's motion for appointment as class counsel. See Pueblo of Zuni v. United States, 243 F.R.D. 436 (D.N.M. 2007). In denying the motion, the Court stated that it was "nothing more than a self-serving motion requesting creation of a sub-class and appointment of themselves as counsel for that sub-class[.]" See id. at 449.

Arthur R. Miller, Fed. Practice & Proc. § 1366 at 484-85 (2d ed. 1990) (explaining that attaching documents to a Rule 12(b)(1) motion does not convert it to one for summary judgment).

**II. Standard for Summary Judgment.**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary Judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986) (citing Fed. R. Civ. P. 1).

The initial burden is on the moving party to point out the absence of any genuine issue of material fact. See Celotex, 477 U.S. at 323, 106 S. Ct. at 2552. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). A determination of which facts are material depends on the underlying substantive law. "Factual disputes that are irrelevant or unnecessary" do not preclude the entry of summary judgment. See 477 U.S. at 248, 106 S. Ct. at 2510. Once the initial burden of the moving party is satisfied, the burden shifts to the responding party to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. See 477 U.S. at 250, 106 S. Ct. at 2511. In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Worth v. Jackson, 377 F. Supp. 2d 177, 181 (D.D.C. 2005), vacated in part on other grounds, 451 F.3d 854 (D.C. Cir.

2006). However, "the non-moving party cannot rely on mere allegations or denials . . . but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial." Id. at 180-81.

## ARGUMENT

### I. THE COURT LACKS SUBJECT MATTER JURISDICTION OVER MANY OF PLAINTIFFS' CLAIMS.

The Court lacks jurisdiction over many of the claims in this case for lack of mandatory presentment, lack of standing, mootness, and failure to exhaust administrative remedies.

#### A. Some of Plaintiffs' Claims Must Be Dismissed for Lack of Presentment.

As this Court has already held, all claims in this suit must first be presented to an IHS contracting officer ("CO"). Tunica, slip op. at 8-15 (docketed as #48). This is mandated by ISDA's jurisdictional provision, 25 U.S.C. § 450m-1(a), which authorizes courts to review claims for money damages under the CDA. See 25 U.S.C. §§ 450m-1(a), (d). Under the CDA, a prerequisite to judicial review is the timely and proper presentment of any claims to a government CO. See 41 U.S.C. § 605(a); Renda Marine, Inc. v. United States, 509 F.3d 1372, 1380-81 (Fed. Cir. 2007);[5] England v. The Swanson Group, Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004); SMS Data Prods. Group, Inc. v. United States, 19 Cl. Ct. 612, 615 (1990); Pueblo of Zuni v. United States, 467 F. Supp. 2d 1099, 1106-07 (D.N.M. 2006); See generally John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750, 757 (2008) (explaining that a similar statute, 28 U.S.C. § 2501, is jurisdictional and cannot be waived).

In the Court's original Order and Opinion, it dismissed Tunica and RNSB's claims not first presented to an IHS CO. See Tunica, slip op. at 8-15. Remaining were Tunica's challenges

[5] The Court of Federal Claims, and its reviewing court, the U.S. Court of Appeals for the Federal Circuit, interpret government contracts almost exclusively, see 41 U.S.C. § 609, 28 U.S.C. § 1295. Thus, the decisions of these courts are cited herein.

(Claims One, Two, and Three) to its 1995-2001 ISDA contracts and AFAs, and RNSB's challenges (Claims One and Two) to its 1995-1996 ISDA contracts and AFAs. See id. RNSB supplemented the Second Amended Complaint to include claims presented to an IHS CO for its 1998-2003 contracts and AFAs. These claims must now be reviewed under the strict jurisdictional prerequisites of the CDA.

RNSB did not present any contract disputes related to its 1997 contract. Thus, all claims related to 1997 must be dismissed. RNSB also did not present Claim Three as to its 1998 contract. (Ex. 28.) This claim must be dismissed as well. Third, RNSB's September 21, 2005 CDA claim letter asserts that IHS overpaid CSC in 2001. (Ex. 29.) This claim must be dismissed. Finally, RNSB presented, in its claim letter, a total amount claimed for 1998-2003, but failed to specify the amount of CSC that it claimed under each theory. The CDA requires that all claims contain a clear statement of their basis and amount. See Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). Based on RNSB's failure to specify the nature of each claim and the actual amount claimed to be due under its 1998-2003 contracts and AFAs, these claims do not satisfy the jurisdictional prerequisite of the CDA and must be dismissed.

**B. Plaintiffs Lack Standing to Pursue Their "Shortfall Claims."**

Plaintiffs lack standing as to their shortfall claims, i.e., their claims that IHS failed to pay the amount of CSC generated by multiplying their indirect cost rate by their direct cost base ("Claim One"). IHS paid Plaintiffs in each year at issue in this suit the amount generated by this calculation. Plaintiffs thus lack an injury for purposes of Article III standing requirements.

Article III of the Constitution confines the federal courts to adjudicating "cases or controversies." U.S. Const., art. III, § 2. The case or controversy requirement is a "bedrock"

requirement. See Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc., 454 U.S. 464, 471, 102 S. Ct. 752, 758 (1982). The Supreme Court has stated: "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37, 96 S. Ct. 1917, 1924 (1976).

One element of the case-or-controversy requirement is that the plaintiff must establish that he or she has standing to sue. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136 (1992). The irreducible minimum of Article III standing constitutes three elements. See Lujan, 504 U.S. at 560-61, 112 S. Ct. at 2136. Relevant here, the first is that the plaintiff must have suffered an injury in fact, which is defined as the invasion of a legally protected interest which is concrete and particularized and actual or imminent, not conjectural or hypothetical. See id.

In this instance, Plaintiffs lack actual and concrete injuries as to their "shortfall" claims. In each year at issue in this lawsuit, Tunica and RNSB recovered more indirect CSC from IHS than the amount generated by multiplying their indirect cost rates by their direct cost bases, as shown in the Tables below.

| **Indirect Costs Generated by Tunica's Indirect Cost Rates** | | | | | |
|---|---|---|---|---|---|
| **Year** | **Actual Direct Cost Base** | **Actual Rate** | **Rate x Base (Maximum Amount)** | **Indirect Costs Awarded** | **Difference Between Maximum and Amount Awarded** |
| 1995 | $313,206 | 53.23% | $166,719.55 | $165,806 | $913.55 |
| 1996 | $303,001 | 54.78% | $165,983.95 | $162,691 | $3,292.95 |
| 1997 | $303,001 | 23.35% | $70,750.73 | $163,016 | ($92,265.27) |
| 1998 | $318,413 | 30.96% | $98,580.66 | $163,016 | ($64,435.34) |
| 1999 | $321,783 | 19.69% | $63,359.07 | $176,273 | ($112,913.93) |
| 2000 | $333,639 | 26.86% | $89,615.44 | $174,966 | ($85,350.56) |
| 2001 | $341,370 | 23.56% | $80,426.77 | $182,884 | ($102,457.23) |
| **Total** | | | $735,436.17 | $1,188,652 | **($453,215.83)** |
| *Data From Ketcher Dec. ¶¶ 36-38 (Ex. 1) | | | | | |

| **Indirect Costs Generated by RNSB's Indirect Cost Rates** | | | | | |
|---|---|---|---|---|---|
| **Year** | **Actual Direct Cost Base** | **Actual Rate** | **Rate x Base (Maximum Amount)** | **Indirect Costs Awarded** | **Difference between Maximum and Amount Awarded** |
| 1995 | $1,496,944 | 25.8% | $386,211.55 | $328,505 | $57,706.55 |
| 1996 | $1,537,975 | 21.3% | $327,588.68 | $336,720 | ($9,131.32) |
| 1997 | $1,531,178 | 17.2% | $263,362.62 | $370,895 | ($107,532.38) |
| 1998 | $1,679,525 | 20.49% | $344,134.67 | $478,228 | ($134,093.33) |
| 1999 | $2,029,752 | 19.33% | $392,351.06 | $483,666 | ($91,314.94) |
| 2000 | $2,411,566 | 18.40% | $443,728.14 | $500,063 | ($56,334.86) |
| 2001 | $2,229,056 | 17.30% | $385,626.69 | $540,832 | ($155,205.31) |
| 2002 | $2,193,929 | 17.04% | $373,845.50 | $417,815 | ($43,969.50) |
| 2003 | $2,568,729 | 15.55% | $399,437.36 | $417,815 | ($18,377.64) |
| **Total** | | | $3,316,286.27 | $3,874,539.00 | **($558,252.73)** |
| *Data From Zuni Dec. ¶¶ 10-64 (Ex. 2); RNSB's Indirect Cost Rates Exhibits 18-22. | | | | | |

As shown above, IHS overpaid Tunica by $453,215.83 and RNSB by $558,252.73. While DOI has since adjusted later indirect cost rates to account for this over-recovery, Plaintiffs cannot make out a claim for additional CSC under "Claim One." Because Plaintiffs recovered more than their "rate generated amount" of indirect CSC (and in fact they recovered significantly more than this amount), Plaintiffs lack an injury in fact, and thus standing, to pursue their "shortfall" claims (or Claim One) against Defendants for additional CSC.

**C. Plaintiffs' Claims Against Secretary Kempthorne Are Moot.**

It is not entirely clear from the Second Amended Complaint, the Supplemental Complaint, and Plaintiffs' CDA claims whether Plaintiffs seek this Court's review of their indirect cost rates independent from their claim that Secretary Leavitt should not have used the indirect cost rates in their contracts. Assuming that Plaintiffs do indeed seek such review, such claim, if ultimately successful, could not yield any monetary relief. DOI's sole function related to this lawsuit was to negotiate and approve indirect cost rates; DOI does not award any ISDA contracts or ISDA funding. Thus, the most that the Court could order pursuant to such a claim is that DOI recalculate Plaintiffs' out-of-date rates. As such relief would have no practical effect, these claims are moot, and the Court should dismiss them outright. See Beethoven.com LLC v.

Librarian of Cong., 394 F.3d 939, 950 (D.C. Cir. 2005) (dismissing claim as moot where granting relief would not provide plaintiff with any meaningful relief).

### D. Plaintiffs' Claims Against Secretary Kempthorne Must Be Dismissed for Failure to Exhaust Administrative Remedies.

The Court should alternatively dismiss Plaintiffs' claims challenging the validity of their rates because they failed to exhaust their administrative remedies. Exhaustion of administrative remedies is generally required before seeking judicial review "'so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision.'" Wilbur v. CIA, 355 F.3d 675, 677 (D.C. Cir. 2004) (quoting Oglesby v. United States Dep't of Army, 920 F.2d 57, 61 (D.C. Cir. 1990)); see also Marine Mammal Conservancy, Inc. v. Dep't of Agric., 134 F.3d 409, 412 (D.C. Cir. 1998) ("Administrative appeals permit agencies to correct mistakes by 'inferior' officers. Judicial review may thereby be entirely avoided."); Andrade v. Lauer, 729 F.2d 1475, 1484 (D.C. Cir. 1984) (explaining that exhaustion discourages the "frequent and deliberate flouting of administrative processes," allows an agency to "correct its own errors," and "promotes judicial economy by avoiding needless repetition of administrative and judicial factfinding, and by perhaps avoiding the necessity of any judicial involvement at all if the parties successfully vindicate their claims before the agency").

As explained in OMB A-87, disputes between the cognizant agency and a contractor related to the negotiation of an indirect cost rate should first be raised with the cognizant agency via the agency's administrative appeals procedure. See 2 C.F.R. Pt. 225, App. E, § F.4. Plaintiffs' cognizant agency is DOI, whose appeals procedures are found at 43 C.F.R. §§ 4.1 et seq. In each year that Plaintiffs negotiated and executed indirect cost rate agreements--agreements that they now challenge as unlawful--they failed to utilize the administrative

procedure. See Moberly Dec. ¶ 46 (Ex. 3). DOI has thus been deprived of an opportunity to review the validity of Plaintiffs' rates in the first instance, in violation of the law requiring that litigants exhaust available administrative remedies before seeking to adjudicate disputes in court. See, e.g., Wilbur, 355 F.3d at 677. Plaintiffs' failure to exhaust administrative remedies should bar their challenge here.

## II. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS BECAUSE THEY FULLY PERFORMED UNDER PLAINTIFFS' CONTRACTS.

Both Plaintiffs allege that Defendants breached their contracts. (2d Am. Compl. ¶ 36.) As is demonstrated below, however, IHS awarded to Plaintiffs all of the CSC funding that IHS promised to award in each year. Whereas the Cherokee case involved an admitted breach by IHS of Cherokee Nation and Shoshone-Paiute's ISDA contracts (i.e., failure to pay the amounts specified in the contracts), see 543 U.S. at 636-37, 125 S. Ct. at 1177, this case does not involve an admission of breach because there has been none; IHS fully performed under the terms of Tunica and RNSB's agreements. Therefore, no claim of breach lies against Defendants.

Contract interpretation begins with the plain language of the contract. See Coast Fed. Bank v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc). A contract should be interpreted as a whole and in a manner which gives "reasonable meaning to all its parts and avoids conflict or surplusage of its provisions." Granite Constr. Co. v. United States, 962 F.2d 998, 1003 (Fed. Cir. 1992). Moreover, the words of a contract "must be given their plain and ordinary meaning . . . in defining the rights and obligations of the parties[.]" Elden v. United States, 617 F.2d 254, 260-61 (Ct. Cl. 1980). The goal of contract interpretation is to ascertain the intent of the parties through the plain language that they chose. See Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988). Contract interpretation is a question of law that is appropriate for summary judgment. See Martin v. United States, 20 Cl. Ct. 738, 745 (1990).

**A. IHS Fully Performed Under Tunica's Contracts.**

The plain language of Tunica's contracts and AFAs demonstrates that IHS fully performed. For example, for calendar year 1995, Tunica's contract specified that it would award $21,383 for indirect costs. (Ex. 6 at 2.) Further, it specified:

> The contractor does not have an approved indirect cost rate for the period beginning January 1, 1995. The fixed with carry forward rate of 57.9% (Tribe's latest approval rate) applied to Total Direct Cost (CMC is included in indirect cost base) is shown in the budget in order to show a budget line item amount. If and when a new rate is negotiated with the Department of Interior, this contract will be modified accordingly.

(Ex. 6 at 32.) During the course of 1995, IHS awarded additional funding to Tunica for indirect CSC, for a total of $165,806. See Ketcher Dec. ¶¶ 9-11 (Ex. 1); see also Ex. 6 at 2 (adding $21,383 indirect costs to the contract); 6 at 53 (adding $118,911); 6 at 56 (adding $25,512). IHS provided this amount to Tunica. See Ketcher Dec. ¶ 11 (Ex. 1). Tunica admits that it received this amount. (Ex. 24 at 2.) Accordingly, there was no breach.

IHS made similar CSC promises to Tunica for 1996 ($162,691), 1997 ($163,016), 1998 ($163,016), 1999 ($176,273), 2000 ($174,966), and 2001 ($182,884). See Ketcher Dec. ¶¶ 14, 19, 21, 26, 27 (Ex. 1); see also Ex. 7 at 23, 61-63, 64, 65, 67-69, 86, 87, 128, 145-47; Ex. 8 at 8, 19, 20, 35-38, 42-44, 45-47, 48-50, 51-52, 53-55, 59-61, 62-64. IHS provided Tunica with the CSC funding promised in each AFA. See Ketcher Dec. ¶¶ 14, 17, 19, 21, 26, 27 (Ex. 1).

Moreover, before execution of the agreements, IHS advised Tunica not to expect any additional funding. See Ketcher Dec. ¶¶ 28-30 (Ex. 1). Therefore, it was not reasonable for Tunica to expect that IHS would provide it with funding beyond what IHS promised to pay. Tunica never notified IHS that it was suspending its contracts due to insufficient funding or was planning to give the program back to IHS, see Ketcher Dec. ¶ 31 (Ex. 1). Finally, Tunica admits that the services that it was able to provide ensured that it did not breach the contract. See Pls.'

Resp. to Interrogs. 28, 29, 30 (Ex. 37 at 6-8). Tunica had sufficient knowledge of the CSC funding IHS would provide and that it could contest this amount if it was dissatisfied with it. There was no breach.

**B. IHS Fully Performed Under RNSB's Contracts.**

IHS also fully performed under RNSB's contracts and AFAs. IHS and RNSB executed an ISDA contract in 1988, which remained in effect in 1995 and 1996. See Zuni Dec. ¶ 10 (Ex. 2); Ex. 9 at 1-25. The contract contained a limitation of cost clause which read:

> Subject to the General Provision Clause 3, "Limitation of Cost" the total cost to the Government, including all direct and indirect costs for the performance of this contract, shall not exceed [ ] until and unless the Contractor is notified in writing by the Contracting Officer that this ceiling amount has been increased.

(Ex. 9 at 12-13.) The dollar amount (the ceiling) for the Limitation of Cost ("LOC") Clause was originally set at $498,897 in 1988 (Ex. 9 at 12), and was increased every few months through May 1, 1995. On May 1, 1995, the LOC Clause was raised to $8,075,704. (Ex. 9 at 26-27.) By this date, IHS had distributed $8,075,704 to RNSB. See Zuni Dec. ¶ 12 (Ex. 2). Under the LOC Clause, IHS made clear to RNSB the exact amount of ISDA funding that would be made available. A LOC clause unambiguously limits the government's liability. See Sociotechnical Research Applications, Inc. v. Whitman, No. 01-1232, 2002 WL 123557, at *3-4 (Fed. Cir. Jan. 30, 2002); Advanced Materials, Inc. v. Perry, 108 F.3d 307, 310 (Fed. Cir. 1997); Titan Corp. v. West, 129 F.3d 1479, 1482 (Fed. Cir. 1997); LSi Serv. Corp. v. United States, 422 F.2d 1334, 1335-36 (Ct. Cl. 1970). Because IHS promised $8,075,704 and awarded this amount, IHS fully performed under RNSB's contract through May 1, 1995.

On May 1, 1995, RNSB and IHS executed an AFA for 1995. RNSB's AFA specified that IHS would make available to RNSB $328,505 for indirect CSC. See Zuni Dec. ¶ 15 (Ex. 2); Ex. 9 at 44. IHS provided this amount to RNSB. See Zuni Dec. ¶ 15 (Ex. 2). RNSB admits that

it received this amount. (Ex. 26 at 2.) Similarly, in 1996, RNSB's AFA provided that IHS would make available to it $336,720 for indirect CSC. See Zuni Dec. ¶ 18; Ex. 9 at 61-62. IHS provided this amount to RNSB, see Zuni Dec. ¶ 18 (Ex. 2), and RNSB admitted that it received this amount, (Ex. 26 at 2). In 1997-2003, IHS agreed to provide RNSB with a specific amount of indirect CSC each year, and each year, IHS paid this amount. See Zuni Dec. ¶¶ 19-64 (Ex. 2); see also Ex. 10 at 42, 43, 60-61, 84, 85-86, 91-92, 95-96, 106-07, 120-21, 122-23; Ex. 11 at 48-50, 51-52, 57-58, 75, 87-88, 91-92, 120-21, 149-50; Ex. 12 at 43, 49-51, 66-67.

Moreover, before execution of the agreements, IHS advised RNSB not to expect any additional funding. See Zuni Dec. ¶ 67 (Ex. 2). Therefore, it was reasonable for RNSB to expect in any year that IHS would provide funding above and beyond what IHS promised to pay. In addition, RNSB never notified IHS that it was suspending its contracts due to insufficient funding or was planning to give the program back to IHS, see Zuni Dec. ¶ 67 (Ex. 2). RNSB admits that the level of services that it was able to provide ensured that it did not breach the contract. See Pls.' Resp. to Interrogs. 11, 12 (Ex. 37 at 4-5). RNSB had sufficient knowledge of the CSC funding that IHS would provide and that it could contest this amount if it was dissatisfied with it. IHS fully performed RNSB's contracts.

## III. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS BECAUSE PLAINTIFFS' CONTRACTS DO NOT VIOLATE THE ISDA.

Aside from asserting that IHS breached their contracts, Plaintiffs allege that the amount of funding promised by IHS under their contracts was not sufficient. (2d Am. Compl. ¶ 2.) They claim that the ISDA, incorporated into their contracts, requires a different and greater amount. But nothing in their contracts contradicts the ISDA. In construing a statute such as the ISDA, the Court must review its plain language. See United States v. Barnes, 295 F.3d 1354, 1359 (D.C. Cir. 2002). An analysis of a statute "begins with the language of the statute. . . [a]nd

where the statutory language provides a clear answer, it ends there as well." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438, 119 S. Ct. 755, 760 (1999) (citation and internal quotation marks omitted). Moreover, in interpreting statutes, Congress is assumed to know the law and legislate against the backdrop of existing legal principles. See Haig v. Agee, 453 U.S. 280, 297, 101 S. Ct. 2766, 2777 (1981); Cannon v. Univ. of Chicago, 441 U.S. 677, 697-99, 99 S. Ct. 1946, 1958 (1979); Wash. Legal Found. v. U.S. Sentencing Comm'n, 17 F.3d 1446, 1450 (D.C. Cir. 1994). When "Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." Neder v. United States, 527 U.S. 1, 21, 119 S. Ct. 1827, 1840 (1999) (citation and internal quotation marks omitted).

The ISDA does not mandate the payment of a specific amount of indirect CSC or that a specific formula be included in the contract. Instead, the amounts of indirect CSC must be "determined." See 25 U.S.C. § 450*l*(c)(b)(4). The ISDA leaves the "determination" of indirect CSC funding to the parties pursuant to a negotiation. See id. §§ 450j-1(a)(3)(B) (providing Tribe or Tribal organization the ability to negotiate with the Secretary on an annual basis the amount of funds that it is entitled to receive); id. § 450*l*(c)(b)(14) (AFAs subject to negotiation); id. § 450j(c)(2) ("The amounts of [self-determination contracts] may be renegotiated annually to reflect changed circumstances and factors . . . ."); id. § 450*l*(a) (self-determination contracts shall contain or incorporate the model contract and "such other provisions as are agreed to by the parties"); § 450j-1(b)(2)(C) (funds may be reduced pursuant to a Tribal authorization); id. § 450j-1(b)(5) (Secretary may increase funds promised upon request by a Tribal organization); see also id. § 450f(b) (requirement that Secretary work with Tribe or Tribal organization to overcome objections to the proposal).

As relevant to indirect CSC, § 450j-1(a) provides that those indirect costs which are "reasonable" and "allowable" shall be added to the contract, but does not specify an amount or a formula for determining those that are reasonable and allowable. See 25 U.S.C. § 450j-1(a). As a starting point, the terms "reasonable" and "allowable," as used in these funding provisions, are general terms. They do not direct IHS to promise a certain amount of indirect CSC or to use a certain formula for the funding of indirect CSC. See, e.g., Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005) (explaining that the funding provisions of the ISDA do not curtail the Secretary's discretion to pay funds, do not have clear standards for the payment of funds, do not specify precise amounts to be paid, and do not compel the payment of funds); see also Pueblo of Zuni v. United States, 467 F. Supp. 2d 1114, 1116-17 (D.N.M. 2006). In addition, because all funding is subject to the availability of appropriations, reading into these funding provisions a requirement to fund a specific amount is contrary to their explicit terms.

To determine the amount of funds to be included in an AFA, the Tribe or Tribal organization must propose specific funding levels and funding terms, see id. §§ 450f(a)(2), 450j-1(a)(3)(B); 25 C.F.R. §§ 900.12, 900.8(h), and the Secretary must ensure that total funding promised in self-determination contracts not exceed available appropriations, see 25 U.S.C. §§ 450j-1(b), 450j(c); see generally Cherokee, 543 U.S. 631, 641-43, 125 S. Ct. at 1179-81; Ramah Navajo Sch. Bd. v. Babbitt, 87 F.3d 1338, 1345 (D.C. Cir. 1996); Babbitt v. Oglala Sioux Tribal Pub. Safety Dep't, 194 F.3d 1374, 1378 (Fed. Cir. 1999); Ramah Navajo Chapter v. Norton, No 90-957, slip op. at 14-15 (D.N.M. 2006) (Ex. 32). The Secretary also must ensure that he does not reduce funding for ongoing contracts unless certain conditions are met, see 25 U.S.C. § 450j-1(b)(2), and he need not "reduce funding for programs, projects, or activities serving a tribe to make funds available to another [contractor]," id. § 450j-1(b).

The ISDA further specifies that, upon receipt of a contract proposal, if the Secretary agrees to the proposed terms, the contract will be executed, without further review. See id. § 450f(a)(2). If the Secretary declines the proposal, in full or in part, the ISDA gives the Tribe or Tribal organization two statutory options: (1) it can challenge the Secretary's full or partial declination in an administrative proceeding or directly in federal court as inconsistent with the ISDA, see id., or (2) it can acquiesce in the terms offered by the Secretary and accept the contract and funding thereunder. The actual funding amount is thus determined by an agreement by the parties, see id., or by a court order directing the Secretary to accept the proposal of the Tribe or Tribal organization, see id., id. § 450m-1(a). Once the amounts are "determined" by a contract entered into in one of these two ways, the parties are bound by them.

By providing Tribe and Tribal organizations with these two statutory options, the ISDA recognizes that the Tribe or Tribal organization is in the best position to know the amount of funding that it needs in order to perform under the contract and provides that, for ongoing contracts, it need not perform the contract if sufficient funds are not offered. See id. § 450*l*(c)(b)(5). The availability of the generous judicial review provisions in the ISDA demonstrate Congress's intent that if there is a dispute between the parties regarding the funding levels or funding terms, the Tribe or Tribal organization must take advantage of the judicial review procedures and challenge the funding levels proposed by the Secretary before contract execution. Once the parties have negotiated and executed a contract, the contract governs the rights and duties of the parties. Thereafter, Congress intended the parties to enforce their rights pursuant to the CDA. See id. §§ 450m-1(a), (d).

The funding levels and terms in Plaintiffs' AFAs are in full compliance with the ISDA and their terms control. See, e.g., Southern Ute Indian Tribe v. Leavitt, No. 05-988, slip op. at 6-

10 (D.N.M. Oct. 18, 2007) (Ex. 33) (interpreting ISDA's funding provisions to require that ISDA contracts set forth a specific and not "nebulous" amount for CSC and holding that IHS is not required to pay more CSC than is set forth in the contract and AFA).[6] Although Plaintiffs may be dissatisfied with the funding levels that they negotiated and to which they agreed, they are bound by them. The Secretary is entitled to summary judgment on this claim.

## IV. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS ON ALL CONTRACT YEARS AFTER 1997 BECAUSE CONGRESS HAS LIMITED THE TOTAL AMOUNT OF CSC THAT IHS CAN AWARD.

Whether Plaintiffs seek additional funding under their contracts or under the ISDA, such claims for years after 1997 cannot succeed in light of an appropriations cap limiting the total amount of CSC available to IHS. Starting in 1998, Congress capped IHS's CSC appropriation[7] and, for these years, the total capped CSC appropriation was less than the total of all of the

---

[6] In a recent decision granting in part and denying in part a motion to dismiss filed by IHS, Judge Collyer appeared to accept, as a threshold matter and in what is possibly dicta, the contractor's argument that the ISDA requires the payment of an amount different from that on the face of executed ISDA contract's terms. See Menominee Indian Tribe v. United States, No. 07-812, 2008 WL 680379, at *2 (D.D.C. Mar. 14, 2008). While the decision acknowledges the applicability of the statutory cap on CSC for years after 1997, it does not comport with the statutory terms as described above, and IHS respectfully disagrees with this decision.

[7] See Dep't of the Interior & Related Agencies Appropriations Act, Pub. L. No. 105-83, 111 Stat. 1543, 1582-83, 1589 (1997) (appropriating an amount not to exceed $161,202,000 for ongoing CSC to be available to IHS for obligation for one year) (Ex. 39); Omnibus Consol. & Emergency Supp. Appropriations Act, 1999, Pub. L. No. 105-277, 112 Stat. 2681, 2681-278-79, 2681-286 (1998) (appropriating an amount not to exceed $203,781,000 for ongoing CSC to be available to IHS for one year) (Ex. 40); Consol. Appropriations Act, 2000, Pub. L. No. 106-113, 113 Stat. 1501, 1501A-181-82, 1501A-190 (1999) (appropriating $228,781,000 for CSC, to be available to IHS for one year) (Ex. 41); Dep't of the Interior & Related Agencies Appropriations Act, 2001, Pub. L. No. 106-291, 114 Stat. 922, 978-79, 987 (2000) (appropriating, after rescission, $248,233,682 for CSC to be available to IHS for one year) (Ex. 42); Dep't of the Interior & Related Agencies Appropriations Act, Pub. L. No. 107-62, 115 Stat. 411, 456, 465 (2001) (appropriating an amount not to exceed $268,234,000 for CSC to be available to IHS for one year) (Ex. 43); Dep't of the Interior & Related Agencies Appropriations Act, Pub. L. No. 108-7, 117 Stat. 11, 260, 270 (2003) (appropriating an amount not to exceed $270,734,000 for CSC to be available to IHS for one year) (Ex. 44).

requests from Tribal contractors to IHS for CSC. See Thompson Dec. ¶ 6 (Ex. 4). Therefore, in each year since 1998, IHS has divided the available appropriations pursuant to published policies in order to provide as much funding as possible to its Tribal contractors. See id. For each year, IHS obligated the vast majority of the CSC appropriation, and the minor unobligated amounts were due to deobligations, refunds or administrative errors. See Thompson Dec. ¶¶ 7-18, 24 (Ex. 4). Moreover, Congress made the CSC appropriations available for only one year. See Thompson Dec. ¶ 4 (Ex. 4). Therefore, the minor amounts, if any, that were not obligated during the years at issue have lapsed as a matter of law. See 31 U.S.C. § 1301(c); City of Houston v. Dep't of Hous. & Urban Dev., 24 F.3d 1421, 1427 (D.C. Cir. 1994).

All funding under the ISDA is subject to the availability of appropriations. See 25 U.S.C. §§ 450j-1(b), 450j(c). These express conditions limited the amount of CSC funding under all of Plaintiffs' post-1997 contracts. See Ramah Navajo Sch. Bd., 87 F.3d at 1345 (explaining that the statutory language making funding of CSC "subject to the availability of appropriations" means that "the Secretary need only distribute the amount of money appropriated by Congress under the Act," but "if the money is not available, it need not be provided, despite a Tribe's claim that the ISDA "entitles" it to the funds"); Oglala Sioux, 194 F.3d at 1377-78 (explaining that the ability of BIA "to bind the Government contractually was expressly conditioned on the availability" of appropriations and that "to repeal the unambiguous language of [ISDA]" and conclude that the Tribe had either a "statutory or contractual right to additional funding for its [CSC]" would exceed the judicial function); RNC, slip op. at 14 (Ex. 32) (holding that BIA could not expend, and the court could not award, indirect CSC in excess of the congressional appropriation for that purpose); Tunica, slip op. at 23-26 (citing Ramah and Oglala for the proposition that the cap limits the amount of CSC that IHS can distribute but

directing IHS to establish that the funds were actually disbursed); see also Greenlee County v. United States, 487 F.3d 871, 879-80 (Fed. Cir. 2007), cert. denied, 76 U.S.L.W. 3260 (2008). Cf. Cherokee, 543 U.S. at 642, 125 S. Ct. at 1181 (explaining that whether appropriations are available for purposes of ISDA contracts depends on express limitations or the absence thereof in the appropriations acts and concluding that IHS's 1995-1997 appropriations were unrestricted).

While IHS fully performed under all of Plaintiffs' contracts, even if they had not, Plaintiffs cannot recover any additional CSC funding under its post-1997 contracts because of the statutory bar in the pertinent appropriations acts. Defendants are entitled to summary judgment on Plaintiffs' post-1997 claims.

## V. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS BECAUSE PLAINTIFFS' INDIRECT COST RATES DO NOT VIOLATE THE ISDA.

Plaintiffs also allege that IHS's use of their indirect cost rates, negotiated under OMB A-87, violates the ISDA and Ramah Navajo Chapter v. Lujan, 112 F.3d 1455 (10th Cir. 1997) ("RNC"). (2d Am. Compl. ¶ 2.) Specifically, Plaintiffs allege that IHS's use of the rates violates 25 U.S.C. §§ 450j-1(a)(2), (a)(3) and 450j-1(g). (2d Am. Compl. ¶¶ 16-17.) As support, they reference RNC, a case that Plaintiffs allege held that OMB A-87 violates the ISDA. (2d Am. Compl. ¶ 3.) Plaintiffs also challenge the carry-forward computation portion of the rate calculation (2d Am. Compl. ¶ 23), which is the computation by which DOI makes adjustments to ensure that a contractor has not recovered more costs than it actually incurred. Because both of Plaintiffs' theories involve the shifting of the costs of non-IHS programs onto IHS programs, they are inconsistent with federal law. And while the ISDA does not mandate a particular

methodology for calculating indirect costs, it prohibits IHS from paying indirect costs not associated with IHS's own programs. See 25 U.S.C. §§ 450j-1, 450 j-3.

**A. The Nature and Treatment of Indirect Costs Under Federal Law.**

Indirect costs first appeared in the ISDA in 1988 and were defined as "costs incurred for a common or joint purpose benefiting more than one contract objective, or which are not readily assignable to the contract objectives specifically benefited without effort disproportionate to the results achieved." 25 U.S.C. § 450b(f). This definition was taken directly from OMB A-87. See 2 C.F.R. Pt. 225, App. A, § F.1. An example might be the salary of a payroll clerk. See Moberly Dec. ¶ 8 (Ex. 3). This payroll clerk may issue paychecks for staff that work on four different programs run by one organization. See id. The payroll clerk "benefits" the four programs by ensuring that staff for each program gets paid, and thus his salary is not easily attributable to just one of the programs. See id. It also might be inefficient and time-consuming to have the clerk keep track of the amount of time he works on each of the four programs because the work he performs is not easily segregable. See id. The salary of the payroll clerk in this example--incurred for the common purpose benefitting more than one program and difficult to directly allocate to the programs served–is a quintessential indirect cost. See id.

**1. Federal appropriations law.**

The determination of how to allocate indirect costs to each of the benefitted programs is critical because if one of the programs is a federal program funded through congressional appropriations, over-charging that federal program may violate the terms of the underlying appropriations. The Appropriations Clause of the Constitution commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause "vests Congress with exclusive power over

the federal purse," assuring that "Congress has absolute control of the moneys of the United States." Rochester Pure Waters Dist. v. EPA, 960 F.2d 180, 185 (D.C. Cir. 1992) (citation and internal quotation marks omitted); see also Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 424, 110 S. Ct. 2465, 2471 (1990) (explaining that the Appropriations Clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress") (citation and internal quotation marks omitted). Federal law further provides that appropriations shall be applied only to the objects for which they were made except as otherwise provided for by law. See 31 U.S.C. § 1301(a) (the stated purpose, time, and amount of any appropriation governs); see also Alabama v. Shalala, 124 F. Supp. 2d 1250, 1269 (M.D. Ala. 2000) ("A general principle of federal appropriations law provides that federal funds may be used only for authorized purposes."); Dep't of Soc. Serv. v. Sullivan, No. 89-15091, 1990 WL 81840, at *3 (9th Cir. June 18, 1990) (unpublished mem.) (explaining that when California received funds from HHS and USDA and used shared administrative services to run the programs, California could not charge costs to HHS that were allocable to USDA without violating § 1301(a)); Maine, 81 F. Supp. 2d at 98 (explaining that cost shifting is not permitted under federal law).

When Congress appropriates funds for a specific purpose, e.g., to the U.S. Department of Agriculture in order to distribute grants to state or Tribal governments to provide school lunches for children, these funds must be spent for this purpose only. See 31 U.S.C. § 1301(a). If this appropriation further provides that the grantees may use only 10% of their grant funds for overhead costs associated with providing the school lunches, no funds in excess of 10% for each grantee may be expended for overhead costs from this appropriation. See id. To do otherwise would violate § 1301(a) and the express text of the appropriation. This limitation, however, in

no sense allows (much less requires) another agency to pick up any additional costs of the USDA program that cannot be covered by USDA consistent with the 10% cap.

**2. Federal cost allocation principles**.

For many years, government cost allocation guidelines for State, Local, and Tribal Governments consistent with federal appropriations law have been found in OMB A-87, 2 C.F.R. Pt. 225. In recognition of 31 U.S.C. § 1301(a), OMB A-87 prohibits "cost-shifting." See, e.g., 2 C.F.R. Pt. 225, App. A, § F.3.b ("Amounts not recoverable as indirect costs or administrative costs under one Federal award may not be shifted to another Federal award, unless specifically authorized by Federal legislation or regulation."); see also Alabama, 124 F. Supp. 2d at 1269 (explaining that cost shifting is impermissible). Cf. Arizona v. Thompson, 281 F.3d 248, 256-57 (D.C. Cir. 2002) (interpreting statute as allowing for allocation method other than OMB A-87, but capping administrative costs at 15%). OMB A-87 has flexible methodologies to determine the maximum amount of indirect costs that can be charged to a federal award, unless more or less is permitted by law, by development of an indirect cost rate.

In general, an indirect cost rate is the ratio of the total amount of reasonable and allowable indirect costs (called an "indirect cost pool") to total program funding that benefits from those indirect costs (called a "direct cost base"). See 2 C.F.R. Pt. 225, App. E, § B.2; Moberly Dec. ¶ 14 (Ex. 3). The ratio yields an indirect cost rate (indirect cost pool / direct cost base). See id. Table 1 provides an example using a hypothetical contractor (Contractor A).

**Table 1: Sample 2006 Negotiation for Contractor A.**

| | |
|---|---|
| **Indirect Costs** | |
| Administrative Assistant | $40,000 |
| Human Resources Director | $68,000 |
| Payroll Clerk | $20,000 |
| Grants and Contracts Officer | $28,000 |
| Procurement Officer | $38,000 |
| Rent | $40,000 |
| Security Guards | $48,000 |
| Office Supplies | $18,000 |
| **Total Indirect Costs** | **$300,000** |
| | |
| **Direct Cost Base** | |
| Bureau of Indian Affairs (BIA) | $700,000 |
| Indian Health Services (IHS) Clinic | $500,000 |
| EPA Program | $200,000 |
| School Lunch Program (USDA) | $100,000 |
| State Program | $500,000 |
| Tribal Program | $1,000,000 |
| **Total Direct Cost Base** | **$3,000,000** |

The simple calculation for Contractor A, based on the figures above, is $300,000 (indirect cost pool) over $3,000,000 (direct cost base) = .1 or 10% (indirect cost rate). See Moberly Dec. ¶¶ 15-16 (Ex. 3). As a general matter, an indirect cost rate is applied against each program's portion of the direct cost base to yield the indirect costs allocable to that program. For example, to determine the maximum amount of indirect costs that Contractor A could charge to the BIA programs, the rate (10%) would be multiplied by the BIA portion of the base ($700,000), to get $70,000. The rate would be applied to the IHS program, resulting in the allocation of $50,000 in indirect costs; to the EPA program, resulting in $20,000 in indirect costs; to the School Lunch Program, resulting in $10,000 in indirect costs; to the State Program,

resulting in $50,000 in indirect costs; and to the Tribal program, resulting in $100,000 in indirect costs. Together, these allocations equal $300,000.

The rate, however, is for allocating costs, and the Circulars specify that there is no expectation of recovery created by the rate methodology. See 2 C.F.R. § 225.20; Moberly Dec. ¶¶ 4, 15-16, 47, 56 (Ex. 3). The amount actually recoverable is determined by reference to the underlying contract or grant. See id. The Circular makes clear that where the funding source restricts the recovery of indirect costs, that restriction governs. See id.; see also State of Ohio Rehab. Serv. Comm'n v. United States Dep't of Educ., No. 95-4213, 1996 WL 665608, at *2 (6th Cir. Nov. 14, 1996) (unpublished mem.); Kentucky ex rel. Cabinet for Human Res. v. United States, 16 Cl. Ct. 755, 764 (1989); Maine, 81 F. Supp. 2d at 96 n.4.

The Circulars also provide for different types of rates or rate structures, depending on the needs of the organization and what would be most equitable. See Moberly Dec. ¶ 17 (Ex. 3). Most relevant here is the "fixed" rate, often called a "fixed-with-carry-forward" ("FCF") rate, which is a rate that is based both on an estimate of the costs to be incurred for the applicable period and on an adjustment (called a carry-forward) that takes into account the difference between the estimated and actual (audited) costs from an earlier period. See 2 C.F.R. Pt. 225, App. E, § 6; Moberly Dec. ¶ 18. The purpose of the carry-forward is to "finalize" or "close-out" a prior year's rate by accounting for the difference between a contractor's actual (audited) expenses and over-or under-recoveries from an earlier period. See Moberly Dec. ¶ 18. The carry-forward increases or decreases the indirect cost pool to reflect any under-recovery or over-recovery of indirect costs from the earlier period. See id. Since before 1995, Tribes and Tribal organizations with FCF rates have used a slightly modified methodology. See id. The

modified methodology uses recoverable and actual recoveries of indirect costs in the computation, and is described herein. See id. A sample follows:

**Table 2: Sample Modified Carry-Forward Computation for Contractor A.**

| **Column** | **A** | **B** | **C** | **D** | **E** | **F** | **G** |
|---|---|---|---|---|---|---|---|
| | **2004 Actual Direct Cost Base** | **% of Total** | **2004 Indirect Cost Pool** | **Indirect Rate @12%** | **Indirect Cost Collections** | **Shortfall** | **Carry-forward** |
| BIA | $600,000 | 24% | $60,000 | $72,000 | $70,000 | 0 | -10,000 |
| IHS | $500,000 | 20% | $50,000 | $60,000 | $60,000 | 0 | -10,000 |
| EPA | $300,000 | 12% | $30,000 | $36,000 | $35,000 | 0 | -5,000 |
| USDA | $100,000 | 4% | $10,000 | $12,000 | $10,000 | 0 | 0 |
| State | $400,000 | 16% | $40,000 | $48,000 | $35,000 | 5,000 | 0 |
| Tribal | $600,000 | 24% | $60,000 | $72,000 | (internal) | (internal) | (internal) |
| **Total** | $2,500,000 | 100% | $250,000 | $300,000 | $210,000 | 5,000 | -25,000 |

In Table 2, Column A reflects the actual direct program expenditures (less excluded costs such as capital expenditures and pass-through funds) of each of the programs in Contractor A's direct cost base for 2004. See Moberly Dec. ¶ 20 (Ex. 3). Column B reflects each program's portion of the total direct cost base (e.g., for IHS, $500,000/2,500,000 = 20%). See id. The Total of Column C reflects the total actual indirect costs incurred by Contractor A (although not shown in the example, an adjustment from an earlier period's carry forward calculation would also be made if applicable). See id. The individual program lines in Column C are that program's share of the total incurred indirect costs in the same proportion as its share of the direct cost base (e.g., for IHS, 20% of $250,000 = $50,000). See id. Column D reflects the indirect cost allocation based on the fiscal year 2004 rate (in this example, 12% multiplied by Column A). See id. And Column E reflects the actual indirect cost recoveries from each of the programs. See id.

Column G, the carry-forward, first calculates over-recoveries, which is when Column E > Column C. They show up as a negative number in Column G. If Column E < Column C, the schedule also considers under-recoveries based on the difference between estimated costs and actual costs (Column D < Column C). See Moberly Dec. ¶ 21 (Ex. 3). As shown in Table 3, the total of Column G is then added or subtracted from the 2006 (estimated) indirect costs ($300,000) to get the total (estimated) pool for 2006 ($275,000). The indirect cost pool is then divided by the 2006 (estimated) direct cost base for an 2006 indirect cost rate of 9.17%. See Moberly Dec. ¶ 22 (Ex. 3).

**Table 3: Sample Calculation of a Fixed-with-Carry-Forward Rate for Contractor A.**

| | |
|---|---:|
| FY 2006 Indirect Costs | $300,000 |
| FY 2004 Over-recovery Carry-forward | -$25,000 |
| FY 2006 Indirect Cost Pool | $275,000 |
| FY 2006 Direct Cost Base | $3,000,000 |
| FY 2006 Indirect Cost Rate | $275,000/$3,000,000=9.17% |

An under-recovery due to an appropriation shortfall is not considered in Column G, but shows up in Column F: If Column D < Column C, then Column D minus Column E is the shortfall; if Column D > Column C, then Column C minus Column E is the shortfall. If the shortfall was carried forward, the shortfalls of one program would be allocated to all of the other programs and thus the congressional limitation would be evaded. See Moberly Dec. ¶ 23.

### B. The ISDA Allows IHS to Use Indirect Cost Rates, Negotiated under OMB A-87, in Making Indirect CSC Funding Awards.

The ISDA does not prohibit IHS from using indirect cost rates negotiated under OMB A-87. To the contrary, the text of the ISDA demonstrates two things: that Congress intends IHS to use indirect cost rates, negotiated under OMB A-87, to make indirect CSC funding awards and that Congress prohibits IHS (and BIA) from paying the indirect costs of other federal agencies.

This intention was made clear from the very first time Congress addressed indirect costs directly in the ISDA. See Indian Self-Determination & Educ. Assistance Act Amendments of 1988, Pub. L. No. 100-472, 102 Stat. 2285, §§ 103, 205 (1988). Significantly, Congress defined "indirect costs" for purposes of the ISDA in the same manner as indirect costs were defined under the pre-existing OMB Circulars. See id. § 103(f) (codified at 25 U.S.C. § 450b(f)); 35 Fed. Reg. 18797, 18799 (1970). By incorporation of the government-wide OMB A-87 definition, the plain language of the 1988 amendments demonstrates that Congress fully expected IHS to continue to use OMB A-87 indirect cost rates as the starting point for calculating indirect costs.

Other parts of the 1988 amendments demonstrate Congress's intent to allow IHS to award indirect costs on the basis of indirect cost rates negotiated under OMB A-87. Congress defined the term "indirect cost rate" in the 1988 amendments as "the rate arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency[.]" Id. § 103(g) (codified as 25 U.S.C. § 450b(g)). Congress also added a requirement that IHS report to it on shortfalls in the funding of CSC. See id. § 205(c) (codified as 25 U.S.C. § 450j-1(c)). This report was to identify "the indirect cost rate and the type of rate for each tribal organization." Id. By these references, Congress evinced its knowledge and approval of the government-wide indirect cost rate system.

With another section of the 1988 amendments addressing certain over and under-recoveries associated with the rate methodologies in OMB A-87, Congress again demonstrated its understanding that IHS would continue to award indirect cost funding on, inter alia, the basis of OMB A-87 rates and that certain federal agencies would continue to disallow or limit indirect cost recovery. See id. § 205(d)(1) (codified at 25 U.S.C. § 450j-1(d)). In another provision, Congress directly cited OMB A-87, in recognition of the fact that IHS used indirect cost rates

developed under these principles in making indirect CSC awards. Id. § 205(e) (codified as 25 U.S.C. § 450j-1(e)). Each of these provisions demonstrates that Congress fully intended IHS and BIA to award indirect costs on the basis of an OMB rate.

Congress further clarified this intention in 1994, when it again amended the ISDA. See Indian Self-Determination Act Amendments of 1994, Pub. L. No. 103-413, 108 Stat. 4250 (1994). Congress included a new paragraph to § 450j-1(a), which read:

> The contract support costs that are eligible costs for the purposes of receiving funding under this Act shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of [direct CSC]. . . and . . . any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract[.]

See id. § 102(14) (emphasis added) (codified at 25 U.S.C. § 450j-1(a)(3)).

Thus, Congress further specified that indirect CSC under the ISDA were limited to "overhead incurred by the contractor in connection with the operation" of IHS programs under contract. As of 1994, the ISDA clearly prohibited the payment of indirect costs incurred in connection with any non-IHS program, regardless of whether that program allowed for indirect cost recovery. The ISDA regulations contemplate that a contractor may negotiate and agree to the use of provisions of OMB Circulars in its ISDA contract. See 25 C.F.R. § 900.37.

The legislative history of the 1988 and 1994 amendments further supports this interpretation. Congress was aware of the indirect cost rate methodology in the OMB Circulars and approved of its use. See, e.g., S. Rep. No. 100-274, 1988 U.S.C.C.A.N. 2620, at 2627-32, 2636-37 (1988) (Ex. 45).[8] Similarly, in 1994, Congress explained that "[t]he amendment does

---

[8] Congress used the term 'indirect costs' because it "is associated with known management practices. Those practices are recognized and defined in [OMB A-87.] The circular anticipates a variety of organizational structures, and therefore allows maximum flexibility while excluding unallowable costs. The indirect cost system described in OMB

not alter the process employed by many tribal contractors for negotiating indirect cost agreements with the appropriate cognizant agency for purposes of cost-recovery accounting under the Act." 140 Cong. Rec. H11140, H11144, 103rd Cong., 2d Sess., 1994 WL 553621 (Oct. 6, 1994). The ISDA bars the payment of indirect costs associated with any program other than the ISDA program under contract. Only costs associated with or incurred in connection with IHS programs may be recovered from IHS.

**1. Ramah Navajo Chapter v. Lujan, 112 F.3d 1455 (10th Cir. 1997).**

Notwithstanding the plain language of the ISDA, in 1997, the Tenth Circuit found that the ISDA was ambiguous with respect to whether the ISDA required BIA to fund more than BIA's share of indirect costs as negotiated under OMB A-87. See RNC, 112 F.3d at 1461-62. The case originated out of a lawsuit brought in 1990 by the Ramah Navajo Chapter on behalf of all Tribal contractors that had contracts with BIA. See RNC v. Babbitt, No. 90-0957, slip op. at 1 (D.N.M. Nov. 4, 1998) (Ex. 31). RNC challenged the OMB A-87 methodology as violating the ISDA. The facts underlying the lawsuit involved RNC's seven contracts. Five of those contracts were ISDA contracts entered into with BIA, for a total in program funding of $755,770. See id. at 3. RNC also had two contracts with the State of New Mexico, with program funding totaling $62,927. See id. The indirect cost pool was $364,021. See id. Under the OMB A-87 methodology, RNC's rate was 44.5%. See id. at 4. Under this rate, a total of $336,318 in indirect costs would be allocated to BIA and a total of $28,003 in indirect costs would be allocated to New Mexico. RNC argued, however, that the ISDA required BIA to pay

---

Circular A-87 is used not only by tribal governments, but also by state governments, counties, municipalities, universities, hospitals, and nonprofit organizations. The intent of the legislation is to end the confusion by making clear that the Congress supports the payment of indirect costs associated with self-determination contracts[.]" S. Rep. No. 100-274, 1988 U.S.C.C.A.N. 2620, at 2627-32, 2636-37 (1988) (Ex. 45).

all of RNC's indirect costs, even those costs associated with the New Mexico programs. See id. RNC thus proposed that its rate be adjusted to exclude the New Mexico program funds from the base before calculating the rate. See id. at 5. RNC's adjustment resulted in the rate calculation as $364,021 / $755,700=48.17%. See id.

The district court agreed with BIA and found that the ISDA was clear and unambiguous in requiring BIA to only pay those costs "associated with its contracts" and thus found that the allocation method contained in OMB A-87 and BIA's regulations was a proper method of determining the costs associated with BIA's programs. See id. at 10-11.

On appeal, the Tenth Circuit reversed, holding that the indirect cost rates used in the BIA contracts violated the ISDA. See RNC, 112 F.3d at 1463. Pivotal to the court's analysis was its determination that the ISDA provisions mandating payment of indirect CSC were ambiguous on the question of the "extent to which indirect costs are to be funded by defendants." Id. at 1461. (analyzing 25 U.S.C. §§ 450j-1(a)(2) and 450j-1(d)). In light of the perceived ambiguity, the court relied on the canon of statutory construction interpreting ambiguous provisions to the benefit of Native Americans. Id. at 1463. The Tenth Circuit stated that although inclusion of the New Mexico program funds in the direct costs base "would have been proper if those programs included funding for their apportioned share of the indirect costs pool, the uncontroverted facts indicate they did not." Id. By including these funds in the direct costs base, the court found that the defendants had "deprived plaintiff of full indirect costs funding for fiscal year 1989." Id. at 1463. The Tenth Circuit also believed that RNC's costs were fixed. See id. Thus, the court required BIA to pay those costs associated with the New Mexico programs. See id.

**2. Immediate congressional response to RNC.**

After the Tenth Circuit's decision, Congress proposed legislation to clarify its intent in the ISDA that only those costs directly attributable to IHS programs under contract could be funded by IHS. Within approximately one year of the Tenth Circuit's decision, Congress had enacted a new ISDA provision, which provides:

> Before, on, and after October 21, 1998, and notwithstanding any other provision of law, funds available to the Indian Health Service in this Act or any other Act for Indian self-determination or self-governance contract or grant support costs may be expended only for costs directly attributable to contracts, grants and compacts pursuant to the Indian Self-Determination Act [25 U.S.C.A. § 450f et seq.] and no funds appropriated by this or any other Act shall be available for any contract support costs or indirect costs associated with any contract, grant, cooperative agreement, self-governance compact, or funding agreement entered into between an Indian tribe or tribal organization and any entity other than the Indian Health Service.

25 U.S.C. § 450j-2 (Pub. L. No. 105-277, Div. A, § 101(e), 112 Stat. 2681-231 (1998)). Congress made abundantly clear its original intention that IHS cannot pay for any indirect costs not attributable to IHS self-determination contracts. Congress enacted this provision soon after RNC, made it clear that this was always the law ("[b]efore, on and after October 21, 1998"), and thus stated unequivocally that the cost-shifting endorsed by the Tenth Circuit was not permissible.[9] See id.

This clarification forecloses any argument that the ISDA has ever allowed IHS to pay indirect costs attributable to non-IHS programs. See Red Lion Broad. Co. v. FCC, 395 U.S. 367, 380-81, 89 S. Ct. 1794, 1800-01 (1969) (explaining that subsequent legislation declaring intent of an earlier statute is entitled to great weight in statutory construction); Liquilux Gas Corp. v.

---

[9] Congress later enacted a similar provision that applies to BIA funding, but unlike § 450j-2 which applies "[b]efore, on, and after October 21, 1998," the new § 450j-3 applies strictly "on and after November 29, 1999." 25 U.S.C. § 450j-3.

Martin Gas Sales, Inc., 979 F.2d 887, 890 (1st Cir. 1992) (same); McCreary v. Offner, 1 F. Supp. 2d 32, 37 (D.D.C. 1998) (same), aff'd, 172 F.3d 76 (D.C. Cir. 1999).

Moreover, 25 U.S.C. § 450j-2 is a clarification of the ISDA and not a substantive amendment, because shortly before its enactment, the Tenth Circuit had found an ambiguity in the funding provisions of the ISDA. Under these circumstances, courts generally interpret such enactments as clarification and not as substantive amendments. See Beverly Cmty. Hosp. Ass'n v. Belshe, 132 F.3d 1259, 1266 (9th Cir. 1997) (construing later enactment as a clarification in light of, inter alia, a split of authority in the courts as to the meaning of original provision); Liquilux, 979 F.2d at 890 (explaining that when a new enactment follows the discovery of an ambiguity, the enactment is construed as a clarification and not a substantive amendment); Porter v. Comm'r, 856 F.2d 1205, 1209-10 (8th Cir. 1988) (same); Barnes v. Cohen, 749 F.2d 1009, 1015 (3d Cir. 1984) (when there is a dispute about ambiguity, subsequent amendment generally construed as a clarification); Brown v. Marquette Sav. & Loan Ass'n, 686 F.2d 608, 615 (7th Cir. 1982) (citing 2A Sutherland Statutory Constr. § 49.11, at 265-66 (4th ed. 1973), and explaining that statutory construction of enactment to determine if it clarifies or is a subsequent amendment involves reviewing the state of the law at the time of the enactment); see also United States v. Montgomery County, 761 F.2d 998, 1003 (4th Cir. 1985) ("Statutes may be passed purely to make what was intended all along even more unmistakably clear.").

Because 25 U.S.C. § 450j-2 was a clarification and not a substantive amendment, there are no retroactivity concerns attendant to the Court's application of the ISDA, as clarified by § 450j-2, to Plaintiffs' contracts in effect before § 450j-2's enactment. See Piamba Cortes v. Am. Airlines, Inc., 177 F.3d 1272, 1283 (11th Cir. 1999); Beverly, 132 F.3d at 1266; Montgomery County, 761 F.2d at 1003; McCreary, 1 F. Supp. 2d at 36.

Section 450j-2 itself is plain and unambiguous and, therefore, resort to legislative history is unnecessary. See United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 495 (D.C. Cir. 2004). But even if, arguendo, the Court were to conclude that it is not clear on its face, legislative history clearly supports Defendants' position. The relevant House Report describes the provision as "specifying that Indian Health Service funding may not be used to pay contract support costs for any entity other than the Indian Health Service." H.R. Rep. No. 105-609, at 110 (1998) (Ex. 46); see also id. at 108 (same). In the same report, the Appropriations Committee expressed concern "about the Ramah Navajo Chapter v. Lujan settlement concerning contract support costs" and further that it believed "that the court in [RNC] made an erroneous decision and that the Administration erred by failing to appeal." Id. at 57. Congressional intent to prevent another decision like the Tenth Circuit's could not be more transparent. See Brown v. Thompson, 374 F.3d 253, 259 (4th Cir. 2004) ("In determining whether an amendment clarifies or changes existing law, a court, of course, looks to statements of intent made by the legislature that enacted the amendment."); Piamba, 177 F.3d at 1284 ("[C]ourts may rely upon a declaration by the enacting body that its intent is to clarify [a] prior enactment.").

**3. The decision in RNC does not apply to Plaintiffs.**

Even were the Court to agree with the Tenth Circuit's pre-1998 statutory interpretation or decline to apply the 1998 amendment to Plaintiffs' 1995-1997 ISDA contracts, there are significant factual distinctions between Plaintiffs and RNC that also direct a different conclusion. The critical facts that are discussed in the Tenth Circuit decision are (1) RNC's indirect costs were fixed, and (2) the State of New Mexico did not pay any indirect costs. See RNC, 112 F.3d at 1461-62. Neither fact is present here.

**a. Plaintiffs' costs are not fixed.**

According to expert Charles Wilkins, C.P.A., indirect costs may be classified into one of four categories: fixed costs, semi-fixed costs, variable costs, or semi-variable costs. See Expert Report of Charles L. Wilkins at 4-5 (Ex. 5). These terms describe the manner in which indirect costs change or fluctuate based upon revenue changes. See id. at 4-5. Fixed costs are costs in which there is little correlation between the indirect costs and revenue. See id. at 4. In other words, a true fixed cost is a cost that is necessary whether the organization is large or small, e.g., a CEO. See id. Variable costs are the opposite, they have a total correlation with revenue. See id. at 5. As revenue increases, so do variable costs, and as revenue decreases, variable costs decrease as well. See id. In between these two types of costs are semi-fixed costs and semi-variable costs. See id. at 4-5.

The Tenth Circuit concluded that RNC's indirect costs were fixed. See RNC, 112 F.3d at 1461. Although not entirely clear, it appears that the court believed that RNC would incur $364,021 in indirect costs whether or not it administered the New Mexico programs. In other words, the court appeared to believe that the revenue change caused by the inclusion or exclusion of the New Mexico programs in the direct cost base would have no impact on the total amount of indirect costs incurred by RNC. Whether or not this is an accurate reflection of how RNC's costs would react to a change in revenue stemming from the elimination of the New Mexico programs, the same cannot be said of Plaintiffs' indirect costs.

Mr. Wilkins has reviewed the indirect costs incurred by Plaintiffs in all years relevant here and has concluded that their costs are not fixed. See Wilkins Rep. at 16 (Ex. 5) ("My opinion is that Plaintiffs' indirect costs, taken as a whole, are not fixed"). To reach this conclusion, he first analyzed the types (categories) of costs incurred by these two Plaintiffs. See

id. at 9-15. Tunica incurred costs related to depreciation, office supplies, travel, utilities, telephone, repairs and maintenance, insurance, professional services, and a tribal newspaper. See id. at 11. All of these costs are variable, semi-variable, or semi-fixed costs. See id. Thus, they will increase or decrease in relation to revenue changes. See id. at 15. Similarly, RNSB's costs are not fixed and thus will fluctuate in relation to revenue changes. See id. at 14, 15.

Mr. Wilkins also reviewed the historical changes in Plaintiffs' indirect costs. See id. at 9-15. He found that Tunica's costs grew even when revenue did not change. See id. at 12-13. As such, he concluded that Tunica's costs cannot be fixed. See id. Were Tunica's costs fixed, they would not have increased when revenue stayed the same. See id. A review of RNSB's historical changes is inconclusive because there has been no significant change in revenue. Based on a review of Tunica and RNSB's categories of indirect costs as well as Tunica's historical trends, Mr. Wilkins has concluded that Plaintiffs' costs are not fixed. See id. at 15. His analysis demonstrates that there is no support for Plaintiffs' statements that their costs are fixed, see 2d Supp. Am. Compl. ¶ 21, and as such, that they have presented circumstances quite different than those presented in RNC.

While RNC's indirect costs did not undergo this type of comprehensive analysis, there are some additional facts that might have led the Tenth Circuit to conclude that RNC's costs were fixed. In that case, RNC's BIA programs comprised 92.7% of their base and the State of New Mexico programs comprised just 6.3% of the base. See RNC, 112 F.3d at 1458. Given this fact, it is at least conceivable that a 6% shift in revenue (the inclusion or exclusion of the New Mexico programs) would not effect a large change in RNC's indirect costs. In contrast, neither Tunica nor RNSB have anywhere close to 92% of their direct cost bases comprised of IHS contracts. See Moberly Dec. ¶ 54 (Ex. 3). For example, between 1995-2001, IHS programs

comprised an average of only 17.6% of Tunica's direct cost base. See id. Between 1995-2003, IHS programs comprised an average of only 19.26% of RNSB's direct cost base. See id. Chart 6 below contrast the direct cost base composition of RNC with those of Plaintiffs.

**Chart 6. Difference in Program Base Proportions Between RNC and Plaintiffs.**




From RNC v. Lujan, 112 F.3d 1455, 1458 (10th Cir. 199 Average Program Base Ratio 1995-2003 (Def. Ex. 3 ¶ 54) Average Program Base Ratio 1995-2001 (Def. Ex. 3 ¶ 54)

In RNC, the plaintiff urged that all of their indirect costs should be born by the programs reflected in the pie chart with the lighter color (92%). Applying that rationale here, all of Plaintiffs' indirect costs would be born by the programs reflected in the pie charts with the lighter color (17.6% for Tunica and 19.26% for RNSB). Given these facts, it is inconceivable that the exclusion of the non-IHS programs from Plaintiffs' direct cost bases (a shift in revenue of over 80% for both Tunica and RNSB), would not effect a corresponding decrease in Plaintiffs' costs. Because Plaintiffs' indirect costs are not fixed, a shift in revenue would cause a corresponding shift in the indirect costs. See Wilkins Rep. at 14-15 (Ex. 5).

**b. Plaintiffs recover indirect costs from other federal agencies.**

Another unique feature of RNC was that the only non-BIA program in the contractor's base were the New Mexico programs that did not pay any indirect costs. See RNC, 112 F.3d at 1458. This scenario is quite different from that of these Plaintiffs. Ms. Moberly, who regularly reviews tribal contractors' funding, has stated that many non-ISDA agencies do, in fact, provide indirect costs. See Moberly Dec. ¶ 78 (Ex. 3). For example, RNSB recovered a significant

amount of indirect costs from non-IHS programs in 1995. See id. ¶ 79. In fact, the total amount of indirect costs that RNSB recovered from all of its contracts and grants was $1,886,094, notwithstanding that it only incurred $1,745,380. See id.; see also Pls.' Resp. to Defs.' Req. for Admission 1-2 (Ex. 38 at 3). Similarly, Tunica, whose base is largely comprised of IHS and BIA programs, recovers indirect CSC from BIA and other agencies (Ex. 13-15) and cannot argue that "other federal agencies do not pay indirect costs." The factual predicate of the RNC case simply does not exist here.

### C. The Rate Adjustment Proposed by Plaintiffs Is Contrary to the ISDA.

The rate adjustment proposed by Plaintiffs is contrary to the ISDA. Plaintiffs' first proposed rate adjustment would involve keeping the indirect cost pool (the numerator) the same, i.e., pooling all of the costs associated with running all of Plaintiffs' contracts, while adjusting the direct cost base (the denominator) to remove the programs that do not allow full recovery of indirect costs. (2d Supp. Am. Compl. ¶ 21.) Under OMB A-87, if Contractor A has $300,000 in indirect costs which benefit $3,000,000 in total program funding, the ratio would be 300,000 to 3,000,000 or 10%, as shown in Table 1. As shown in Table 2, however, Contractor A does not recover from the State program that portion of the Contractor's indirect costs (the State's portion is $40,000 and the State only awards $35,000). Therefore, under Plaintiffs' adjustment, Contractor A's rate would be calculated only after first removing the funding for the State program (the $500,000 from Table 1) from the base. This is notwithstanding the fact that the State program benefits from those costs. Plaintiffs' adjustment would result in an indirect cost pool of $300,000 allocated over a base of $2,500,000, resulting in a rate of 12%.

Although the costs generated by the IHS programs under the OMB A-87 methodology (without the carry-forward) would only generate $50,000 in indirect costs, applying Plaintiffs'

adjusted rate would result in an allocation of $60,000 in costs to the IHS programs. The relative benefit to the IHS programs, however, has not changed. As this example makes clear, Plaintiffs' theory would allocate the costs associated with the State program to IHS.

Plaintiffs' second adjustment would also shift (or spread) the shortfalls of one program to all of the other programs through an adjustment to the carry-forward computation. (2d Supp. Am. Compl. ¶ 23.) Under OMB A-87, Contractor A's $5,000 shortfall from the State program is not carried forward because it represents a legal or contractual limitation related to the State program. If this shortfall was carried forward, the State program's shortfall would be re-allocated to all of the other programs in a future year. Plaintiffs' proposed adjustment, which in the example of Contractor A would carry forward the $5,000 shortfall from the State program, would circumvent legal limitations precluding particular agencies from allowing full indirect cost funding. Plaintiffs' proposed adjustment, shown below in Table 4, would carry forward Contractor A's $5,000 shortfall from the 2004 State program in Column G.

**Table 4: Plaintiffs' Adjustment to Carry-Forward Computation for Contractor A.**

| Column | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| | **2004 Actual Direct Cost Base** | **% of Total** | **2004 Indirect Cost Pool** | **Indirect Rate @12%** | **Indirect Cost Collections** | **Shortfall** | **Carry-forward** |
| BIA | $600,000 | 24% | $60,000 | $72,000 | $70,000 | 0 | -10,000 |
| IHS | $500,000 | 20% | $50,000 | $60,000 | $60,000 | 0 | -10,000 |
| EPA | $300,000 | 12% | $30,000 | $36,000 | $35,000 | 0 | -5,000 |
| USDA | $100,000 | 4% | $10,000 | $12,000 | $10,000 | 0 | 0 |
| State | $400,000 | 16% | $40,000 | $48,000 | $35,000 | 0 | 5,000 |
| Tribal | $600,000 | 24% | $60,000 | $72,000 | (internal) | (internal) | (internal) |
| Total | $2,500,000 | 100% | $250,000 | $300,000 | $210,000 | 0 | -20,000 |

The total over-recovery in Column G would be reduced from -$25,000 to -$20,000. Then, the 2006 pool in Table 3 would increase from $275,000 to $280,000, as below.

**Table 5: Plaintiffs' Adjustment to Rate Calculation for Contractor A**.

| | |
|---|---|
| FY 2006 Indirect Costs | $300,000 |
| FY 2004 Over-recovery Carry-forward | -$20,000 |
| FY 2006 Indirect Cost Pool | $280,000 |
| FY 2006 Direct Cost Base | $3,000,000 |
| FY 2006 Indirect Cost Rate | $280,000/$3,000,000=**9.33%** |

Under Plaintiffs' adjustment, the rate would then be calculated as $280,000 divided by $3,000,000, or 9.33% (instead of 9.17%), see Table 3). All of the programs in the 2006 base would be allocated indirect costs at a 9.33% rate, resulting in a greater amount of costs allocated to these programs. Under this example, the costs allocated to the IHS programs would increase from $45,850 to $46,650, despite the IHS program not having received any greater benefit from the indirect cost pool. Both of Plaintiffs' adjustments would result in IHS shouldering indirect costs not associated with or directly attributable to its programs, which is contrary to the ISDA.

What Plaintiffs ignore is that OMB A-87 contains various methodologies in order to ensure that indirect costs are equitable allocated. For example, OMB A-87 allows the use of multiple or special rates. See 2 C.F.R. Pt. 225, App. E, §§ C.3, C.4. Multiple rates are available to any government contractor that can demonstrate that their use would more equitably allocate indirect costs. See Moberly Dec. ¶ 29 (Ex. 3). In fact, many contractors currently have multiple rates. See id. The choice of what type of rate to negotiate is made by the contractor. See id. ¶ 27. Marcel Kerkmans, a witness for Plaintiffs, has attested to the various methodologies in the Circular. See Kerkmans Aff. ¶ 3 (Ex. 36). He stated that the use of "multiple rates" under OMB A-87 allowed one contractor to recover close to 100% of its indirect costs. See id.

Also available under the Circular are different types of rates, e.g., provisional/final rates, which do not rely upon the "carry forward" methodology to account for over and under-

recoveries. See 2 C.F.R. Pt. 225, App. E, §§ B.7, B.8. Many contractors, including tribal contractors, utilize provisional/final rates. See Moberly Dec. ¶ 26 (Ex. 3). Taking advantage of these available mechanisms might eliminate some or all of the harm which Plaintiffs allege they have suffered.

At bottom, there is no question that the ISDA allows IHS to use of indirect cost rates, negotiated under OMB A-87, for calculating indirect costs. But there is also no question that the ISDA prohibits exactly what Plaintiffs seek, i.e., the shifting of costs to IHS from other agencies.

## VI. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS BECAUSE PLAINTIFFS HAVE WAIVED, AND ARE ESTOPPED FROM RAISING, ANY CLAIMS THAT THEIR CONTRACTS OR THEIR INDIRECT COST RATES VIOLATE THE ISDA.

Even assuming, arguendo, that the ISDA required a specific amount for indirect CSC or prohibited the use of indirect cost rates, Plaintiffs have waived (and are therefore estopped from raising) any claim to additional funding because they continuously and knowingly acquiesced to the amounts in their ISDA agreements. Plaintiffs' knowing and voluntary acceptance is demonstrated by the fact that (1) they failed in each year to challenge the funding levels and funding terms proposed for their agreements pursuant to the procedures available to them under the ISDA, (2) they executed the relevant agreements year after year, (3) they performed under the agreements, and (4) they accepted funding from the Secretary under the agreements. The Secretary, as a party to these agreements, relied upon the enforceability of their terms, and acted to his detriment in assuming other obligations. Under these circumstances, the law of waiver and estoppel preclude any claims that Plaintiffs might raise for additional funding.

### A. Plaintiffs Have Waived Any Claims to Additional Funding.

When a government contractor believes that the government has violated a statute by including improper terms or conditions in a government contract, the contractor cannot simply

accept the contract and continue contract performance, without protest. To do so effects a waiver of the contractor's claim. See ConocoPhillips v. United States, 501 F.3d 1374, 1378-80 (Fed. Cir. 2007), aff'g 73 Fed. Cl. 46, 56-58 (2006); Whittaker Elec. Sys. v. Dalton, 124 F.3d 1443, 1446 (Fed. Cir. 1997); E. Walters & Co. v. United States, 576 F.2d 362, 368 (Cl. Ct. 1978); Hermes Consol., Inc. v. United States, 58 Fed. Cl. 409, 417 (2003), rev'd on other grounds sub nom., Tesoro Haw. Corp. v. United States, 405 F.3d 1339 (Fed. Cir. 2005); Reservation Ranch v. United States, 39 Fed. Cl. 696, 712 (1997), aff'd on other grounds, 217 F.3d 850 (Fed. Cir. Sept. 9, 1999) (unpublished mem.); see also Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1563 (Fed. Cir. 1990) (recognizing that acceptance of contract provisions that are different from those in the Constitution or a statute can demonstrate voluntary and knowing waiver of a right); Do-Well Mach. Shop, Inc. v. United States, 870 F.2d 637, 641 (Fed. Cir. 1989) (same); Mexican Intermodal Equip., S.A. de C.V. v. United States, 61 Fed. Cl. 55, 70 (2004) ("[The plaintiff] belatedly seeks the benefit of a bargain it did not make, which, if permitted by this court, would tend to undermine the fairness of the procurement process. . . . [Instead], Plaintiff should be held to its voluntary contract commitment.") (citation and internal quotation marks omitted); Flink/Vulcan v. United States, 63 Fed. Cl. 292, 307-08 (2004) (reiterating the long accepted doctrines of waiver and estoppel), aff'd on other grounds, No. 05-5048, 2006 WL 222995 (Fed. Cir. Jan. 12, 2006); PCL Const. Servs., Inc. v. United States, 41 Fed. Cl. 242, 252 (1998) (When the alleged deviation from law is plain, the failure to object before execution waives the objection), aff'd on other grounds, No. 03-5060, 2004 WL 842984 (Fed. Cir. Apr. 7, 2004).

In fact, there is little better evidence of an intent to waive a statutory or regulatory right than (a) not taking advantage of pre-execution remedies, (b) signing a contract, (c) performing

the contract, and (d) accepting funds under the contract. See Aleutian Constructors v. United States, 24 Cl. Ct. 372, 384 (1991) ("Continuance of the contract is the most common and clearest case of waiver."); Appeal of USD Techs., Inc., ASBCA No. 31305, 1987 WL 40766 (Mar. 12, 1987) ("In the realm of Government contracts, absent mistake or duress . . . few things signify knowing and intentional conduct more than does the execution of a bilateral modification."), aff'd No. 87-1439, 1988 WL 7829 (Fed. Cir. Feb. 3, 1988) (unpublished mem.). Courts reviewing claims of waiver of statutory rights have considered whether Congress intended to preclude waiver of any substantive protection. See Do-Well, 870 F.2d at 641. The court in Do-Well explained:

> We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history. Having made the bargain, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.

Id. (citation, internal quotation marks, and alterations omitted). Cf. Cherokee, 543 U.S. at 641-43, 125 S. Ct. at 1182 (disfavoring an interpretation of the ISDA that "would undo a binding governmental contractual promise"). The burden to show that Congress intended to preclude waiver is on the party opposing waiver. See Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 227, 107 S. Ct. 2332, 2337-38 (1987).

Here, Congress provided Tribes and Tribal organizations with a powerful vehicle--the declination action--for immediate federal court review of the Secretary's decision to decline to fund a contract at the level or under the terms proposed by the Tribe or Tribal organization. See 25 U.S.C. §§ 450m-1(a), 450f(a)(2). For example, if the Secretary declines to accept the funding levels or funding terms proposed by a Tribal contractor, either for purposes of a new self-determination contract or for purposes of an AFA, § 450f(a)(2) of the ISDA provides that the

Tribe or Tribal organization can challenge the basis for that "declination" through an administrative process, described in 25 C.F.R. § 900.150-900.176, or directly in federal court. See id. § 450f(b); 25 C.F.R. § 900.31. If a Tribe or Tribal organization chooses to go to federal court, § 450m-1(a) gives federal courts the power to review a Secretary's declination decision for its compliance with ISDA and, if the decision was in error, to enjoin the Secretary "to reverse a declination finding . . . or to compel the Secretary to award and fund an approved self-determination contract." 25 U.S.C. § 450m-1(a). Thus, the typical result of a successful declination action challenging the funding levels offered by the Secretary is an order compelling the Secretary to enter into a contract in conformity with the contractor's proposal. In this respect, the Tribe or Tribal organization has every incentive to ensure that the terms and conditions of any contract that it signs embody everything to which it believes it is entitled. By executing agreements that provided for a particular funding level, Plaintiffs affirmatively signaled an intent to forego any additional benefits that could possibly be read in the ISDA.

Changing course by seeking relief at this late date and after accepting funding under their agreements, Plaintiffs have "retained all options for [themselves] . . . made [their] calculation entirely in [their] own favor, without proper consideration of the defendant's position," and thus violated the "basic principle calling for fair treatment of both parties." Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 148 (1973).[10] Under these circumstances, contractors like

[10] There are some older cases in which courts have declined to apply waiver or estoppel when a contract was found to be illegal. See, e.g., Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185-86 (Fed. Cir. 1988); MAPCO Alaska Petroleum, Inc. v. United States, 27 Fed. Cl. 405, 416 (1992), rev'd by implication on other grounds by Tesoro Haw. Corp. v. United States, 405 F.3d 1339 (Fed. Cir. 2005). The court in Hermes compared the two lines of cases and concluded that the cases in which courts declined to apply waiver were cases in which the contractor raised its complaint at contract formation or at an early juncture in the dispute, and in which the government's illegal contract outweighed the contractor's wrongdoing. See 58 Fed. Cl. at 413. Neither of these factors are present here to avoid the application of waiver. Another

Tunica and RNSB that fail to take advantage of ISDA's declination review procedure and enter into contracts should be held to the four corners of those contracts. They have agreed to these terms, and they accepted funding under these agreements. In fact, if they had determined that the funding was inadequate to administer a particular program, they could have retroceded it and IHS would have been required to provide services at no cost to the Tribe. The existence of the contract and AFAs, as well as both parties performance thereunder, should be deemed sufficient evidence a waiver of any rights that Plaintiffs might have otherwise had under the ISDA.

**B. Plaintiffs Are Estopped from Claiming Additional Funding.**

Not only did Plaintiffs fail to object--and instead accepted--funding under their AFAs, the Secretary relied to his detriment on the funding levels and funding amounts negotiated by the parties and set forth in the agreements. All pertinent appropriations that might have been available for obligation in Plaintiffs' 1995-2003 agreements (had they challenged the funding levels prior to execution) have long since been obligated for other purposes and the remaining amounts, thought trivial, have lapsed as a matter of law. See supra n.7; Thompson Dec. ¶¶ 6, 7-24 (Ex. 4). Had Plaintiffs raised their objections prior to contract execution, the Secretary would have had a full range of options: he could have litigated the issue, he could have attempted to re-negotiate the funding levels with the Plaintiffs, or he could have agreed to provide additional funds if appropriated funds were available and not already obligated. Further, had Plaintiffs raised their claims and been successful years ago, the Secretary necessarily would have obligated additional funds for Plaintiffs' agreements and not for other purposes. This

---

more recent case, GHS Health Maintenance Organization, Inc. v. United States, 76 Fed. Cl. 339 (2007), currently on appeal, discussed and rejected the government's waiver argument.

would have ensured that the Secretary not exceed the limitations set by Congress and thus circumvent Congress's exclusive power to appropriate funds. See U.S. Const. art. I, § 9, cl. 7.

Conversely, if the Court permits Plaintiffs to raise their claims now and if they are successful, the Secretary will be responsible for liquidation of all of the original obligations incurred by the Secretary (in reliance on the funding levels provided to Plaintiffs) as well as the obligations that would now be considered part of Plaintiffs' agreements.[11] Plaintiffs should be estopped from challenging the terms in their agreements at this late date as they had every opportunity--including a wide range of statutory review procedures specifically prescribed for this purpose--to timely attempt to demand more favorable contract terms prior to execution.

In a central case explaining estoppel, a government contractor claimed that, by exercising a contract option which, in effect, permitted the government to procure the contractor's product at an extremely low price, the government had violated its own regulations. See E. Walters, 576 F.2d at 368. The Court held that the contractor was estopped from raising its claim because it had failed to object to the allegedly illegal option at the time of the contract award and instead fully performed the contract. See id. As the Court explained it:

> Had plaintiff protested the use of the [challenged] provision at the time of award, defendant would have been in a position to either reaffirm its use of the [provision], in apparent disregard of [the regulatory] prohibition, with the further knowledge that it could later be faced with a claim for the [higher] price . . . or it could have elected instead, to [omit the challenged provision but award the contract to the next lowest bidder] . . . . Plaintiff's silence deprived the Government of that relatively painless alternative.

Id.; see also Union Pac. R.R. Co. v. United States, 847 F.2d 1567, 1570 (Fed. Cir. 1988) (applying equitable estoppel against government contractor that complied with a contract term it

[11] While monetary relief would presumably come from the Judgment Fund, the CDA requires IHS to repay these amounts. See 41 U.S.C. § 612.

later challenged because the government could not be put back in the same position as before the challenge); Hartford Accident & Indem. Co., 130 Ct. Cl. 490, 567 (1955) (finding that contractor was estopped from arguing that contract terms were invalid because it knew the terms and accepted payment under the contract).

In summary, Plaintiffs accepted funding from the Secretary for many years under agreements that they now allege--after funds have either been provided to them, obligated to other contractors, or lapsed--conflict with the ISDA. The doctrines of waiver and estoppel, as well as basic principles of fairness, dictate that the Secretary be granted summary judgment on Plaintiffs' claims alleging that their contracts violate the ISDA.

**C. Plaintiffs Have Waived Any Claims Related to their Indirect Cost Rates.**

Under the same authorities cited above, Plaintiffs waived any challenge to the validity of their indirect cost rates. See ConocoPhillips, 501 F.3d at 1378-80 ; Whittaker, 124 F.3d at 1446; Seaboard Lumber, 903 F.2d at 1563; E. Walters, 576 F.2d at 368; Hermes, 58 Fed. Cl. at 417; Reservation Ranch, 39 Fed. Cl. at 712. The actions taken by Plaintiffs in negotiating and accepting their indirect cost rates fully demonstrate their knowing and voluntary waiver of the right to challenge their rates. Instead of taking advantage of the agency's appeals procedure, 2 C.F.R. § 225.20, App. E, § F.4; 43 C.F.R. §§ 4.1 et seq., Plaintiffs agreed, without objection, to each of their indirect cost rates by signing their indirect cost rate agreements. (Ex. 13-20.) But they went even further. They then entered into contracts with IHS agreeing that their indirect cost rates, without adjustment, would be used to make indirect CSC awards. (Ex. 6 at 32; 7 at 23, 65, 87, 128; 8 at 20; 9 at 12-13, 44, 61-62; 10 at 43, 85-86, 106-07; 11 at 45, 75-76, 116-17; 12 at 44.) They did this without objection or resort to ISDA's judicial review process, 25 U.S.C. §§ 450f(a)(2), 450m-1(a), in which they could have challenged the use of indirect cost rates as a

basis for indirect cost awards if they believed that doing so violated the ISDA. There can be no conclusion but that they affirmatively waived any claims related to the validity of these rates.[12]

## VII. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO DEFENDANTS BECAUSE THE AWARD OF ADDITIONAL CSC WOULD BE A WINDFALL.

Even if Plaintiffs were to prevail on liability, no remedy would lie. This is because, in each year at issue in this suit, Tunica and RNSB recovered more indirect CSC from IHS than it expended on IHS programs. See Moberly Dec. ¶¶ 58-75 (Ex. 3). While DOI has since adjusted Plaintiffs' indirect cost rates in later years to take this over-recovery into account, Plaintiffs cannot claim entitlement to any additional CSC as any additional recovery would be a windfall, which is not permitted under the ISDA. See Samish, 419 F.3d at 1367; RNC, 112 F.3d at 1464.

A review of Tunica and RNSB's indirect CSC payments compared to the amount that they expended demonstrates that IHS significantly overpaid Plaintiffs. One of the reasons for these overpayments is that neither Tunica nor RNSB negotiated new indirect cost rates with DOI for 1997-2003 until 2004 and 2005, well after the contracts at issue in this case were executed and performed. Because of this, IHS was paying indirect CSC on the basis of old rates, and what IHS now knows were greatly inflated rates. In fact, RNSB submitted a proposed rate for 1997 of 25.7% to IHS for purposes of calculating indirect CSC for 1998-2002. See Zuni Dec. ¶¶ 70-71 (Ex. 2). In April 1999, however, DOI rejected RNSB's proposed rate of 25.7% and instead offered it a rate of 17.2% (Ex. 35). RNSB withheld this information from IHS and continued to submit its proposed (and much higher) rate of 25.7%. See Zuni Dec. ¶¶ 70-71 (Ex. 2). This resulted in IHS calculating the maximum amount of indirect CSC to which RNSB was eligible

---

[12] RNSB submitted an indirect cost rate proposal to DOI seeking a 25.1% rate for 1995. See Pls.' Resp. to Req. for Admission 6 at 2 (Ex. 38). The final rate RNSB negotiated with DOI (25.8%) was higher (Ex. 16).

on the basis of a rejected rate, something that IHS would not have done had RNSB disclosed this critical information to IHS. Because IHS awarded Plaintiffs with more CSC funding than Plaintiffs actually spent on IHS programs, no remedy lies for any alleged violation of the ISDA or Plaintiffs' contracts.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss and For Summary Judgment should be granted and judgment entered for Defendants. As a threshold matter, the Court lacks jurisdiction over many of Plaintiffs' claims. As to the merits, IHS fully performed under the terms and conditions of Plaintiffs' contracts. Moreover, the ISDA does not mandate the payment of an amount independent of that agreed to in an ISDA contract, and thus Plaintiffs' contracts do not violate the ISDA.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director

/s/Rachel J. Hines
______________________________
RACHEL J. HINES (D.C. Bar #424774)
HANNAH Y.S. CHANOINE
Federal Programs Branch, Room 7314
Civil Division
P.O. Box 883
Washington, DC 20044
Telephone: (202) 514-5532
Facsimile: (202) 318-7604
E-mail: rachel.hines@usdoj.gov

Dated: April 20, 2008

Counsel for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TUNICA-BILOXI TRIBE OF LOUISIANA;
RAMAH NAVAJO SCHOOL BOARD, INC.,

Plaintiffs,

v.

UNITED STATES of AMERICA;
MICHAEL O. LEAVITT, Secretary of the
United States Department of Health and Human
Services; DIRK KEMPTHORNE, Secretary
of the United States Department of the Interior,

Defendants.

Case No. 02-2413 (RBW/DAR)

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**

Defendants, by and through undersigned counsel, hereby submit this Statement of Material Facts as required under Local Rule 7(h). For purposes of this Statement, the following abbreviations are used:

| | |
|---|---|
| RNSB | The Ramah Navajo School Board |
| Tunica | The Tunica-Biloxi Tribe of Louisiana |
| HHS | The Department of Health and Human Services |
| DOI | The Department of the Interior |
| IHS | The Indian Health Service within HHS |
| BIA | The Bureau of Indian Affairs within DOI |
| NBC | The National Business Center within DOI |
| ISDA | The Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450 et seq. |
| CDA | Contract Disputes Act |
| CSC | Contract support costs |
| AFA | The annual funding agreement component of an ISDA contract |

**STATEMENT OF MATERIAL FACTS**

*Jurisdictional CDA Presentment and Exhaustion of Administrative Remedies*

1. RNSB did not submit a CDA claim related to its 1997 contract or AFA. See Zuni Dec. ¶ 6.

2. RNSB did not submit a CDA claim related to its 1998 contract or AFA on the basis of the "carry-forward claim." See Ex. 28.

3. In its CDA claim letter of December 21, 2005, RNSB did not seek any additional CSC funding from IHS under its 1999-2003 contracts or AFAs on the basis of "the rate claim" or "the shortfall claim." See Ex. 29.

4. In its CDA claim letter of December 21, 2005, RNSB did not seek any additional CSC funding from IHS under its 2001 contract or AFA. See Ex. 29.

5. In its CDA claim letter of December 21, 2005, RNSB calculated that IHS overpaid CSC under its 2001 contract and AFA. See Ex. 29.

6. Tunica did not challenge its 1995-2001 indirect cost rates through DOI's appeals process. See Pls.' Resp. to Defs.' Req. for Admissions 10, 17, 20, 23 (Ex. 38 at 5-9); Moberly Dec. ¶ 46 (Ex. 3).

7. RNSB did not challenge its 1995-2003 indirect cost rates through DOI's appeals process. See Pls.' Resp. to Defs.' Req. for Admissions 10, 17, 20, 23 (Ex. 38 at 5-9); Moberly Dec. ¶ 46 (Ex. 3).

*IHS Performance Under Tunica's Contracts*

<u>1995</u>

8. IHS promised to pay Tunica $165,806 in indirect CSC funding in fiscal year 1995. See Ketcher Dec. ¶ 11 (Ex. 1).

9. IHS paid Tunica $165,806 in indirect CSC funding in fiscal year 1995. See Ketcher Dec. ¶ 11 (Ex. 1); Ex. 24 at 2.

10. IHS and Tunica agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which Tunica was eligible in 1995. See Ketcher Dec. ¶ 8 (Ex. 1).

11. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which Tunica was eligible in 1995. See Ketcher Dec. ¶ 32 (Ex. 1).

12. The amount of indirect costs that IHS provided Tunica in calendar year 1995 was in excess of IHS's proportional share of the actual indirect costs incurred by Tunica in calendar year 1995. See Moberly Dec. ¶ 58 (Ex. 3).

13. In 1995, IHS paid Tunica more than the amount generated by multiplying Tunica's 1995 direct cost base by Tunica's 1995 indirect cost rate. See Ketcher Dec. ¶¶ 37-38 (Ex. 1).

1996

14. IHS promised to pay Tunica $162,691 in indirect CSC funding in 1996. See Ketcher Dec. ¶ 14 (Ex. 1).

15. IHS paid Tunica $162,691 in indirect CSC funding in 1996. See Ketcher Dec. ¶ 14 (Ex. 1); Ex. 23 at 1.

16. IHS and Tunica agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which Tunica was eligible in 1996. See Ketcher Dec. ¶ 12 (Ex. 1).

17. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which Tunica was eligible in 1996. See Ketcher Dec. ¶ 32 (Ex. 1).

18. The amount of indirect costs that IHS provided to Tunica in calendar year 1996 was in excess of IHS's proportional share of the actual indirect costs incurred by Tunica in calendar year 1996. See Moberly Dec. ¶ 59 (Ex. 3).

19. In 1996, IHS paid Tunica more than the amount generated by multiplying Tunica's 1996 direct cost base by Tunica's 1996 indirect cost rate. See Ketcher Dec. ¶¶ 37-38 (Ex. 1).

1997

20. IHS promised to pay Tunica $163,016 in indirect CSC funding in 1997. See Ketcher Dec. ¶ 17 (Ex. 1).

21. IHS paid Tunica $163,016 in indirect CSC funding in 1997. See Ketcher Dec. ¶ 17 (Ex. 1); Ex. 23 at 2.

22. IHS and Tunica agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which Tunica was eligible in 1997. See Ketcher Dec. ¶ 15 (Ex. 1).

23. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which Tunica was eligible in 1997. See Ketcher Dec. ¶ 32 (Ex. 1).

24. The amount of indirect costs that IHS provided to Tunica in calendar year 1997 was in excess of IHS's proportional share of the actual indirect costs incurred by Tunica in calendar year 1997. See Moberly Dec. ¶ 60 (Ex. 3).

25. In 1997, IHS paid Tunica more than the amount generated by multiplying Tunica's 1997 direct cost base by Tunica's 1997 indirect cost rate. See Ketcher Dec. ¶¶ 37-38 (Ex. 1).

1998

26. IHS promised to pay Tunica $163,016 in indirect CSC funding in 1998. See Ketcher Dec. ¶ 19 (Ex. 1).

27. IHS paid Tunica $163,016 in indirect CSC funding in 1998. See Ketcher Dec. ¶ 19 (Ex. 1); Ex. 23 at 2.

28. IHS and Tunica agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which Tunica was eligible in 1998. See Ketcher Dec. ¶ 18 (Ex. 1).

29. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which Tunica was eligible in 1998. See Ketcher Dec. ¶ 32 (Ex. 1).

30. The amount of indirect costs that IHS provided to Tunica in calendar year 1998 was in excess of IHS's proportional share of the actual indirect costs incurred by Tunica in calendar year 1998. See Moberly Dec. ¶ 61 (Ex. 3).

31. In 1998, IHS paid Tunica more than the amount generated by multiplying Tunica's direct cost base by Tunica's 1998 indirect cost rate. See Ketcher Dec. ¶¶ 37-38 (Ex. 1).

1999

32. IHS promised to pay Tunica $176,273 in indirect CSC funding in 1999. See Ketcher Dec. ¶ 21 (Ex. 1).

33. IHS paid Tunica $176,273 in indirect CSC funding in 1999. See Ketcher Dec. ¶ 21 (Ex. 1); Ex. 23 at 2.

34. IHS and Tunica agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which Tunica was eligible in 1999. See Ketcher Dec. ¶ 20 (Ex. 1).

35. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which Tunica was eligible in 1999. See Ketcher Dec. ¶ 32 (Ex. 1).

36. The amount of indirect costs that IHS provided to Tunica in calendar year 1999 was in excess of IHS's proportional share of the actual indirect costs incurred by Tunica in calendar year 1999. See Moberly Dec. ¶ 62 (Ex. 3).

37. In 1999, IHS paid Tunica more than the amount generated by multiplying Tunica's 1999 direct cost base by Tunica's 1999 indirect cost rate. See Ketcher Dec. ¶¶ 37-38 (Ex. 1).

2000

38. IHS promised to pay Tunica $174,966 in indirect CSC funding in 2000. See Ketcher Dec. ¶ 26 (Ex. 1).

39. IHS paid Tunica $174,966 in indirect CSC funding in 2000. See Ketcher Dec. ¶ 26 (Ex. 1).

40. IHS and Tunica agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which Tunica was eligible in 2000. See Ketcher Dec. ¶ 23 (Ex. 1).

41. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which Tunica was eligible in 2000. See Ketcher Dec. ¶ 32 (Ex. 1).

42. The amount of indirect costs that IHS provided to Tunica in calendar year 2000 was in excess of IHS's proportional share of the actual indirect costs incurred by Tunica in calendar year 2000. See Moberly Dec. ¶ 63 (Ex. 3).

43. In 2000, IHS paid Tunica more than the amount generated by multiplying Tunica's 2000 direct cost base by Tunica's 2000 indirect cost rate. See Ketcher Dec. ¶¶ 37-38 (Ex. 1).

2001

44. IHS promised to pay Tunica $182,884 in indirect CSC funding in 2001. See Ketcher Dec. ¶ 27 (Ex. 1).

45. IHS paid Tunica $182,884 in indirect CSC funding in 2001. See Ketcher Dec. ¶ 27 (Ex. 1).

46. IHS and Tunica agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which Tunica was eligible in 2001. See Ketcher Dec. ¶ 27 (Ex. 1).

47. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which Tunica was eligible in 2001. See Ketcher Dec. ¶ 32 (Ex. 1).

48. The amount of indirect costs that IHS provided to Tunica in calendar year 2001 was in excess of IHS's proportional share of the actual indirect costs incurred by Tunica in calendar year 2001. See Moberly Dec. ¶ 64 (Ex. 3).

49. In 2001, IHS paid Tunica more than the amount generated by multiplying Tunica's 2001 direct cost base by Tunica's 2001 indirect cost rate. See Ketcher Dec. ¶¶ 37-38 (Ex. 1).

50. Tunica did not dispute any of its contracts or AFAs in 1995-2001 prior to execution such that the Secretary had to issue a declination. See Ketcher Dec. ¶ 29 (Ex. 1).

51. Tunica did not suspend any of its 1995-2001 contracts due to insufficient funding. See Ketcher Dec. ¶ 31 (Ex. 1).

*IHS Performance Under RNSB's Contracts*

1995

52. By May 1, 1995, the total amount that IHS promised to pay RNSB under RNSB's 1988 ISDA contract was $8,075,704. See Zuni Dec. ¶ 11 (Ex. 2).

53. By May 1, 1995, IHS had paid RNSB a total of $8,075,704 under RNSB's 1988 ISDA contract. See Zuni Dec. ¶ 12 (Ex. 2).

54. IHS promised to pay RNSB $328,505 in indirect CSC funding in 1995. See Zuni Dec. ¶ 15 (Ex. 2).

55. IHS paid RNSB $328,505 in indirect CSC funding in 1995. See Zuni Dec. ¶ 15 (Ex. 2); Ex. 26 at 2.

56. IHS and RNSB agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which RNSB was eligible in 1995. See Zuni Dec. ¶ 15 (Ex. 2).

57. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which RNSB was eligible in 1995. See Zuni Dec. ¶ 68 (Ex. 2).

58. The amount of indirect costs that IHS provided to RNSB in calendar year 1995 was in excess of IHS's proportional share of the actual indirect costs incurred by RNSB in calendar year 1995. See Moberly Dec. ¶ 66 (Ex. 3).

59. In 1995, IHS paid RNSB more than the amount generated by multiplying RNSB's 1995 direct cost base by RNSB's 1995 indirect cost rate. See Exs. 16, 18.

1996

60. IHS promised to pay RNSB $336,720 in indirect CSC funding in 1996. See Zuni Dec. ¶¶ 16-17 (Ex. 2).

61. IHS paid RNSB $336,720 in indirect CSC funding in 1996. See Zuni Dec. ¶ 18 (Ex. 2); Ex. 26 at 2.

62. IHS and RNSB agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which RNSB was eligible in 1996. See Zuni Dec. ¶ 17 (Ex. 2).

63. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which RNSB was eligible in 1996. See Zuni Dec. ¶ 68 (Ex. 2).

64. The amount of indirect costs that IHS provided to RNSB in calendar year 1996 was in excess of IHS's proportional share of the actual indirect costs incurred by RNSB in calendar year 1996. See Moberly Dec. ¶ 67 (Ex. 3).

65. In 1996, IHS paid RNSB more than the amount generated by multiplying RNSB's 1996 direct cost base by RNSB's 1996 indirect cost rate. See Exs. 17, 19,

1997

66. IHS promised to pay RNSB $370,895 in indirect CSC funding in 1997. See Zuni Dec. ¶¶ 19-24 (Ex. 2).

67. IHS paid RNSB $370,895 in indirect CSC funding in 1997. See Zuni Dec. ¶ 25 (Ex. 2).

68. IHS and RNSB agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which RNSB was eligible in 1997. See Zuni Dec. ¶ 22 (Ex. 2).

69. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which RNSB was eligible in 1997. See Zuni Dec. ¶ 68 (Ex. 2).

70. The amount of indirect costs that IHS provided to RNSB in calendar year 1997 was in excess of IHS's proportional share of the actual indirect costs incurred by RNSB in calendar year 1997. See Moberly Dec. ¶ 68 (Ex. 3).

71. In 1997, IHS paid RNSB more than the amount generated by multiplying RNSB's 1997 direct cost base by RNSB's 1997 indirect cost rate. See Exs. 18, 19.

<u>1998</u>

72. IHS promised to pay RNSB $478,228 in indirect CSC funding in 1998. <u>See</u> Zuni Dec. ¶¶ 26-31 (Ex. 2).

73. IHS paid RNSB $478,228 in indirect CSC funding in 1998. <u>See</u> Zuni Dec. ¶ 32 (Ex. 2).

74. IHS and RNSB agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which RNSB was eligible in 1998. <u>See</u> Zuni Dec. ¶ 27 (Ex. 2).

75. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which RNSB was eligible in 1998. <u>See</u> Zuni Dec. ¶ 68 (Ex. 2).

76. The amount of indirect costs that IHS provided to RNSB in calendar year 1998 was in excess of IHS's proportional share of the actual indirect costs incurred by RNSB in calendar year 1998. <u>See</u> Moberly Dec. ¶ 69 (Ex. 3).

77. In 1998, IHS paid RNSB more than the amount generated by multiplying RNSB's 1998 direct cost base by RNSB's 1998 indirect cost rate. <u>See</u> Ex. 19.

<u>1999</u>

78. IHS promised to pay RNSB $483,666 in indirect CSC funding in 1999. <u>See</u> Zuni Dec. ¶¶ 32-36 (Ex. 2).

79. IHS paid RNSB $483,666 in indirect CSC funding in 1999. <u>See</u> Zuni Dec. ¶ 37 (Ex. 2).

80. IHS and RNSB agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which RNSB was eligible in 1999. <u>See</u> Zuni Dec. ¶ 33 (Ex. 2).

81. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which RNSB was eligible in 1999. See Zuni Dec. ¶ 68 (Ex. 2).

82. The amount of indirect costs that IHS provided to RNSB in calendar year 1999 was in excess of IHS's proportional share of the actual indirect costs incurred by RNSB in calendar year 1999. See Moberly Dec. ¶ 70 (Ex. 3).

83. In 1999, IHS paid RNSB more than the amount generated by multiplying RNSB's 1999 direct cost base by RNSB's 1999 indirect cost rate. See Ex. 19.

2000

84. IHS promised to pay RNSB $500,063 in indirect CSC funding in 2000. See Zuni Dec. ¶¶ 38-44 (Ex. 2).

85. IHS paid RNSB $500,063 in indirect CSC funding in 2000. See Zuni Dec. ¶ 45 (Ex. 2).

86. IHS and RNSB agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which RNSB was eligible in 2000. See Zuni Dec. ¶ 41 (Ex. 2).

87. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which RNSB was eligible in 2000. See Zuni Dec. ¶ 68 (Ex. 2).

88. The amount of indirect costs that IHS provided to RNSB in calendar year 2000 was in excess of IHS's proportional share of the actual indirect costs incurred by RNSB in calendar year 2000. See Moberly Dec. ¶ 71 (Ex. 3).

89. In 2000, IHS paid RNSB more than the amount generated by multiplying RNSB's 2000 direct cost base by RNSB's 2000 indirect cost rate. See Ex. 19.

2001

90. IHS promised to pay RNSB $540,832 in indirect CSC funding in 2001. See Zuni Dec. ¶¶ 46-50 (Ex. 2).

91. IHS paid RNSB $540,832 in indirect CSC funding in 2001. See Zuni Dec. ¶ 51 (Ex. 2); Ex. 29.

92. IHS and RNSB agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which RNSB was eligible in 2001. See Zuni Dec. ¶ 47 (Ex. 2).

93. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which RNSB was eligible in 2001. See Zuni Dec. ¶ 68 (Ex. 2).

94. The amount of indirect costs that IHS provided to RNSB in calendar year 2001 was in excess of IHS's proportional share of the actual indirect costs incurred by RNSB in calendar year 2001. See Moberly Dec. ¶ 72 (Ex. 3).

95. In 2001, IHS paid RNSB more than the amount generated by multiplying RNSB's 2001 direct cost base by RNSB's 2001 indirect cost rate. See Exs. 19, 20.

2002

96. IHS promised to pay RNSB $417,815 in indirect CSC funding in 2002. See Zuni Dec. ¶¶ 52-55 (Ex. 2).

97. IHS paid RNSB $417,815 in indirect CSC funding in 2002. See Zuni Dec. ¶ 56 (Ex. 2); Ex. 29 at 4.

98. IHS and RNSB agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which RNSB was eligible in 2002. See Zuni Dec. ¶ 53 (Ex. 2).

99. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which RNSB was eligible in 2002. See Zuni Dec. ¶ 68 (Ex. 2).

100. The amount of indirect costs that IHS provided to RNSB in calendar year 2002 was in excess of IHS's proportional share of the actual indirect costs incurred by RNSB in calendar year 2002. See Moberly Dec. ¶ 73 (Ex. 3).

101. In 2002, IHS paid RNSB more than the amount generated by multiplying RNSB's 2002 direct cost base by RNSB's 2002 indirect cost rate. See Exs. 19, 21.

2003

102. IHS promised to pay RNSB $417,815 in indirect CSC funding in 2003. See Zuni Dec. ¶¶ 57-63 (Ex. 2).

103. IHS paid RNSB $417,815 in indirect CSC funding in 2003. See Zuni Dec. ¶ 64 (Ex. 2).

104. IHS and RNSB agreed to use an indirect cost rate negotiated with DOI to calculate the maximum amount of CSC for which RNSB was eligible in 2003. See Zuni Dec. ¶ 60 (Ex. 2).

105. IHS used an indirect cost rate negotiated with DOI in calculating the maximum amount of CSC for which RNSB was eligible in 2003. See Zuni Dec. ¶ 68 (Ex. 2).

106. The amount of indirect costs that IHS provided to RNSB in calendar year 2003 was in excess of IHS's proportional share of the actual indirect costs incurred by RNSB in calendar year 2003. See Moberly Dec. ¶ 74 (Ex. 3).

107. In 2003, IHS paid RNSB more than the amount generated by multiplying RNSB's 2003 direct cost base by RNSB's 2003 indirect cost rate. See Exs. 20, 22.

108. RNSB did not dispute any of its contracts or AFAs prior to execution such that the Secretary had to issue a declination. See Zuni Dec. ¶ 66 (Ex. 2).

109. RNSB did not suspend any of its 1995-2003 contracts due to insufficient funding. See Zuni Dec. ¶ 67 (Ex. 2).

*Obligation of Congressional CSC Appropriations*

110. For fiscal year 1998, OMB apportioned to IHS, in a one-year account, $161,242,000 for CSC for ongoing self-determination contracts and compacts. See Thompson Dec. ¶ 7 (Ex. 4).

111 IHS obligated $161,225,431 by the close of fiscal year 1998, leaving an unobligated balance of $16,569. See Thompson Dec. ¶ 8 (Ex. 4).

112. These 1998 funds were statutorily withdrawn in September 2003. See Thompson Dec. ¶ 8 (Ex. 4).

113. For fiscal year 1999, OMB apportioned to IHS, in a one-year account, $203,781,000 for CSC for ongoing self-determination contracts and compacts. See Thompson Dec. ¶ 9 (Ex. 4).

114. IHS obligated $203,781,000 by the close of the fiscal year, leaving an unobligated balance of $0. See Thompson Dec. ¶ 10 (Ex. 4).

115. These 1999 funds were statutorily withdrawn in September 2004. See Thompson Dec. ¶ 10 (Ex. 4).

116. For fiscal year 2000, OMB apportioned to IHS, in a one-year account, $228,781,000 for CSC for ongoing self-determination contracts and compacts. See Thompson Dec. ¶ 11 (Ex. 4).

117. IHS obligated $228,700,203 by the close of fiscal year 2000, leaving an unobligated balance of $80,797. See Thompson Dec. ¶ 12 (Ex. 4).

118. These 2000 funds were statutorily withdrawn in September 2005. See Thompson Dec. ¶ 12 (Ex. 4).

119. For fiscal year 2001, OMB apportioned to IHS, in a one-year account, $248,233,682 for CSC for ongoing self-determination contracts and compacts. See Thompson Dec. ¶ 13 (Ex. 4).

120. IHS obligated $248,230,585 by the close of fiscal year 2001, leaving an unobligated balance of $3,097. See Thompson Dec. ¶ 14 (Ex. 4).

121. These 2001 funds were statutorily withdrawn in September 2006. See Thompson Dec. ¶ 14 (Ex. 4).

122. For fiscal year 2002, OMB apportioned to IHS, in a one-year account, $268,234,000 for CSC for ongoing self-determination contracts and compacts. See Thompson Dec. ¶ 15 (Ex. 4).

123. IHS obligated $268,234,000 by the close of fiscal year 2002, leaving an unobligated balance of $0. See Thompson Dec. ¶ 16 (Ex. 4).

124. These 2002 funds were statutorily withdrawn in September 2007. See Thompson Dec. ¶ 16 (Ex. 4).

125. For fiscal year 2003, OMB apportioned to IHS, in a one-year account, $268,974,229 for CSC for ongoing self-determination contracts and compacts. See Thompson Dec. ¶ 17 (Ex. 4).

126. IHS obligated $268,974,228 by the close of fiscal year 2003, leaving an unobligated balance of $1. See Thompson Dec. ¶ 18 (Ex. 4).

127. These 2003 funds will be statutorily withdrawn in September 2008. See Thompson Dec. ¶ 18 (Ex. 4).

*Indirect Costs Are Not Fixed*

128. Tunica's indirect cost pool is not fixed. See Wilkins Rep. at 15 (Ex. 5).

129. RNSB's indirect cost pool is not fixed. See Wilkins Rep. at 15 (Ex. 5).

130. For 1995-2003, IHS programs comprised an average of only 19.26% of RNSB's direct cost base. See Moberly Dec. ¶ 54 (Ex. 3).

131. For 1995-2001, IHS programs comprised an average of only 17.6% of Tunica's direct cost base. See Moberly Dec. ¶ 54 (Ex. 3).

*Agencies Other than IHS Pay Indirect Costs*

132. Many non-IHS agencies provide indirect cost funding. See Moberly Dec. ¶ 78 (Ex. 3).

133. RNSB recovered indirect costs from non-IHS programs in 1995-2003. See Moberly Dec. ¶ 79 (Ex. 3); Exs. 16-22.

134. Tunica recovered indirect costs from non-IHS programs in 1995-2001. See Exs. 13-15.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director

/s/Rachel J. Hines

______________________________
RACHEL J. HINES (D.C. Bar #424774)

HANNAH Y.S. CHANOINE
Federal Programs Branch, Room 7314
Civil Division
Mailing Address
P.O. Box 883
Washington, DC 20044
Delivery Address
20 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 514-5532
Facsimile: (202) 318-7604
E-mail: rachel.hines@usdoj.gov
Email: hannah.chanoine@usdoj.gov

Dated: April 20, 2008

Counsel for Defendants